## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Shannon Miller,<br>Jen Banford, and<br>Annette Wiles, | Case No. |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| The Board of Regents of the<br>University of Minnesota, | |
| Defendant. | |

For their Complaint against Defendant The Board of Regents of the University of Minnesota, Plaintiffs Shannon Miller ("Miller"), Jen Banford ("Banford"), and Annette Wiles ("Wiles") state as follows:

### JURISDICTION AND VENUE

1.     The Board of Regents of the University of Minnesota is a Minnesota nonprofit corporation located at 516 15th Avenue SE, in Hennepin County, State of Minnesota.

2.     Shannon Miller is a California resident and the former women's hockey coach at the University of Minnesota-Duluth.

3.     Jen Banford is a California resident and the former women's softball coach and director of operations for the women's hockey program at the University of Minnesota-Duluth.

4.     Annette Wiles is a Kansas resident and the former women's basketball coach at the University of Minnesota-Duluth.

5.     This action is properly in this judicial district because the unlawful employment practices were committed in this district, the employment records relevant to such practice are maintained and administered in this district, Plaintiffs would have worked in this district but for the alleged unlawful employment practices, and Defendant Board of Regents of the University of Minnesota has its principal office in this district.

6.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this is an action to recover damages or secure equitable or other relief under Acts of Congress providing for the protection of civil rights, including Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and further is a civil action arising under federal law, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

7.     This Court has supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' civil rights claims, over which this Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution, and judicial economy, convenience, and fairness to the parties named herein will result through this Court's exercise of supplemental jurisdiction over those claims.

## FACTUAL ALLEGATIONS

8.     The Board of Regents of the University of Minnesota is the governing body of the University of Minnesota—including without limitation the governing body for the University of Minnesota-Duluth (the "University")—and consists of twelve members elected pursuant to Minnesota Statutes § 137.0246.

9.     Pursuant to Minnesota Statutes § 137.021, the Board of Regents of the University of Minnesota is the state agency empowered to accept federal funding on behalf of the University of Minnesota, including without limitation on behalf of the University of Minnesota-Duluth.  Because it is the governing body for the University, the Board of Regents of the University of Minnesota is liable for the University's conduct at issue in this lawsuit.

### SHANNON MILLER

10.     Shannon Miller is a woman from Canada, is 51 years old, and identifies as gay.  Miller is the most successful women's hockey coach in NCAA history, as measured by winning five NCAA Division I national championships and eleven Frozen Four tournaments.  She was the University of Minnesota-Duluth's head women's hockey coach before the University unexpectedly non-renewed her coaching contract on December 9, 2014.

11.     Born on November 17, 1963 in Melfort, Saskatchewan, Miller became a United States citizen on May 2, 2012 and holds dual Canadian/American citizenship.

12.     As a hockey player, Miller played in the first ever Canadian national championships in 1982.  Miller was also a member of the Canadian Hockey Feminine Council and President of the Southern Alberta Women's Hockey League.

13.     Miller was the head coach for the Canadian national women's hockey team, claiming the silver medal in ice hockey at the 1998 Winter Olympics in Nagano, Japan and winning the gold medal at the 1997 International Ice Hockey Federation World Women's Championships.  Miller was also the assistant coach for Team Alberta at the

1991 Canada Winter Games, winning a gold medal, and an assistant coach for Team Canada at the 1992 and 1994 Women's World Ice Hockey Championships, also winning gold. She served as a coaching mentor for the Russian senior national team during its preparation for the 2014 Winter Olympics in Sochi, Russia.

14.     Minnesota-Duluth did not have a Division I Women's Ice Hockey program before it hired Miller. Because of Miller's international reputation, she was hired as the program's first head coach on April 20, 1998. Over the next 16 years Miller devoted herself to building the women's ice hockey program into the national powerhouse it is today.

15.     Miller is an extremely successful and experienced hockey coach. According to statistics compiled by U.S. College Hockey Online, during Miller's 16 seasons at the University, totaling 577 games, Miller amassed a winning percentage of .707. In doing so, Miller reached her 250th and 300th career wins faster than any other head coach in NCAA Division I women's hockey history. Miller currently has the fourth most wins among active Division I women's hockey coaches, has the 11th highest winning percentage among active coaches, and has finished only one season with a losing record. She has trained 26 Olympians.

16.     For her successes, Miller was named the 2000 WCHA Coach of the Year, the 2003 AHCA Coach of the Year, Miller's entire coaching staff was collectively named the American Association of College Coaches' Women's Hockey Coaching Staff of the Year in 2003, and in 2010 Miller was awarded the YWCA's Woman of Distinction award celebrating women's leadership. Miller was also chair of the Ethics Committee for

U.S. Women's College Hockey and served two terms on the NCAA Division I Championship Committee.

17.     In recognition of Miller's accomplishments, the mayor of Duluth designated March 26, 2010 as "Shannon Miller Day."

18.     On April 25, 2013, Minnesota-Duluth named Josh Berlo ("Berlo") as its new Intercollegiate Athletic Director.

19.     On December 9, 2014, Miller was summoned to a meeting with Berlo and Chancellor Lendley C. Black.  At the time of this meeting, Miller's Minnesota-Duluth team had won 12 out of its previous 13 games and held a Pairwise Ranking of Number six in the nation.

20.     At that December 9 meeting, Berlo and Black informed Miller that her contract—and the contracts of her entire coaching staff, consisting of three women, all of whom are Canadian citizens and identify as gay, lesbian, bisexual, or transgender (GLBT)—would not be renewed, effective June 30, 2015.

21.     Berlo and Black told Miller that the decision was "strictly financial" and that the University simply could not afford to pay Miller's salary.

22.     Berlo requested that Miller retire or resign.  Miller is 51 years old.  Miller refused to retire or resign.

23.     Over the course of her employment at the University, however, Miller had previously taken pay cuts in order to assist the University's financial needs.  For example, in the spring of 2010, during a challenging fiscal time for the University, Miller was

asked to take a voluntary salary "roll back" along with other University employees. Miller willingly did so.

24.     Relating to the University's most recent alleged financial concerns, Miller was willing and ready to take a pay cut, but was never approached or asked to take a pay cut before the December 9 meeting.

25.     Prior to the December 9 meeting, Miller was not provided with any indication that her contract would not be renewed, for financial reasons or otherwise.  In fact, as recently as July of 2014, both Berlo and Black had told Miller that they would continue to discuss the renewal of her coaching contract and that the lines of communication would be kept open.

26.     Furthermore, in the year leading up to Miller's termination notice, no factors or other concerns were brought to Miller's attention regarding her performance as women's hockey coach, including without limitation Miller's recruiting and recent record against the University of Minnesota-Duluth's rivals.

27.     On December 11, 2014, Berlo called Miller, again stating her options were to retire or resign.  Miller replied that she preferred to tell the truth, that Minnesota-Duluth was not renewing her contract and was wiping out the entire Women's Hockey staff.

28.     On December 15, 2014, Minnesota-Duluth issued a press release announcing Miller's termination as a "financially driven decision."

29.     Despite the fact that Miller was the most successful coach at the University of Minnesota-Duluth, a pay disparity existed between Miller and other similarly-situated coaches at the University who are male, straight, American, and/or under 40 years of age.

30.     For example, the current men's hockey coach at the University of Minnesota-Duluth, Scott Sandelin, earns a base salary of at least $300,241, which is at least $93,241 more per year than Miller was paid.   Despite earning more than Miller, Sandelin's career winning percentage is only .506, and he has won only one national championship.

31.     However, despite the University's alleged financial troubles, Sandelin was not terminated and, on information and belief, his salary was not decreased.

32.     Sandelin is male, heterosexual, and was born in the United States.

33.     Similarly, the men's football coach at the University of Minnesota-Duluth, Curt Wiese, had his contract extended during the time Miller was having the above-described discussions with Berlo and Black.

34.     However, despite the University's alleged financial troubles, Wiese was not terminated and, on information and belief, his salary was not decreased.

35.     Wiese is male, heterosexual, is from the United States, and on information and belief, is under 40 years old.

36.     During her employment Miller repeatedly raised issues to former athletic director Bob Nielson and current director Berlo regarding the lack of funding and services for the Women's Hockey team compared to the men's team, including:

a) Miller was told the recruiting budget for the men's team is unlimited.  The women's hockey recruiting budget for 2014-15 was only $26,000.

b) The men's hockey team has a full-time director of operations.  The women's team only had a part-time director of operations.

c) The men's team had a full-time equipment manager and a full-time strength coach who had minor duties with baseball.  The women's team only had one coach who served as both the equipment manager and strength coach, as well as additional duties with basketball.

d) The men's hockey team received two meals on weekends.  The women's team only received one meal.

e) The men's team received funding to pay students for the May term and summer school.  The women's team was not provided any funds for the May term or summer school.

37.   During her tenure as the head women's hockey coach, Miller regularly experienced hostility toward Canadians by University officials.  For example, Athletic Director Berlo frequently remarked that "there are too many Canadians around here."

38.   Additionally, the University has treated the University of Minnesota-Duluth women's hockey team in a disparate manner compared to the University's men's hockey team.  The women's hockey program has been given far less funding and support than the men's hockey team, is discriminated against when making financial and budgetary

8

decisions, and the women's hockey program staff is treated differently than the men's hockey program staff by University officials.

39.     According to information from the U.S. Department of Education's Equity in Athletics Data Analysis database, the operating expenses for the University's men's ice hockey team exceeds those for the women's ice hockey team by $273,590, despite only three more participants on the men's ice hockey team.

40.     Relating to the disparate funding issues, Miller repeatedly raised this issue to the attention of the University.  Miller also made many informal and formal complaints to, among others, the Athletic Director, the Vice Chancellor, the Chancellor, and the Human Resources director regarding discrimination and disparate treatment at the University.  For doing so, Miller was discriminated against and harassed, was subjected to being called derogatory terms, received less support than male, straight, American, and younger head coaches, and suffered hostility and anger from her co-workers and supervisors.

41.     As one example, in the summer of 2006, Miller and Plaintiff Jen Banford were humiliated when they were intentionally excluded from participating in an athletics department and community golf tournament and were left standing in a parking lot.

42.     The following day, Miller spoke with Nielson, who refused to talk with her about what had occurred the previous day.

43.     Banford also complained about the events to Nielson and received no follow-up or apology.

44.     On April 30, 2010, Miller began receiving harassing mail in her work mail box.  On several occasions from 2010 to 2011, Miller reported complaints to the Human Resources department, including Human Resources Director Judith Karon.  For example, when Miller began receiving hate mail, such as several pieces of mail calling Miller a "dyke" and suggesting that she "go" home, emails saying "goodbye" and "the end," and mail containing clippings from newspapers showing the disparity between attendance at women's hockey games versus men's hockey games and with Miller's salary handwritten on them, she reported these despicable acts to Karon.  No remedial action was taken by Karon or the University.

45.     Miller also complained to the Human Resources department when an unknown individual from the department removed Miller's mail from her department mailbox.  The Human Resources department told Miller that locks would be placed on her mailbox.  However, no locks were installed as promised.  Subsequently, after Miller complained to Karon, she was told that her mail would be delivered to DECC/Amsoil Arena, where Miller's office is located. However, the mail was not diverted as promised.

46.     By March 9, 2011, four harassing mail incidents against Miller had taken place.  Miller informed Human Resources of each of these incidents and also informed the Athletic Director (Nielson), Vice Chancellor Bill Wade, and Chancellor Black.  No remedial action was taken by any of these individuals, or by the University.

47.     During Miller's in-person visits with Karon from 2010 through 2011, Miller shared her concerns regarding a male co-worker who referred to her as a "dyke"

10

and who told several co-workers that he would be the one to bring Miller down.  Karon and the University took no remedial action.

48.     On or about October 3, 2011, Miller sent a formal complaint to Chancellor Black, copying Karon, regarding the climate in the athletic department, its effect on Miller, and the inaction by Athletic Director Neilson and Vice Chancellor Wade over several years.  After sending that complaint, Miller again met with Karon, who talked about opening a potential investigation.  Miller made very clear that she did not want a "formal investigation," stating that things would only get worse for her.

49.     Despite Miller's clear wishes and stated desire to avoid further harassment and discrimination, Karon and Human Resources initiated a formal investigation without notifying Miller.  Miller only found out about the investigation when she received a phone call from an employee at the University of Minnesota's Twin Cities campus, and later an email from the Department of Human Resources and Equal Opportunity at the Twin Cities campus ("OEO") with the investigation "results."

50.     In the spring of 2012, Miller communicated with the University's GLBT Director, Angie Nichols, concerning the intolerant climate in the athletic department, Miller's frequent complaints, and the inaction by the University.  Miller also communicated that the environment at the University had, in fact, gotten worse.

51.     On information and belief, Nichols advised Chancellor Black of the climate in the athletic department and strongly encouraged him to step in and create change.

52.     On February 20, 2015, 13 Minnesota State Senators sent a letter to Eric Kaler, President of the University of Minnesota, and Chancellor Black.  The senators

11

questioned the University's reasons for terminating Miller and Banford and requested further information.  The letter noted that despite the University's apparent financial reasons for the decision, the University retained the men's hockey coach who earns more than Miller.  The senators also reminded the University of its responsibility to uphold state and federal laws that prohibit sex-based discrimination, warning that Title IX violations could have serious consequences for the Minnesota higher education system.

53.     On February 24, 2015, Chancellor Black responded via letter to Senator Katie Sieben, stating for the first time that other factors in addition to financial reasons supported the decision to non-renew Miller's coaching contract.

54.     On information and belief, Chancellor Black's statement that "[t]he decision not to extend Coach Miller's contract had nothing to do with gender or sexual orientation" is false.  On the contrary, Miller's contract as the head coach of the women's hockey team at the University was non-renewed because she is an openly gay woman, from Canada, and/or is over 40 years old.  Furthermore, any other reasons provided by the University are mere pretext with the intended effect of obscuring the University's discriminatory intent.

**JEN BANFORD**

55.     Jen Banford is a woman from Canada, is 34 years old, and identifies as gay.  Banford was also the highly accomplished head women's softball coach and served as the director of operations for the University of Minnesota-Duluth's women's hockey program before the University unexpectedly non-renewed both of her contracts on December 11, 2014.

56.     Banford was hired by the University in 2005 in a dual role as the women's head softball coach and the director of women's hockey operations.  She served as the head softball coach for 10 years.

57.     Per Banford's contract, her role as the director of women's hockey operations position—a part-time position—constituted 25% of Banford's duties. Banford's duties as head softball coach, however, were full-time.

58.     Over ten seasons as the women's softball coach, Banford amassed an overall record of 332-169 (a .639 winning percentage), guided her team to four NCAA II Central Region berths and one Northern Sun Intercollegiate Conference regular season title, and was named the Northern Sun Intercollegiate Conference Coach of the Year in 2013 for her accomplishments.

59.     On December 11, 2014, only two days after the University's notice to Miller that her coaching contract would not be renewed, Banford received an email from the University's Assistant Athletic Director, Jay Finnerty, attaching a letter from Athletic Director Berlo which provided notice that Banford's contracts as head softball coach and part-time director of women's hockey operations would not be renewed, concluding "[t]hank you for your services and my best wishes on your endeavors."

60.     Neither Jay Finnerty, who was Banford's supervisor, nor Associate Athletic Director Karen Stromme, nor Josh Berlo ever called Banford to notify her that she would be receiving a non-renewal letter for either the head softball coach position or the director of hockey operations position.

61.     Due to Banford's position as the Director of Operations for Women's Hockey, the media attention engulfing the University in the wake of its sudden and suspicious termination of Shannon Miller, and Banford's outspoken support of Miller, Banford became the target of significant hostility in the athletics department immediately after Miller's termination.

62.     The day after receiving her non-renewal letter, Banford called Associate Athletic Director Karen Stromme and then called Berlo.  During Banford's call with Berlo, he did not raise the issue of the non-renewal letter until Banford broached the subject.  During that conversation, Berlo referred to Shannon Miller as one of Banford's supervisors despite Miller never being Banford's supervisor.

63.     At no time during that conversation did Berlo inform Banford that she would be retained as head women's softball coach, or even that she would be offered another contract in that role.

64.     On December 16, 2014, while Banford was coaching at a camp for Team Canada, Associate Athletic Director Stromme met with the players on the women's softball team and informed them that Banford was let go only from her position as director of hockey operations.  This statement was false and caused embarrassment and humiliation to Banford.

65.      On December 17, 2014, Banford requested a meeting with Assistant Athletic Director Finnerty and Athletic Director Berlo regarding her future with the University.  Although Banford called Finnerty and Berlo personally, neither returned Banford's call to set up a meeting or extend a contract offer.

14

66.     On January 16, 2015, Banford attended a women's hockey budget meeting. During a discussion about salary augmentations improperly included in the women's hockey budget, it was mentioned that UMD would be renewing Banford's head softball coaching contract at $28,000 rather than $38,000.  Assistant Athletic Director Finnerty interrupted, stating "[w]e didn't invite her, we have yet to present her with a renewal letter."

67.     From the date when Banford was notified that she would be terminated, December 11, 2014, until approximately January 16, 2015, no individual met with, or offered to meet with Banford on behalf of the University in order to discuss her future there, and no public statement was made that she would be retained as the head softball coach.

68.     During that time period, the administrative employees at the University began treating Banford differently—in a rude and threatening manner.  This conduct made it clear to Banford that the University did not want her to return.

69.     In early-January, Banford met with the University's Director of Human Resources, Linda Kinnear.  During that conversation, Kinnear confirmed that according to the paperwork, Banford would no longer remain with the University after June 14, 2015, in either her capacity as the softball head coach or the director of hockey operations.  To that end, Kinnear informed Banford that Berlo had not filed any additional paperwork with the University regarding Banford, including, without limitation, any renewal offer for her head softball coach position.

15

70.     On January 18, 2015, ESPNw, a division of ESPN directed at female fans and women's sports issues, broke the national story regarding Banford's termination as Minnesota-Duluth's head softball coach.  In that story, Berlo told the ESPNw reporter that Banford's belief that she would not be retained as head softball coach was mistaken and that the University was working to keep Banford as the head softball coach, that Banford "is our softball coach," and that she "was only notified relative to the position of women's hockey."

71.     These statements were false and directly contradicted Berlo's December 11 letter to Banford, which plainly stated that Banford's "appointment as the Director of Hockey Operations/Head Softball Coach 38154, 12 months (A), Annual Renewal Appointment, 100% will end on June 14, 2015."   On information and belief, the University reversed course and decided to attempt to retain Banford after negative publicity arising from Shannon Miller's non-renewal.

72.     As of the date of Berlo's statement to ESPNw, Banford had not spoken with Berlo in six weeks, and had not been presented with any offer for a renewal of her coaching contract.

73.     On January 27, 2015, Berlo sent another letter to Banford, this time providing Banford—who had already been notified that her contract would not be renewed—with an offer of appointment for a head softball coach position, but at a lower salary.

74. Berlo's January 27 letter did not, however, address the outright discrimination and harassment against Banford, and the disparate treatment of her programs, on the basis of her sex, sexual orientation, and national origin.

75. After the summer 2006 incident in which Banford and Miller were excluded from a University golfing event, in the spring of 2007 Banford was again excluded from a fundraising event held in Proctor, Minnesota. As the women's head softball coach, Banford submitted her name and timely paid for the event, but was told when she arrived that there was no place for her to sit.

76. On April 30, 2010, Banford and Miller received harassing mail in their respective mailboxes. Banford was the primary witness to this incident because she would frequently gather Miller's mail and transport it to Amsoil Arena as part of her duties as director of hockey operations. Although Banford reported these incidents to Athletic Director Nielson, Human Resources Director Karon, and Vice Chancellor Wade, no action was taken to determine who placed the harassing mail in the mailboxes, nor was any remedial action taken to prevent future incidents.

77. Banford also experienced disparate treatment regarding the equipment used by the softball team. In November of 2014, Assistant Athletic Director Jay Finnerty informed Banford that he would not release equipment that the softball team purchased with its own fundraising budget. Instead, Finnerty told Banford's assistant coach that he was holding it "hostage." Plaintiffs are not aware of any other program at the University, other than women's softball and women's hockey, that had its equipment withheld to the detriment of the student-athletes.

78.     This "hostage" holding occurred again in or about January of 2015, when Finnerty refused to release equipment to the women's hockey equipment manager and refused to put in additional equipment orders.   Finnerty only relented when Miller confronted him several weeks after the University had received the equipment.

79.     Banford would also regularly raise complaints to Berlo that the women's softball and hockey budgets do not reflect what has been promised to them.   Berlo's response to these complaints was that it did not matter what "pot" the funding came from, but Berlo's belief is inaccurate and represents a fundamental misunderstanding of how the University's budgets operate.

80.     In the University's 2013-2014 official report submitted pursuant to the Equity in Athletics Disclosure Act by Athletic Director Berlo and the Compliance Coordinator, Abbey Strong, Banford was listed as a part-time softball coach.

81.     The University's baseball coach, Bob Reints, who is male and, on information and belief, is not gay, had 25% duties with the football team similar to Banford's duties with the hockey team, but Reints was listed as a full-time coach rather than a part-time coach.

82.     Furthermore, as a result of the additional public scrutiny caused by Berlo's false statements, the hostility that Banford experienced within the athletics department escalated significantly.   A few examples include incidents of supervisory staff threats against Banford such as "I would punch her" due to the ESPNw article; a failure of supervisory staff to work with Banford to effectuate necessary policy regarding field use; intentional undermining of Banford with her players; and the creation of an anonymous

Twitter account, followed by various men's hockey players, the men's hockey equipment manager, and the official UMD hockey Twitter account run by a male Assistant Athletic Director, which was used to defame Banford and Miller.  Other incidents include outright hostility and coldness from department staff.

83.     On multiple occasions from January 2015 on, Finnerty refused to respond to Banford's budget questions in a timely manner, interfering with decision-making for the women's hockey program during its competitive season.  Finnerty also delayed Banford's reimbursement money for submitted expense reports, as well as for her assistant softball coach.

84.     Furthermore, Finnerty attempted to isolate Banford and turn others in the athletic department against her regarding the usage of the Malosky Stadium field.  Rather than allow the coaches to work together regarding field usage, Finnerty insisted that he would meet with coaches one-on-one.  However, Finnerty, on information and belief, informed the football, track, and soccer coaches during those one-on-one meetings that Banford was the reason they could not use the fields for practice, despite Finnerty telling Banford that the softball team would receive priority because it was in its championship season and needed to schedule conference games.  The field issue became a near-daily problem due to the need to balance student-athletes' attendance requirements, visiting teams' travel abilities, and umpires.  Finnerty's interference caused field issues to be significantly more difficult in the 2014-2015 season than in prior years.

85.     Banford was also advised that softball would not be given priority by the University.  Although the softball team was in its championship season, it was made clear

to Banford that her student-athletes would need to miss classes for rescheduled home games so that the football, women's soccer, and track teams did not have their practice slots displaced.

86.     Banford was also subjected to frequent discrimination on the basis of her national origin.   On several occasions, Banford attended meetings where Athletic Director Berlo made remarks such as "I've never seen so many damn Canadians," "there are too many Canadians around here," or similar derogatory remarks about Banford's and Miller's national origin.

87.     Banford also experienced numerous instances of disparate treatment by Berlo, Finnerty, and other athletic department administrators on the basis of her sex, national origin, and sexual orientation, as well as in retaliation for her outspoken support for equal access and funds for women athletes in the hockey and softball programs at the University under Title IX.

88.     Based upon the above-described discrimination, harassment, and disparate treatment of Banford—which represent only a portion of the hostility that she suffered while employed at the University—Banford determined that she could not accept the University's belated offer to retain her at a lower salary.   Accordingly, by letter dated February 9, 2015, Banford informed the University that in light of the discrimination against her, the disparate treatment, and the hostile work environment as a result of Berlo's leadership and the publicity surrounding the University's termination of the entire women's hockey staff, she would not accept the University's belated attempt to obscure

or rescind its earlier decision to terminate her.  Banford agreed to remain as the head softball coach through June 15, 2015, the end of her contract term.

89.   Just over two weeks after Banford informed the University that she could not accept its offer based on the discriminatory treatment she received while employed there, Chancellor Black claimed in his response letter to Senator Sieben regarding the suspicious terminations of Miller and Banford, that the University "always intended to retain Coach Banford as Head Softball Coach."  This statement is false.

90.   Chancellor Black also stated that "[i]t is standard University practice to provide notices of non-renewal to a departing Head Coach's staff to allow a new Coach to select her or his own staff."  However, Black did not provide notices of non-renewal at least two other full-time staff members who were hired by Shannon Miller, both of whom are American citizens.

91.   On information and belief, the University decided to non-renew Banford's contracts as its head softball coach and the director of hockey operations because she supported Miller and the women's hockey program and/or because she is an openly gay, Canadian woman, and advocated for gender equity in UMD athletics programs. Furthermore, any other reasons provided by the University are mere pretext with the intended effect of obscuring the University's discriminatory intent.

**ANNETTE WILES**

92.   Annette Wiles is a woman, is 46 years old, and identifies as gay.  Wiles was also the highly-successful and well-regarded head women's basketball coach for the

21

University of Minnesota-Duluth before she was forced to resign on June 1, 2015 due to the hostile and discriminatory environment created by the University.

93.     Wiles was hired in May of 2008 as the University's head women's basketball coach.

94.     Wiles was a stand-out basketball player before joining the coaching ranks. A two-time All-American in college, Wiles led Fort Hays State University in Kansas to the 1991 NAIA national championship and was named NAIA National Tournament MVP for her role in that run.  Wiles finished her playing career as the best player in Fort Hays women's basketball history, and remains today the top scorer (by over 600 total points) and rebounder (by 60 rebounds) in the history of the Fort Hays women's program.  Wiles is a member of the Tiger Sports Hall of Fame and the Rocky Mountain Athletic Conference Hall of Fame.

95.     Before accepting the head women's basketball coaching position at Minnesota-Duluth, Wiles was the head coach at Bethany College in Kansas for seven years, and then served as the head coach at Fort Hays, her alma mater, for eight seasons. Over that period, Wiles amassed an overall record of 300-141. Wiles' winning percentage of .680 ranked her 17th in winning percentage among active Division II women's basketball coaches.  She led Fort Hays to its first ever national tournament appearance during the 2004-2005 season and Bethany College to seven consecutive 20-plus win seasons.  Wiles also had 25 Academic All-Americans in only seven years at Bethany College.

96.     In seven seasons with Minnesota-Duluth, Wiles compiled a 109-86 record and won her 400th career game during the 2014-2015 season. She guided her team into the postseason in each of the previous five seasons before her resignation and to the NCAA Division II playoffs twice.  Wiles also produced nine All-NSIC selections, one NSIC Player of the Year, one NSIC Freshman of the Year, and two NSIC Defensive Players of the Year.  Furthermore, 33 players under Wiles have attained NSIC All-Academic Team honors, and the team has collectively compiled a grade point average of 3.41 during that five-year stretch.  During Wiles' tenure, the women's basketball team had a 100% graduation rate and had the highest team GPA of any sports team at Minnesota-Duluth in six out of the seven years in which Wiles was the coach.

97.     Since accepting employment with the University in 2008, Wiles has been subjected to discrimination and disparate treatment on the basis of her sexual orientation and gender.  In particular, Berlo and Abby Strong established a pattern of disrespect, exclusion, and lack of civility in their interactions with Wiles, setting a tone that was destructive of Wiles' credibility with her players and her track record as a coach and a leader and causing substantial injury to Wiles.

98.     In Wiles' 22 years as a collegiate head women's basketball coach, she had never previously experienced the discrimination, hostility, and utter lack of professionalism exhibited by the University.

99.     Berlo's hostility to Wiles began not long after he was hired as the University's Athletic Director in 2013.  Initially he was polite to Wiles, but suddenly changed his demeanor after an incident in October of 2013.

23

100. Wiles was the keynote speaker for the GLBT National Coming Out Day luncheon on Minnesota-Duluth's campus in October of 2013. This event is a well-attended and highly visible event on campus. Wiles planned to come out publicly as a lesbian.

101. Wiles informed Berlo of her plans and asked if he would like to attend the event with her. When asked to attend, Berlo responded that he would be "out of town that day."

102. However, on the day of the event, Wiles passed Berlo's office and noticed that he was sitting at his desk. Once again, Wiles invited Berlo to attend and informed him that she had an extra seat at her table and that he was welcome to join her. This time, Berlo responded that he was "not available for that event."

103. A few days after that event, Wiles was in the Athletic Department workroom along with Berlo. At that time, Berlo asked Wiles, "Did you give it a lot of thought before you decided to speak?" Wiles understood Berlo's remark to mean he was questioning Wiles' wisdom in deciding to speak at the luncheon because it would negatively affect her career.

104. Following that event, Berlo and Assistant Athletic Director Strong began to act in a cold and hostile manner towards Wiles. Although Wiles was well-liked and generally well-regarded at Minnesota-Duluth before the event, after the event she began to be shunned and excluded. Berlo ceased saying hello to Wiles or even acknowledging her existence when they crossed paths at work. Similarly, Wiles' interactions with Strong became a nasty experience, leaving Wiles feeling unwelcome.

24

105.    By May of 2014, Wiles began to experience the same hostile and cold treatment from other individuals in the athletics department.   Despite many years of successful relationships, Wiles began to be shunned, excluded, and disrespected.   On information and belief, this hostile culture formed as a reflection of Berlo's and Strong's conduct toward Wiles after October 2013.

106.    On several occasions, Wiles was treated in a manner different from other coaches.   The following instances of disparate treatment, discrimination, and hostility toward Wiles are examples and are not an exhaustive list of every such instance.

107.    For nearly 12 months after the October 2013 incident, Berlo rarely spoke to Wiles, even to say "hello" or respond to a "hello" from Wiles.   The only time that Berlo would acknowledge Wiles' presence was when they were both in front of others.

108.    Berlo purposely excluded Wiles from department meetings, creating the appearance that she simply did not show up.   When Wiles would ask why she was excluded, Berlo would respond that she was not needed.

109.    Berlo routinely rescheduled meetings with Wiles.   Wiles interpreted this conduct as an intentional act of disrespect to her.

110.    After the 2014 women's basketball season, a non-approved and invalid survey was provided to Wiles' players, and the results of that survey were used to impact her merit raise.   Wiles was never provided a hard copy of the questions, or provided a copy of the results in any form.

111.    Also relating to Wiles' 2014 review, although her program met every element of the standards for a greater raise, Wiles was given a 1% merit increase,

whereas on information and belief every male, straight, and/or under 40 University head coach received a merit increase greater than 1%.

112.   In 2014 and 2015, exit interviews with Wiles' senior players were performed by Berlo and Associate Athletic Director Stromme rather than being performed by Strong.  Although Wiles' senior players were very positive with her on the evening prior to these interviews, they suddenly treated Wiles coldly and would not talk with her after the interviews.

113.   In 2014, Berlo and another supervisor attended Wiles' performance evaluation.  During that evaluation, the supervisor avoided eye contact with her and emphasized only negatives from the previous season.  When Wiles attempted to remind him of positive aspects of the previous season, including the team's grade point average (3.65, leading all team sports on campus), community volunteer events, fundraising achievements, Wiles' 100% graduation rate, and that she was nearing her 400th career coaching win, Berlo stood up and began preparing to leave the office.  Wiles stated that she had a few questions that she wanted to discuss, but Berlo responded that he had a more important meeting across campus and abruptly left the office.  Wiles' 2014 performance evaluation meeting lasted only approximately fifteen minutes.

114.   During a budget meeting in the fall of 2014, Wiles was provided a print-out of her team's 2014-2015 budget, which included substantial decreases in certain categories and did not include increases in scholarships as promised by former Athletic Director Neilson.  Berlo tersely ordered Wiles to sign the budget, otherwise she would be given her "walking papers."  This experience differed starkly from Wiles' previous

experiences working at the University under other athletic directors and at other universities.

115.   Regardless of whether Wiles could meet the budget provided to her in the fall of 2014, the form she was ordered to sign required meeting the budget or it would be a key factor in her performance evaluations.

116.   Since the signing of the 2014-2015 budget, and without any discussion, Strong gave Wiles additional print-outs of the budget that reflected further decreases that Wiles had to meet in order to avoid negative consequences in her performance evaluations.

117.   As part of Wiles' employment, and as part of the employment for many other coaches, the University provided Wiles with a dealer car.  However, Wiles and her assistant were required to keep their dealer cars longer than male/straight/under 40 coaches, and they were required to personally pay for minor damage and excess mileage. At Berlo's direction, male, straight, and under 40 coaches were either given a new car without comment, or the Minnesota-Duluth budget paid for the damage or excess mileage, or the coach was allowed to use camp funds for that purpose.

118.   Berlo has established a practice of finding "anonymous donors" for the needs of the men's sports programs and favored male coaches.  However, since the fall of 2013, no anonymous donors were found to assist with the expenses for the women's basketball program, despite the repeated slashing of the women's basketball budget.

119.   In the fall of 2013 and early-2014, Wiles spoke with Strong, in the presence of others, more than a dozen times concerning Berlo's rude, disrespectful, and uncivilized

behavior toward Wiles in meetings, office spaces, parking lots, at sports events, and many other locations.  Despite these complaints, no remedial action or protection was provided.

120.   In May of 2014, after meeting with Berlo and Strong regarding her concerns about the surveys, merit pay issues, and exit interviews, Wiles met with Vice Chancellor Lisa Erwin.  During that meeting, Wiles shared her concerns regarding the disparate treatment in the athletics department, discrimination on the basis of gender, and concerns regarding perceived bigotry on the part of Berlo.  Wiles also informed Erwin that she felt Berlo was on a "witch hunt" in attempting to fire Wiles or cause her resignation.  Wiles raised the following concerns regarding the disparities in treatment between the men's and women's basketball teams:

a)  The women basketball coaches had to pay for the expenses for the cars they were provided, and the male basketball coaches did not.

b)  The men's basketball team was provided with funds to play 28 games, but the women's basketball team was provided with funds to play only 26 games.

c)  The men's basketball team was given new uniforms every season, and the women's team used the same uniforms for four to five years.

d)  The men's basketball team members received $500 each for Under Armor apparel, and the women's basketball team did not.

e)  The men's basketball teams' locker room was five times larger than the women's team.

121.   In the fall of 2014, Wiles and her assistant coach spoke with Mary Cameron, a director in Human Resources regarding the disparate treatment of Wiles, including Wiles' concerns about the dealer car and general belief that male coaches were being given privileges that were not offered to Wiles or her assistant coach.  Wiles also informed Cameron that "secret" program fund money was being used by male coaches to support men's sports, but no such support was given to women's sports.  Finally, Wiles informed Cameron that she felt Berlo was biased against her for being an outspoken lesbian head coach, and that she felt discriminated and retaliated against.  Despite these complaints, no remedial action or protection was provided.

122.   In the spring of 2015, Wiles again went to the campus Human Resources office and met with Linda Kinnear to request her personnel file.  When Kinnear asked about Wiles' concerns, Wiles stated that she was feeling alienated and retaliated against by many employees in the athletics department. She spoke specifically about Berlo's outward discrimination and the daily hostility that Wiles experienced in the department. Despite these complaints, no remedial action or protection was provided.

123.   In March 2015, Wiles filed a formal complaint with the University and met with the investigator in April 2015.

124.   As a result of the University's hostility towards Wiles, and the outright discrimination that she experienced, she has gained 80 pounds over the past year-and-a-half, has been admitted numerous times to the emergency room with chest pains, and has been forced to seek medical attention for stress-related ailments.

125.   On information and belief, the University was hostile towards and discriminated against Wiles because she is an openly gay woman who is over 40 years old.  Furthermore, any other reasons provided by the University to justify its actions are mere pretext with the intended effect of obscuring the University's discriminatory intent.

## ALL PLAINTIFFS

126.   On information and belief, since December 9, 2014, no male, straight, and/or under 40 Division I or II coaches at the University have been terminated.

127.   On information and belief, since December 9, 2014, no male, straight, and/or under 40 Division I or II coaches at the University have had their salaries reduced.

128.   On information and belief, since December 9, 2014, no male, straight, and/or under 40 Division I or II coaches at the University have had their job duties reduced.

129.   On information and belief, since December 9, 2014, no men's sports at the University have had their budgets reduced.

130.   According to information from the U.S. Department of Education's Equity in Athletics Data Analysis database, the average institutional salary per head coach at the University is $47,667 higher for men's teams than women's teams.

131.   The Equity in Athletics Data Analysis also shows that there is a wide disparity in the University's treatment of assistant coaches for the women's teams, who receive an annual average of $8,561 less than their counterparts on the University's men's teams.

**COUNT ONE**
**DISCRIMINATION ON BASIS OF SEX, SEXUAL ORIENTATION,**
**NATIONAL ORIGIN, AND/OR AGE**
**MINNESOTA HUMAN RIGHTS ACT**
**MINN. STAT. §§ 363A.01, *et seq*.**

132.    Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

133.    Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in Minnesota Statutes § 363A.03.

134.    Minnesota Statutes § 363A.08 prohibits an employer, because of sex, sexual orientation, national origin, and/or age, from discriminating against a person "with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."

135.    Minnesota Statutes § 363A.08 further provides that it is unlawful for an employer, because of sex, sexual orientation, national origin, and/or age, to discharge an employee.

136.    The University discriminated against Plaintiffs in the following manners:

    a) Outright discrimination and harassment, as described in detail above;

    b) Declining to take remedial measures to minimize or prevent the discrimination and harassment of Plaintiffs by University employees in the athletics department;

    c) Paying Plaintiffs less per year than their male, straight, American and/or under 40 colleagues for parallel jobs with the same level of responsibilities;

31

d) Denying Plaintiffs support related to important functions of their jobs that was provided to male, straight, American and/or under 40 athletics coaches at the University;

e) Intentionally placing obstacles in Plaintiffs' way, making it difficult for them to optimally perform their respective jobs; and

f) Intentionally creating working conditions that a reasonable person in Plaintiffs' situations would find intolerable.

137. The University discharged Plaintiff Miller on the basis of her sex, sexual orientation, national origin, and/or age.

138. The University discharged Plaintiff Banford on the basis of her sex, sexual orientation, and/or national origin.

139. The University intended to force Plaintiff Wiles to quit her employment on the basis of her sex, sexual orientation, and/or age.

140. The University constructively discharged Plaintiff Wiles on the basis of her sex, sexual orientation, and/or age.

141. By deciding to non-renew Miller's and Banford's coaching contracts, and by creating an environment designed to force Wiles to resign, the University discriminated against Plaintiffs on the basis of their sex, sexual orientation, national origin, and/or age. The University's discrimination against Plaintiffs related to their compensation, facilities, privileges of employment, and Plaintiffs' terms and conditions of employment and prevented them from discharging their duties as head women's hockey, softball, and basketball coaches.

142.    The discrimination described herein was deliberate and intentional and committed with malice, reckless disregard, or deliberate disregard for Plaintiffs' rights.

143.    The University presents no legitimate reason for this discrimination and its stated motivation is pretext for discrimination.

144.    As a direct and proximate result of the University's sex discrimination, sexual orientation discrimination, national origin discrimination, and/or age discrimination, Plaintiffs have suffered damages, including but not limited to past and future wage loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount to be proved at trial.

**COUNT TWO**
**REPRISAL**
**MINNESOTA HUMAN RIGHTS ACT**
**MINN. STAT. §§ 363A.01, *et seq.***

145.    Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

146.    Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in Minnesota Statutes § 363A.03.

147.    For the above-described reasons, the University discriminated against Plaintiffs on the basis of their sex, sexual orientation, national origin, and/or age in violation of the Minnesota Human Rights Act.

148.    Minnesota Statutes § 363A.15 prohibits an employer from "intentionally engag[ing] in any reprisal against any person because that person . . . opposed a practice forbidden under this chapter. . . ."

149.    The Minnesota Human Rights Act specifically defines reprisal to include retaliation and harassment, and further prohibits the University from retaliating by departing from any customary employment practice.

150.    Plaintiffs Miller, Banford, and Wiles opposed practices forbidden under the Minnesota Human Rights Act, including discrimination against University employees on the basis of their sex, sexual orientation, national origin, and/or age.   Furthermore, Plaintiffs, on numerous occasions, brought these concerns to the University's attention in an attempt to obtain remedial action.

151.    Because Plaintiffs opposed the University's discriminatory conduct, they were subject to reprisal, including being subjected to a wide range of departures from customary employment practices including, but not limited to, further discrimination, outright harassment, retaliation, refusal to take remedial measures regarding overt discrimination against Plaintiffs in the workplace, hostility and refusal to treat Plaintiffs with respect and kindness in the workplace, and exclusion of Plaintiffs from athletics events.

152.    The discrimination described herein was deliberate and intentional and committed with malice, reckless disregard, or deliberate disregard for Plaintiffs' rights.

153.    As a direct and proximate result of the University's reprisal, Plaintiffs have suffered damages, including but not limited to past and future wage loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount to be proved at trial.

## COUNT THREE
## DISCRIMINATION ON BASIS OF SEX AND/OR NATIONAL ORIGIN
## TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964 AND 1991
## 42 U.S.C. § 2000e, *et seq.*

154.   Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

155.   The University is a public institution receiving federal financial assistance with more than 15 employees.

156.   The University discriminated against Plaintiff on the basis of protected characteristics under Title VII, including Miller's and Banford's national origin and sex, and Wiles' sex.

157.   42 U.S.C. § 2000e-2(a) prohibits an employer from discharging or discriminating against any individual with respect to their compensation, terms, conditions, or privileges of employment  "because of such individual's … sex, or national origin."

158.   The University discriminated against Plaintiffs in the following manner:

   a) Outright discrimination and harassment, as described in detail above;

   b) Declining to take remedial measures to minimize or prevent the discrimination and harassment of Plaintiffs by University employees in the athletics department;

   c) Paying Plaintiffs less per year than their male, straight, American and/or under 40 colleagues for parallel jobs with the same level of responsibilities;

35

d) Denying Plaintiffs support related to important functions of their jobs that was provided to male, straight, American and/or under 40 athletics coaches at the University;

e) Intentionally placing obstacles in Plaintiffs' way, making it difficult for them to optimally perform their respective jobs; and

f) Intentionally creating working conditions that a reasonable person in Plaintiffs' situations would find intolerable.

159.   The University discharged Plaintiffs Miller and Banford on the basis of their sex and national origin.

160.   The University intended to force Plaintiff Wiles to quit her employment on the basis of her sex.

161.   The University constructively discharged Plaintiff Wiles on the basis of her sex.

162.   The University presents no legitimate reason for this discrimination, and its stated motivation is pretext for discrimination.

163.   As a direct and proximate result of the University's sex discrimination, sexual orientation discrimination, national origin discrimination, and/or age discrimination, Plaintiffs have suffered damages, including but not limited to past and future wage loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount to be proved at trial.

**COUNT FOUR**
**CREATION OF HOSTILE WORK ENVIRONMENT**
**TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964 AND 1991**
**42 U.S.C. § 2000e, *et seq.***
**MINNESOTA HUMAN RIGHTS ACT**
**MINN. STAT. §§ 363A.01, *et seq*.**

164.   Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

165.   The University is a public institution receiving federal financial assistance with more than 15 employees.

166.   Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in Minnesota Statutes § 363A.03.

167.   As detailed above, the University discriminated against Plaintiff, and subjected Plaintiffs to unwelcome harassment, on the basis of protected characteristics under Title VII and the MHRA, including Plaintiffs' sex, sexual orientation, national origin, and age.

168.   Furthermore, based on Plaintiffs' sex, sexual orientation, national origin, and age, they were exposed to disadvantageous terms and conditions of employment to which male athletics coaches at the University were not exposed.

169.   That harassment affected a term, condition, or privilege of employment, as Plaintiffs were unable to discharge their duties as head coaches of the women's hockey, softball, and basketball teams, respectively.

170.   Furthermore, their harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of their respective employment, and indeed was so

intimidating, offensive, and hostile as to poison the work environment in the athletics department at the University.

171.   The University was aware of the harassment of Miller, Banford, and Wiles, including without limitation reports made by Plaintiffs to, among others, Black, Berlo, Cameron, Erwin, Finnerty, Kinnear, Stromme, and Strong.  Despite this knowledge, the University failed to take remedial action.

172.   As a result of the University's conduct, a reasonable person in Plaintiffs' situation would find that the working conditions were intolerable.   Moreover, the University's conduct was patterned and pervasive in that its discriminatory conduct against Plaintiffs happened with regular frequency, its discriminatory conduct was severe and caused substantial harm to Plaintiffs, its discriminatory conduct was humiliating to Plaintiffs, and its discriminatory conduct unreasonably interfered with Plaintiffs' work performance.

173.   The University presents no legitimate reason for its creation of such intolerable conditions and any stated motivation is pretext for discrimination.

174.   As a direct and proximate result of the University's creation of a hostile work environment, Plaintiffs have suffered damages, including but not limited to past and future wage loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount to be proved at trial.

**COUNT FIVE**
**UNLAWFUL RETAILIATION AND DISCRIMINATION**
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**20 U.S.C. § 1681,** *et seq.*

175.   Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

176.   Title IX prohibits exclusion from participation in, denial of benefits of, or discrimination under any education or athletic activity receiving federal financial assistance.

177.   The University is an educational institution that received federal financial assistance for its educational and athletic activities, and was therefore covered under Title IX.

178.   Title IX also prohibits discrimination on the basis of sex at educational institutions receiving federal assistance.  Title IX's prohibition of sex discrimination includes prohibition of sexual harassment of employees by University employees and discrimination by the University in the benefits, terms, and conditions of employment on the basis of employees' sex.

179.   Because Congress enacted Title IX to prevent use of federal funding to support discriminatory practices, reporting an incident of discrimination is integral to Title IX enforcement.  Accordingly, persons who complain about sex discrimination, including harassment on the basis of sex, have protection against retaliation and are provided a private right of action as part of the Title IX enforcement scheme.

180.    Title IX prohibits retaliation against individuals who engage in protected activity including good faith complaints of sex discrimination, opposing illegal practices under Title IX, opposing discrimination through internal school communications and voicing concerns to superiors at the educational institution.

181.    Plaintiffs Miller, Banford, and Wiles engaged in activity protected by Title IX including, but not limited to:

a)  Reporting harassment of Plaintiffs by University employees;

b)  Speaking out and opposing the institutional indifference and failure to investigate and remedy sexual harassment of employees by the University;

c)  Complaining to University administrators about discrimination against Plaintiffs on the basis of their sex;

d)  Complaining to the University that its treatment of Plaintiffs, and of the women's hockey, softball, and basketball programs, may be in violation of Title IX; and

e)  Initiating a formal investigation into sexual harassment and discrimination against Banford.

182.    The University deliberately and intentionally subjected Plaintiffs to adverse employment actions, including the constructive termination of Wiles' employment, for Plaintiffs' advocacy of gender equity under Title IX contrary to law and/or because Plaintiffs engaged in the protected activity described above.

40

183.   There was a causal connection between the University's adverse actions against Plaintiffs and their protected activity.

184.   The University's unlawful conduct was the proximate cause of Plaintiffs' loss of employment, medical expenses, general damages arising from mental distress, and other economic losses including loss of compensation and benefits, which losses continue.

### COUNT SIX
### VIOLATION OF THE EQUAL PAY FOR EQUAL WORK LAW
### MINN. STAT. § 181.66, *et seq.*

185.   Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

186.   Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in Minnesota Statutes § 181.66.

187.   Minn. Stat. § 181.67 prohibits an employer from discriminating between employees on the basis of sex "by paying wages to employees at a rate less than the rate the employer pays to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . ."

188.   Plaintiffs Miller, Banford, and Wiles—the head women's hockey, softball, and basketball coaches, respectively—were paid wages at a rate less than the rate the University paid to its male head men's hockey, baseball, and basketball coaches.

189.   The jobs held by Plaintiffs Miller, Banford, and Wiles at the University required equal skill, effort, and responsibility, and were performed under similar working

conditions, as the jobs held by the University's male head men's hockey, baseball, and basketball coaches.

190.    As a result of the University's violation of Minnesota Statutes § 181.66, *et seq.*, Plaintiffs are entitled to recovery of the amount of their unpaid wages to which they are entitled for a one year period preceding the commencement of this action, exemplary damages, and recovery of their costs and reasonable attorneys' fees.

**COUNT SEVEN**
**VIOLATION OF THE EQUAL PAY ACT ("EPA")**
**29 U.S.C. § 206(d)(1)**

191.    Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

192.    Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in 29 U.S.C. § 203.

193.    29 U.S.C. § 206 prohibits an employer from discriminating between employees on the basis of sex, including paying employees a lower rate than is paid to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . ."

194.    Plaintiffs Miller, Banford, and Wiles—the head women's hockey, softball, and basketball coaches, respectively—were paid wages at a rate less than the rate the University paid to its male head men's hockey, baseball, and basketball coaches.

195.    The jobs held by Plaintiffs Miller, Banford, and Wiles at the University required equal skill, effort, and responsibility, and were performed under similar working

conditions, as the jobs held by the University's male head men's hockey, baseball, and basketball coaches.

196.    As a result of the University's violation of the Equal Pay Act, Plaintiffs are entitled to recovery of their unpaid wages, an additional equal amount as liquidated damages, and recovery of their costs and reasonable attorneys' fees.

## COUNT EIGHT
### VIOLATION OF MINNESOTA WHISTLEBLOWER ACT
### MINN. STAT. § 181.932

197.    Plaintiffs reallege and incorporate by reference herein the foregoing allegations as though fully set forth herein.

198.    Plaintiffs and the University are employees and an employer, respectively, for the purposes of the definition set forth in Minnesota Statutes § 181.931.

199.    Minnesota Statutes § 181.932 prohibits an employer from discharging, disciplining, otherwise discriminating against, or penalizing an employee regarding their compensation, terms, conditions, or privileges of employment because "the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer. . . ."

200.    On numerous occasions, Plaintiffs Miller, Banford, and Wiles reported violations, suspected violations, and planned violations of the Minnesota Human Rights Act, Title VII, and Title IX to the University, including without limitation to, among others, Berlo, Cameron, Erwin, Finnerty, Kinnear, Stromme, and Strong.

201.    Because of Plaintiffs' reports to the University, it discharged, disciplined, otherwise discriminated against, and penalized Plaintiffs regarding their compensation, terms, conditions, and privileges of employment.

202.    As a result of the University's violation of Minnesota Statutes § 181.932, Plaintiffs are entitled to recover back pay, compensatory damages, their costs, disbursements, reasonable attorneys' fees, and any injunctive and other equitable relief as determined by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Miller, Banford, and Wiles respectfully request that this Court:

A.    Enter judgment in favor of Plaintiffs and against Defendant awarding Plaintiffs back pay, front pay, damages for emotional distress and compensatory damages in an amount according to proof together with prejudgment interest;

B.    Award Plaintiffs their reasonable attorneys' fees, costs, and prejudgment interest; and

C.    Grant Plaintiffs such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial as to all claims so triable.

**SIEGEL & YEE**

Dan Siegel
Jane Brunner
Jalle Dafa
499 14th Street, Suite 300
Oakland, California 94612
Phone (510) 839-1200
Facsimile (510) 444-6698
*dansiegel@siegelyee.com*
*janebrunner@siegelyee.com*
*jalle@siegelyee.com*

**Attorneys *pro hac vice* for Plaintiffs**

*AND*

**FAFINSKI MARK & JOHNSON, P.A.**

Dated: September 28, 2015          By:  s/ Donald Chance Mark, Jr.
                                   Donald Chance Mark, Jr. (#67659)
                                   Andrew T. James (#0390982)
                                   Tyler P. Brimmer (#0392700)
                                   Flagship Corporate Center
                                   775 Prairie Center Drive, Suite 400
                                   Eden Prairie, MN 55344
                                   Phone (952) 995-9500
                                   Fax (952) 995-9577
                                   *donald.mark@fmjlaw.com*
                                   *andrew.james@fmjlaw.com*
                                   *tyler.brimmer@fmjlaw.com*

**Attorneys for Plaintiffs**