UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SHANNON MILLER, JEN BANFORD,          Case No. 15-CV-3740 (PJS/LIB)
and ANNETTE WILES,

                    Plaintiffs,

                                                      ORDER
v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MINNESOTA,

                    Defendant.

---

Daniel Mark Siegel, Jalle Dafa, and Jane E. Brunner, SIEGEL & YEE; Sharon L. Van Dyck, Donald Chance Mark, Jr., Andrew T. James, Christopher R. Sall, and Tyler P. Brimmer, FAFINSKI MARK & JOHNSON, P.A., for plaintiffs.

Timothy Joseph Pramas and William P. Donohue, UNIVERSITY OF MINNESOTA OFFICE OF GENERAL COUNSEL; Jeanette M. Bazis, Katherine M. Swenson, and Jenny Gassman-Pines, GREENE ESPEL PLLP, for defendant.

Plaintiffs Shannon Miller, Jen Banford, and Annette Wiles were employed as coaches by defendant University of Minnesota Duluth ("UMD").  Miller coached the women's hockey team, Banford coached the women's softball team (and simultaneously served on Miller's staff as director of hockey operations), and Wiles coached the women's basketball team.  All three coaches enjoyed considerable success.  Miller, in fact, won five national championships and may be the most accomplished women's hockey coach in the history of college athletics.

In December 2014, UMD decided not to renew Miller's contract following a number of disappointing seasons. UMD also decided not to renew the contracts of several members of Miller's staff, including Banford. In the wake of Miller's non-renewal, both Banford and Wiles quit their jobs—Banford by rejecting UMD's offer to renew her contract as women's softball coach and Wiles by resigning as UMD was about to renew her contract as women's basketball coach.

Miller, Banford, and Wiles filed this lawsuit against UMD. The three coaches claim that they were non-renewed or constructively discharged on account of their sex (female) and sexual orientation (lesbian) and in retaliation for accusing UMD of violating Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq. The three coaches also claim that, while they were employed by UMD, they experienced a hostile work environment on account of their sex and sexual orientation.[1] Finally, the three coaches assert claims under the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d).

This matter is before the Court on UMD's motion for summary judgment. UMD has also moved for separate trials on any of plaintiffs' claims that survive. Finally, UMD has moved to exclude the testimony of plaintiffs' expert witness. The parties

---

[1]Miller and Banford also asserted claims on the basis of their nationality (Canadian), but they have abandoned those claims.

submitted about 250 pages of briefs and thousands of pages of exhibits, and the Court

conducted a long hearing on UMD's motions on October 30, 2017.

For the reasons that follow, the Court grants UMD's summary-judgment motion

in part with respect to Miller and in full with respect to Banford and Wiles. All of the

claims of Banford and Wiles are dismissed. Likewise, all of the claims of Miller are

dismissed, with the exception of her claim that, when UMD decided not to renew her

contract, UMD discriminated against her on the basis of sex and retaliated against her

for raising Title IX complaints. Those two claims will be tried before a jury in Duluth

beginning on March 6, 2018.

## I.  SUMMARY-JUDGMENT MOTION

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a fact is "genuine" only

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in [her] favor." *Id.* at 255.

The Court will not attempt to summarize the facts.  As noted, the parties' briefs are voluminous, and they describe dozens of emails, phone calls, conversations, meetings, actions, and decisions.  The parties have already waited a long time for UMD's motions to be decided,[2] and a detailed recitation of the facts would serve little purpose.  The facts are described in the briefs and are largely undisputed.  The Court will assume familiarity with those facts and will mention particular facts only as necessary to explain the basis of its rulings.

### A. Sexual-Orientation and State-Law Claims

 As noted, all three plaintiffs are lesbians, and all three contend that they lost their jobs and suffered a hostile work environment on account of their sexual orientation.  The plaintiffs assert these claims under both federal and state law—specifically, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and under the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. §§ 363A.01 et seq.

Plaintiffs' sexual-orientation claims—and, in particular, their hostile-environment claims—are their strongest.  Unfortunately for plaintiffs, however, their

---

[2]The summary-judgment motions and motion to exclude expert testimony were filed on April 13, 2017, and the motion for separate trials was filed on May 11, 2017. Unfortunately, however, the judge before whom those motions were originally pending had to take disability leave.  The case was then reassigned to the undersigned, and the hearing on UMD's motions had to be rescheduled.

federal claims must be dismissed on the merits, and their state claims must be dismissed for lack of jurisdiction.

Plaintiffs' claims under federal law must be dismissed with prejudice because the Eighth Circuit has held that "Title VII does not prohibit discrimination against homosexuals." *See, e.g., Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) (per curiam). Plaintiffs point out that the Seventh Circuit recently became the first of the federal courts of appeals to hold that Title VII prohibits discrimination on the basis of sexual orientation. *See Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc). As plaintiffs concede, however, this Court is bound by the decisions of the Eighth Circuit. *See Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) ("The District Court . . . is bound, as are we, to apply the precedent of this Circuit.").

Plaintiffs' claims under state law must also be dismissed. Unlike Title VII, the MHRA explicitly prohibits discrimination on the basis of sexual orientation. Minn. Stat. § 363A.08, subd. 2. But, as plaintiffs also concede, the Eleventh Amendment deprives this Court of jurisdiction over plaintiffs' MHRA claims. *See* Mem. in Opp'n at 31 (ECF No. 306). The Eleventh Amendment provides that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." Although the text of the Eleventh Amendment bars actions against a state only when those actions

are brought by "Citizens of another State," the Supreme Court long ago held that the

Eleventh Amendment also bars actions against a state that are brought by its own

citizens. *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890). "The University of Minnesota, of

which UMD is a constituent part . . . , is considered an arm of the state and, therefore,

shares the State of Minnesota's Eleventh Amendment immunity." *Cardoso v. Bd. of*

*Regents of the Univ. of Minn.*, 205 F. Supp. 3d 1046, 1049 (D. Minn. 2016) (citing *Treleven*

*v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir.1996)).

Either Congress or the Minnesota Legislature could abrogate the Eleventh

Amendment immunity of the State of Minnesota. But "it is quite clear no such

abrogation has occurred" with respect to claims under the MHRA. *Cardoso*, 205

F. Supp. 3d at 1049 (citing *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 969 (8th Cir.

2000), and *Phillips v. Minn. State Univ. Mankato*, No. 09-CV-1659 (DSD/FLN), 2009 WL

5103233, at *3 (D. Minn. Dec. 17, 2009)). As a result, this Court does not have

jurisdiction over plaintiffs' sexual-orientation claims under the MHRA—or, for that

matter, over any of plaintiffs' other state-law claims. Those claims must be dismissed

without prejudice.

To be clear: Plaintiffs could have pursued their state-law claims—including their

MHRA sexual-orientation claims—in state court. But, for reasons that are not apparent,

plaintiffs chose to bring those claims in federal court, despite the fact that plaintiffs

knew (or should have known) that a federal court would have no jurisdiction over them. As a result of their own choices, then, plaintiffs cannot recover on their (stronger) sexual-orientation claims, and instead are left to litigate their (weaker) sex discrimination, hostile environment, Title IX, and EPA claims.[3]

### B. Other Federal Claims

#### 1. Miller

Miller alleges (1) discrimination based on sex with respect to the non-renewal of her contract in violation Title VII; (2) hostile work environment based on sex in violation of Title VII; (3) retaliation in violation of Title IX; and (4) violation of the EPA.

a. *Sex Discrimination.* Miller does not have direct evidence of sex discrimination, and thus, to avoid summary judgment, she must establish a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Specifically, Miller must show (1) that she was a member of a protected class; (2) that she was meeting UMD's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that

---

[3]The strength of plaintiffs' sexual-orientation claims—and the corresponding weakness of their other claims—is reflected in their memorandum. The core narrative of that memorandum is that Athletics Director Josh Berlo (the key decision maker with respect to all three plaintiffs) was "extremely homophobic" and acted to "purge" lesbians from his department. *See, e.g.,* Mem. in Opp'n at 1 (accusing Berlo of "an effort to rid [UMD's athletics] department of six self-identified lesbian coaches"); *id.* at 6 (alleging that UMD had a "historical problem with lesbian women"); *id.* at 11 (Wiles complaining Berlo "was extremely homophobic and on a 'witch hunt' to fire her"); *id.* at 16 (arguing that Berlo enacted a "[p]lan[] to purge six lesbian coaches and staff").

the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1042 (D. Minn. 2008). If Miller makes out a prima facie case, the burden shifts to UMD to provide a legitimate nondiscriminatory explanation for the adverse action. *Id.* If UMD provides such an explanation, the burden shifts back to Miller to establish that UMD's proffered explanation is pretextual and that discrimination was the real reason for the adverse action. *Id.*

Miller has satisfied the "low burden" of establishing a prima facie case. *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1068 (8th Cir. 2017). First, Miller was a member of a protected class. Second, Miller was meeting UMD's legitimate expectations—and, in fact, had performed her job for years. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). Third, Miller suffered an adverse employment action when her contract was not renewed. As the Second Circuit noted in *Leibowitz v. Cornell University*, 584 F.3d 487, 501 (2d Cir. 2009), *superseded by statute on other grounds, as recognized in Sands v. Rice*, 619 F. App'x 31, 32 (2d Cir. 2015), "[a]n employee seeking a renewal of an employment contract . . . suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under Title VII . . . . The mere fact that the employer's decision not to renew is completely discretionary does not mean that it is not an 'adverse'

employment decision." *But see Ewald v. Royal Norwegian Embassy*, 2 F. Supp. 3d 1101, 1121 (D. Minn. 2014) (concluding without analysis that the non-renewal of a contract was not an adverse employment action). Finally, Miller has proffered facts "that give rise to an inference of sex discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 (8th Cir. 2007). These same facts also provide evidence that UMD's explanation for her firing—the poor performance of the women's hockey team and the poor return on UMD's "salary investment"—is pretextual.

Specifically, the record contains evidence that would allow a jury to find that: (1) Scott Sandelin, the head coach of the men's hockey team, had his contract renewed despite comparable (or arguably worse) performance. (2) In deciding to renew Sandelin's contract, UMD applied different criteria than it applied in deciding not to renew Miller's contract. (3) The administrators involved in the decision not to renew Miller's contract offered inconsistent explanations for their decision, first claiming that the non-renewal was based solely on financial considerations and only later attempting to justify the non-renewal on the basis of Miller's performance. (4) UMD's financial condition was not as dire as it claimed. (5) UMD did not ask Miller to accept a pay cut in lieu of termination, nor did it pursue leads regarding donors who expressed interest in helping to fund Miller's salary. *See* Mem. in Opp'n at 19, 36, 40-46.

Miller has sufficient evidence to try her sex-discrimination claim.

*b. Title IX Retaliation.*  Miller also has sufficient evidence to try her Title IX retaliation claim.  UMD does not dispute that Miller engaged in protected conduct by complaining that UMD treated the men's athletics program better than the women's athletics program.  UMD also does not dispute that Miller suffered an adverse employment action when her contract was not renewed.[4]  Instead, UMD argues only that Miller cannot prove a connection between the protected activity and the adverse action.  UMD Mem. (ECF No. 283) at 52-53.

The Court disagrees.  The record indicates that Miller regularly complained about perceived Title IX violations, and that those complaints spanned her tenure.  Indeed, UMD conceded at oral argument that Miller's complaints continued until shortly before Athletics Director Josh Berlo opted not to renew her contract.  *See also* Miller Decl. (ECF No. 307) ¶¶ 7, 30-31; Miller's Am. Answers to Def.'s First Set of Interrogs. (ECF No. 131) at 6-7 (noting she had "repeatedly raised the issues of disparate funding for women's teams," including "at least five times during the 2013-14 school year"); *id.* at 12 (discussing July 2014 meeting with Berlo raising concerns with funding and athletics trainers).  While UMD correctly notes that, as a general matter, temporal proximity will not suffice to establish retaliation, an adverse action close in time to

---

[4] Curiously, UMD asserts that non-renewal of an employment contract is an adverse action for purposes of a Title IX retaliation claim but not for purposes of a Title VII discrimination claim.  It is difficult to understand how that could be true.

-10-

protected activity "may directly support an inference of retaliation" when viewed "within the context of the overall record." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc).

Looking at the record in its entirety, the Court concludes that, although the evidence supporting Miller's Title IX retaliation claim is thin, Miller has sufficient evidence to avoid summary judgment.

*c. Hostile Work Environment.*  Miller does not, however, have sufficient evidence to avoid summary judgment on her claim that she suffered a hostile work environment on account of her sex.  Two things about Miller's claim must be emphasized:

First, Miller must show that she suffered a hostile environment on account of her sex and not for some other reason, such as that her personality clashed with the personalities of others, or that she and others had strong disagreements over, say, the proper direction of the women's hockey program.  Miller has evidence that she suffered hostility on account of her sexual orientation (that is, because she was a person who was sexually attracted to members of the same sex), *see* Miller Decl. ¶¶ 14-16, but she has little evidence that she suffered hostility on account of her sex (that is, because she was female).  For example, Miller complains that she was excluded from a strategic planning committee created by Berlo in May 2014.  Yet it is undisputed that several women were

asked to serve on that committee, including Banford.  Thus, while Miller's exclusion from the committee may be evidence that Berlo was hostile to her, it is not evidence that Berlo was hostile to her *on account of her sex*.  *See, e.g., Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (conduct must be based on plaintiff's protected classification).

Second, Miller must show that she experienced something worse than the type of bad behavior found in most workplaces.  Every employee at one time or another must endure the stupid decisions of bosses or the irritating behavior of co-workers.  Title VII does not provide shelter from the slings and arrows of the typical workplace.  Instead, to recover on a hostile-environment claim, an employee must show that she was exposed to conduct that was so "'severe or pervasive' . . . as to create an 'objectively hostile or abusive work environment.'"  *Crawford v. BNSF Ry. Co.*, 665 F.3d 978, 983 (8th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993)); *see also Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010) ("Actionable conduct must . . . be extreme rather than merely rude or unpleasant.").

The Eighth Circuit has often described this as a "high threshold," *Duncan v. County of Dakota*, 687 F.3d 955, 959 (8th Cir. 2012), and the Eighth Circuit has meant it. For example, the Eighth Circuit affirmed the dismissal of a hostile-environment claim in *Rickard v. Swedish Match North America, Inc.*, 773 F.3d 181, 183 (8th Cir. 2014), even

though the supervisor grabbed and squeezed the employee's nipple while stating "this is a form of sexual harassment," and even though the supervisor took a towel from the employee, rubbed it on his crotch, and gave it back to the employee.  The Eighth Circuit also affirmed the dismissal of a hostile-environment claim in *McMiller v. Metro*, 738 F.3d 185, 186-87 (8th Cir. 2013), even though the supervisor put his arms around the employee's shoulders and kissed the side of her face and then later called the employee into his office, locked the door, and, when the employee tried to escape, "placed his hand on her right wrist, removed her hand from the door, turned her toward him, put his arms on her shoulders and neck, and kissed her on the side of her face and forehead."  The *McMiller* court found that the employee did not have a viable hostile-environment claim in light of the high bar set by prior Eighth Circuit decisions, some of which it described as follows:

> In *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir.2002), the court determined that a plaintiff had not proved a hostile work environment with evidence that a supervisor sexually propositioned her, repeatedly touched her hand, requested that she draw an image of a phallic object to demonstrate her qualification for a position, displayed a poster portraying the plaintiff as "the president and CEO of the Man Hater's Club of America," and asked her to type a copy of a "He-Men Women Hater's Club" manifesto.  *Id.* at 931-35.  In *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858 (8th Cir. 2009), where a supervisor had rubbed an employee's back and shoulders, called her "baby doll," "accus[ed] her of not wanting to be 'one of [his] girls,'" suggested once in a long-distance phone call "that she should be in bed with

him," and "insinuat[ed] that she could go farther in the company if she got along with him," this court ruled that the evidence was insufficient to establish a hostile work environment. *Id.* at 862. And in *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098 (8th Cir. 2005), the court ruled that a plaintiff who asserted that a harasser asked him to watch pornographic movies and to masturbate together, suggested that the plaintiff would advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh, had not established actionable harassment. *Id.* at 1100-03.

*McMiller*, 738 F.3d at 188-89.

The evidence in the record does not enable Miller to clear the "high threshold" of proving that she experienced misconduct that was so severe or pervasive that it "affected a term, condition, or privilege of her employment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010). To the contrary, the bad behavior of which she complains was not nearly as serious as the bad behavior experienced by the unsuccessful plaintiffs in *Rickard*, *McMiller*, *Anderson*, *LeGrand*, and *Duncan*. Miller argues generally that she was "treated coldly or completely ignored by Berlo." Mem. in Opp'n at 50. But getting the cold shoulder from a boss is not the kind of severe or pervasive conduct that violates Title VII. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," are not

-14-

actionable, lest Title VII "become a 'general civility code'" (citation omitted)).  Miller

also cites various disputes with Berlo and others in the athletics department, such as a

dispute over the removal of an article about her from UMD's website.  But these are the

types of disputes that are typical of any workplace—especially a workplace that is as

competitive as a college athletics department.  *See, e.g.*, *Bradley v. Widnall*, 232 F.3d 626,

631-32 (8th Cir. 2000) (affirming dismissal of claim based on allegations that plaintiff's

supervisory duties were curtailed, she was left out of decisionmaking, and she was

treated with disrespect and subjected to false complaints), *abrogated on other grounds by*

*Torgerson*, 643 F.3d at 1059.  Moreover, there is no evidence that the various slights

suffered by Miller interfered with her ability to perform her job; to the contrary, Miller

wanted to remain at UMD, and she contends that she was performing admirably at the

time that her contract was not renewed.  Miller Decl. ¶¶ 55-56; *see also* Mem. in Opp'n

at 36 ("At the time UMD decided not to renew Miller's coaching contract, her team was

one of the best in the country . . . .").

     For these reasons, the Court grants UMD's motion for summary judgment on

Miller's claim that she experienced a hostile work environment based on sex.

     *d.  Equal Pay Act.*  The EPA provides, in relevant part, as follows:

> No employer . . . shall discriminate, within any
> establishment in which such employees are employed,
> between employees on the basis of sex by paying wages to
> employees in such establishment at a rate less than the rate

> at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance
> of which requires equal skill, effort, and responsibility, and
> which are performed under similar working conditions,
> except where such payment is made pursuant to (i) a
> seniority system; (ii) a merit system; (iii) a system which
> measures earnings by quantity or quality of production; or
> (iv) a differential based on any other factor other than sex.
> . . .

29 U.S.C. § 206(d)(1).  To make out a prima facie case under the EPA, the plaintiff must

show that her employer paid her less than a male employee even though their jobs

required equal skill, effort, and responsibility, and were performed under similar

working conditions.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

Miller argues that she was paid less than Sandelin—who, she says, was

performing a job "on par" with hers because each coached a hockey team at UMD.

Mem. in Opp'n at 54-55.  Jobs do not have to be identical to be considered "equal"

under the EPA.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995).  At the same

time, job titles and classifications are not dispositive; it is the actual requirements of the

jobs that control.  *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003).

Miller cannot prove that her job and Sandelin's job "require[d] equal skill, effort,

and responsibility, and . . . [were] performed under similar working conditions."  29

U.S.C. § 206(d)(1).  True, the formal job duties listed in Miller's contract were identical

to the formal job duties listed in Sandelin's.  But it is undisputed that the men's hockey

-16-

team at UMD attracts vastly more attention, draws vastly higher attendance, and earns

vastly more revenue than the women's hockey team.  Indeed, the men's hockey team

helps to fund the women's hockey team.

Understandably, then, the men's hockey coach is under more pressure to

win—and has more demands on his time—than the women's hockey coach.  This fact,

standing alone, is "evidence of a substantial difference in responsibility."  *Stanley v.*

*Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994); *accord, e.g., Cullen v. Ind. Univ. Bd. of*

*Trs.*, 338 F.3d 693, 700 (7th Cir. 2003) (difference in revenue generated by university

programs in physical therapy and respiratory therapy, and university's "dependence

upon the revenue generated by" the physical-therapy program, meant plaintiff's

position as head of respiratory therapy was not "equal" to head of physical therapy).

The conditions under which Sandelin worked were simply not "similar" to the

conditions under which Miller worked.  29 U.S.C. § 206(d)(1).

Moreover, even if Miller could show that Sandelin and she were performing

equal work under similar conditions, UMD still would be entitled to summary

judgment because there is no genuine dispute that the pay differential between Miller

and Sandelin reflected market forces.  UMD does not hire coaches in a vacuum; it

competes for them in open markets.  And the undisputed evidence is that the market

for coaches of men's hockey teams is far larger and far more competitive than the

market for coaches of women's hockey teams.  As a result, *men* who coach women's hockey teams make less money than *men* who coach men's hockey teams.  "Unequal wages that reflect market conditions of supply and demand are not prohibited by the EPA."  *Stanley*, 13 F.3d at 1322; *see also Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980) ("[A]n employer may consider the market place value of the skills of a particular individual when determining his or her salary.").

At the hearing, Miller directed the Court's attention to *Drum v. Leeson Electric Corp.*, 565 F.3d 1071, 1073 (8th Cir. 2009), which, she argued, held that market forces cannot justify paying a woman less than a man for equal work.  But *Drum* is distinguishable.  In *Drum*, the employer hired both the plaintiff and her male comparator from the same market—namely, the market for human-resources directors. The Eighth Circuit held that, when both a man and a woman are hired from the same market, an employer cannot justify paying lower wages to the woman on the grounds that women in that market have traditionally been paid less than men in that market. Here, by contrast, UMD hired Sandelin from one market (the market for coaches of men's hockey teams) and Miller from a different market (the market for coaches of women's hockey teams).  *Drum*, therefore, does not help Miller.

For these reasons, the Court grants UMD's motion for summary judgment on Miller's claim under the EPA.

2.  Banford

Banford alleges (1) discrimination based on sex with respect to the termination of her employment in violation Title VII; (2) hostile work environment based on sex in violation of Title VII; and (3) retaliation in violation of Title IX.[5]

*a. Sex Discrimination.*  Banford served simultaneously as head softball coach and director of (women's) hockey operations.  UMD terminated Banford's contract in December 2014, as part of its decision not to renew the contracts of Miller and her senior staff.  Banford argues that termination of her two positions violated Title VII.  The evidence does not support her argument.

Banford offered scant argument about the softball position in her memorandum, and for good reason:  The record clearly establishes that UMD intended to retain her as head softball coach notwithstanding the termination of her hockey-operations position. Indeed, on January 27, 2015, the school offered her a new contract limited to coaching the softball team (at comparable pay[6]), but she turned it down.  Under these circumstances, it is difficult to conceive how UMD discriminated against her in the

---

[5]Banford, like Miller, also brought an EPA claim, but she has abandoned that claim.

[6]To be sure, Banford's overall pay would have been lower in the new contract, as the new contract was for one job rather than two.  But Banford acknowledged at oral argument that her salary under the new contract would have been "fairly comparable" to the "softball" portion of the salary that she received under the old contract.

"termination" of her softball position—or, indeed, how it "terminated" her from that position at all. Banford cannot establish that she suffered an adverse employment action, and thus she cannot make out a prima facie case of discrimination. *See Fair v. Norris*, 480 F.3d 865, 870 (8th Cir. 2007) (plaintiff, who was initially denied promotion, could not establish adverse-action element of prima facie case where employer later offered her the position sought, with back pay and benefits).

Banford points to a form letter that she received on December 11, 2014, which indicated that her "appointment as the Director of Hockey Operations/Head Softball Coach . . . will end on June 14, 2015," and which concluded by wishing her luck in her future endeavors. ECF No. 102 at 4. She claims this shows that UMD did not intend to retain her as softball coach and only offered her a new contract after she spoke to the media on January 18, 2015. *See* Mem. in Opp'n at 20-22. Yet Banford acknowledges that the December 11 letter was attached to an email advising her that UMD was "working with Human Resources to reclassify your job as solely Head Softball Coach." ECF No. 102 at 3. She further acknowledges that Berlo told her in December 2014 that "you are our softball coach." Banford Decl. (ECF No. 308) ¶ 21. And she acknowledges that Jay Finnerty, a UMD Assistant Athletics Director, told her in December 2014 that she should "relax" because the school had 60 days to prepare a new contract reflecting a softball-only role. Banford Dep. (ECF No. 177) at 164-65, 192. Finally, none of UMD's

internal communications indicate any intent to terminate her as softball coach.  *See, e.g.*, ECF No. 89 at 70-74, 88-89; ECF No. 93 at 2.  Banford simply was not "terminated" from her softball position.

There is no dispute that UMD terminated Banford from her hockey-operations position, but the record does not support Banford's argument that UMD terminated her because she was a woman.  When UMD opted not to renew Miller's contract as head coach of the women's hockey team, UMD also opted not to renew the contracts of Miller's senior staff, including her assistant coaches and her director of hockey operations (Banford).  According to UMD, when a college discharges a head coach, it is common to discharge the head coach's senior staff at the same time so that "the incoming head coach can select her own staff . . . ." UMD Mem. at 5.  Both Berlo and UMD Chancellor Lendley Black testified to this "common" practice at their depositions. *See* Berlo Dep. (ECF No. 179) at 31-32; Black Dep.[7] at 214-15.  Berlo's deposition testimony was consistent with what he told Miller during a December 11, 2014 telephone call that Miller recorded without Berlo's knowledge.  *See* ECF No. 93 at 3 (when Berlo was asked by Miller why Banford would not be retained as director of operations, he responded, "Because the supervisor potentially is changing and anytime that's the case . . . you know, it would be up to whomever comes in if they want that

---

[7]The transcript of Black's deposition does not have its own docket entry, but rather commences on page 96 of ECF No. 93.

arrangement or not").  Even *Miller* acknowledged in her deposition that "no head coach maybe wants to be dictated who's on their staff . . . ."  Miller Dep. (ECF No. 183) at 22.

Banford responds that UMD's proffered reason is unworthy of credence.  She notes that three other, non-coaching members of the hockey staff were not terminated at the same time she was.  She also argues that, while it might be common to discharge assistant *coaches* when a head coach is fired, it is not common to discharge someone like Banford, who worked only in an operations role.  Mem. in Opp'n at 42.  But Banford cites no evidence to support this argument.  Moreover, despite Banford's assertions to the contrary, the record is clear that Banford reported directly to Miller in connection with her hockey duties, while each of the non-coaching members of the hockey staff who were retained did not.  *See* ECF No. 92 at 14-15; ECF No. 94 at 35-36; Banford Dep. at 147-48; Wheeler Dep. (ECF No. 152) at 30-31.  It is entirely consistent with UMD's explanation that Miller's direct reports were dismissed but not those who reported to others.  In any event, it is undisputed that the three persons who were retained were all *female*, which completely undermines Banford's argument that she was terminated—and the others were not—on account of sex.

For these reasons, the Court grants UMD's motion for summary judgment on Banford's sex-discrimination claim.

b. *Hostile Work Environment.*  Banford also does not have sufficient evidence to avoid summary judgment on her claim that she suffered a hostile work environment on account of her sex.  Like Miller, Banford cannot clear the "high threshold" of showing that (1) she experienced misconduct that was so severe or pervasive that it created an objectively hostile or abusive work environment and (2) she experienced this conduct because she was a woman, instead of for another reason.  *Duncan*, 687 F.3d at 959.

Banford has a long list of complaints—some bordering on petty—about the way that she was treated by UMD, including (to cite just a few examples) fights over budgets, fights over equipment, fights over field usage, fights over the location of her office, and fights over how to address certain issues involving certain student athletes.  None of the matters about which Banford complains have an apparent connection to the fact that she is female; to the contrary, they seem to be the types of disputes that are ubiquitous in college athletics departments.  Moreover, none of the matters about which Banford complains—alone or in combination—represent conduct that is "extreme rather than merely rude or unpleasant."  *Cross*, 615 F.3d at 981.[8]

The most serious conduct cited by Banford is an alleged statement made in 2015 by Bob Nygaard, Assistant Athletics Director for Communications, after Banford

---

[8]Like Miller, Banford also points to a few serious incidents from 2011 and earlier, but these incidents related to her sexual orientation, not her sex.  *See* Banford Decl. ¶¶ 6-8.

complained to the media that she was being mistreated by UMD. Banford heard from Kelly Wheeler, the hockey team's Sports Information Director, that Nygaard reacted to the media reports by saying that he would have punched Banford in the face if he had seen her. Banford Dep. at 259; Wheeler Dep. at 100-01. But this threat was not made to Banford; she heard about it only second-hand from Wheeler. Moreover, when Banford complained to Finnerty about the threat, UMD conducted an investigation and suspended Nygaard for five days without pay. ECF No. 126. (Berlo later reversed the suspension.) Regardless, this isolated threat made outside of Banford's presence falls far short of the bad behavior experienced by the plaintiffs in *Rickard*, *McMiller*, *Anderson*, *LeGrand*, and *Duncan*—and those plaintiffs, it will be recalled, had their hostile-environment claims dismissed.

For these reasons, the Court grants UMD's motion for summary judgment on Banford's claim that she experienced a hostile work environment based on sex.

*c. Title IX Retaliation.* Banford, like Miller, alleges that she was terminated in retaliation for complaining that UMD violated Title IX by treating men's athletics programs better than women's athletics programs. In addressing Miller's claim, the Court concluded that, while Miller's evidence was thin, she had enough evidence to survive summary judgment. The Court reaches a different conclusion about Banford.

As the Court has already held, Banford was not terminated *at all* from her job as head softball coach.  The record is also clear that Banford was terminated from her job as director of hockey operations so that Miller's replacement would be free to hire her own staff.  There is no evidence supporting Banford's claim that the real reason for her termination from her hockey-operations position was to retaliate against her for complaining about Title IX violations.

Banford expressed concerns to Berlo about the field that the women's softball team had to use, but that occurred in 2013, which predated the termination of her hockey-operations position by more than a year.  This lack of temporal proximity undermines any retaliatory nexus.  *See, e.g.*, *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017).  Further undermining any such nexus is the fact that Berlo gave Banford an extremely positive performance review in May 2014, which was *after* she complained about the field.  ECF No. 89 at 16-24.

As already noted, Banford also complained to the media about UMD's treatment of her specifically and the women's athletics program generally in January 2015.  Far from being retaliated against, however, the record reveals that she received a new offer to coach the softball team a mere nine days later, and she was encouraged to apply for a position with the newly hired women's hockey coach.  ECF No. 89 at 95-96.  Banford

turned down that offer[9]—and, on the same day, complained to Finnerty about a host of

perceived gender-equity issues. She made additional complaints in the months that

followed. At that point, however, the die was cast. Banford had rejected UMD's offer

and made clear that she would be leaving at the end of the season. It is therefore

difficult to identify any adverse action that UMD took in retaliation for these

complaints—which, the Court notes, were forwarded by Finnerty to the University of

Minnesota's Office of Equal Opportunity and Affirmative Action. That office

investigated Banford's complaints and found that, with one exception (the complaint

about Nygaard's comment, which is described above), the complaints were without

substance. *See* ECF No. 137.

---

[9]Though far from clear, Banford may intend to argue that her working conditions were so intolerable that she had no choice but to turn down UMD's offer. In other words, Banford may be claiming that she was constructively discharged. If Banford is making such a claim, the Court rejects it. The Court has already held that the conduct that Banford cites was not sufficiently severe or pervasive to support a hostile-environment claim; necessarily, then, that same conduct does not support a constructive-discharge claim. *See Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004). Moreover, a reasonable jury could not conclude that UMD "deliberately created intolerable working conditions *with the intention of forcing her*" to reject its contract offer. *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (emphasis added) (citation and quotations omitted), *petition for cert. filed* (U.S. Jan. 16, 2018) (No. 17-1015); *see also Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 768 (8th Cir. 2014) (evidence showing employer's "intent to maintain an employment relationship" undermined constructive-discharge claim).

For these reasons, the Court grants UMD's motion for summary judgment on

Banford's claim that she was terminated in retaliation for complaining about violations

of Title IX.

### 3. Wiles

Wiles alleges (1) discrimination based on sex with respect to being constructively

discharged in violation of Title VII; (2) hostile work environment based on sex in

violation of Title VII; (3) retaliation in violation of Title IX; and (4) violation of the EPA.

Having reviewed the record carefully, the Court concludes that Wiles, like Banford,

does not have sufficient evidence to survive summary judgment on any of her claims.

*a. Sex Discrimination and Hostile Work Environment.* Wiles's main claim is that

UMD constructively discharged her—that is, "forced [her] to resign less than 3 weeks

before her contract's end date." Mem. in Opp'n at 35. "To prove a case of constructive

discharge, a plaintiff must show (1) a reasonable person in her situation would find the

working conditions intolerable, and (2) the employer intended to force her to quit."

*Anda v. Wickes Furniture Co.*, 517 F.3d 526, 534 (8th Cir. 2008) (citation, quotations, and

brackets omitted).

A constructive-discharge claim is analytically distinct from a hostile-environment

claim. *See Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 954 (8th Cir. 2011).

Both, however, require the plaintiff to prove not just that she experienced bad conduct,

but that she experienced *really* bad conduct.  In connection with a hostile-environment

claim, a plaintiff must (as discussed above) establish conduct that was so "'severe or

pervasive' . . . as to create an 'objectively hostile or abusive work environment.'"

*Crawford*, 665 F.3d at 983 (quoting *Harris*, 510 U.S. at 20).  In connection with a

constructive-discharge claim, a plaintiff must establish conduct that "[a] reasonable

person in her position would . . . have found . . . so intolerable that she was compelled

to resign."  *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007).

The constructive-discharge standard is even more difficult to meet than the hostile-

environment standard.  *See Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A

hostile-environment constructive discharge claim entails something more [than an

actionable hostile work environment].");  *see also Brenneman*, 507 F.3d at 1143-45 (finding

that the conduct experienced by plaintiff was sufficiently severe to create an objectively

hostile environment, but not so intolerable as to compel a reasonable person to resign).

Here, Wiles points to the same evidence to support both her hostile-environment

and constructive-discharge claims.  *See* Mem. in Opp'n at 39 (supporting her

constructive-discharge claim with the argument that UMD's athletics department "was

objectively and subjectively hostile to all women").  Like Miller and Banford, Wiles cites

a host of matters she labels as "hostile," such as disputes over her budget, exclusion

from meetings and committees, the imposition of charges for wear and tear on her

UMD-leased car, and being "treated coldly by Berlo."  Mem. in Opp'n at 8-9, 15, 40.  But there is no evidence that any of these run-of-the-mill disputes had anything to do with the fact that Wiles is a woman.  And even if, say, Wiles would not have experienced a dispute over wear-and-tear charges if she had been a man, the conduct that she cites falls far short of the type of conduct needed to support a hostile-environment or constructive-discharge claim.

Indeed, the story told by Wiles strongly suggests that whatever hostility she experienced was related to her *sexual orientation*, not her *sex*.  According to Wiles, she got along very well with Berlo until October 2013, during which time Berlo obviously knew that Wiles was a woman.  In October 2013, however, Berlo learned that Wiles would be speaking at a "Coming Out Day Luncheon."  Berlo declined Wiles's invitation to attend the luncheon and made a comment about the event that she perceived as hostile to homosexuals.  After that, according to Wiles, Berlo was hostile to her.

Wiles's claim is difficult to square with the fact that Berlo gave her an extremely positive performance review in April 2014—that is, long after the Coming Out Day Luncheon.  *See* ECF No. 226.  It is hard to know why an "extremely homophobic" athletics director who was plotting to "purge" lesbians from his department would give such a glowing review to Wiles.  *See, e.g.*, Mem. in Opp'n at 11 (Wiles complaining Berlo

"was extremely homophobic and on a 'witch hunt' to fire her"); *id.* at 16 (arguing that Berlo enacted a "[p]lan[] to purge six lesbian coaches and staff").

The relationship between Wiles and Berlo did sour after the April 2014 performance review, but the cause of that deterioration is clear from the record. Berlo directed that all student athletes at UMD (male and female) be surveyed on an annual basis about their experiences. Wiles was the only coach whose players expressed significant criticism, and Wiles took the news very hard. Berlo did not help matters when he used the negative feedback to justify giving Wiles a salary increase that was smaller than the raise she otherwise would have received—a decision that the University later deemed to be inequitable.

None of this is evidence of sex discrimination. Wiles acknowledges that there is no evidence in the record suggesting that any male coach received a higher salary increase after receiving similarly negative feedback. Nor is there any indication that Berlo used the survey results as a pretext to force Wiles to resign. Indeed, Berlo was generally *supportive* of Wiles—notwithstanding the fact that her players were harshly critical of her—and he continued to give her encouragement in face-to-face meetings and through text messages and emails. *See* ECF No. 91 at 124, 135; ECF No. 94 at 11, 13; ECF Nos. 167, 169, 173, 175.

Wiles contends that Berlo's hostility culminated in her not receiving a contract offer by the time she resigned in June 2015. But (as Wiles acknowledged at her deposition) renewal of her contract was *automatic* unless she received six months' advance notice of non-renewal, which she indisputably did not receive. Wiles Dep. (ECF No. 189) at 44-45. In other words, Berlo effectively renewed Wiles's contract when he did not provide six months' notice of an intent to non-renew. Wiles has no explanation for why Berlo would give her positive performance reviews, support her in the face of negative player evaluations, and *renew her contract* if he was trying to force her to quit.

For these reasons, the Court grants UMD's motion for summary judgment on Wiles's hostile-environment and constructive-discharge claims.

   *b. Title IX Retaliation.* Wiles claims that she was constructively discharged in retaliation for complaining about violations of Title IX. But the Court has already held that no reasonable jury could find that Wiles was constructively discharged. The Court therefore grants UMD's motion for summary judgment on Wiles's claim of retaliation under Title IX.

   *c. Equal Pay Act.* Wiles asserts a claim under the EPA, contending she was paid less than Matt Bowen, the head coach of the men's basketball team. But Berlo has submitted a declaration explaining that, during the last two years of Wiles's

employment (the 2013-14 and 2014-15 seasons[10]), Wiles's total compensation actually *exceeded* Bowen's.  ECF No. 453 ¶ 11.

Wiles disputed Berlo's figures at oral argument, pointing to the report of her expert witness, Donna Lopiano.  *See* Lopiano Report (ECF No. 73).  But a comparison of the numbers in the Lopiano report to those in the Berlo declaration suggests that Lopiano *excluded* certain items when calculating *Wiles's* total compensation, but *included* similar items when calculating *Bowen's*.  For example, Lopiano appears to have included in Bowen's 2013-14 compensation a $7,200 vehicle stipend that he received.  *Compare* Lopiano Report at 92-93 *with* ECF No. 453 ¶ 11.  Yet Lopiano appears to have excluded from Wiles's compensation the value of the leased vehicle that she received.

In short, Wiles appears to rest her EPA claim on an apples-to-oranges comparison.  Hence, the Court does not believe that she has met her burden of demonstrating that she was paid less than Bowen.  *See, e.g.*, *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (EPA plaintiff bears initial burden of showing that defendant paid male employees more than females).

Even if Miller's numbers were accepted, they show a disparity in pay during the relevant time period of just over two percent.  As it did with respect to Miller, UMD

---

[10]A two-year statute of limitations applies to non-willful EPA violations.  29 U.S.C. § 255(a).  Plaintiffs do not allege that any violation of the EPA by UMD was willful.

offers a market-based justification for this small difference between Wiles's and

Bowen's compensation.  UMD also submitted evidence that, while Wiles's salary was

above market for women's basketball coaches, Bowen's salary was below market for

men's basketball coaches.  In her brief, Wiles offered no response to UMD's evidence.

When pressed at oral argument, Wiles simply pointed to *Drum*, which does not help her

for the same reason that it does not help Miller.

The Court therefore grants UMD's motion for summary judgment on Wiles's

EPA claim.

## II.  MOTION FOR SEPARATE TRIALS

UMD has moved (ECF No. 273) for separate trials on the claims of each plaintiff.

This motion is denied as moot, given that only Miller has claims that remain to be tried.

## III.  MOTION TO EXCLUDE EXPERT TESTIMONY

Finally, UMD has moved (ECF No. 69) to preclude Lopiano from testifying at

trial under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  As noted at the

hearing, the Court doubts that it will permit Lopiano to testify about much, if it permits

her to testify at all.  But as also noted at the hearing, the Court believes that Lopiano's

proposed testimony is better addressed through a motion in limine that focuses

specifically on the two claims that will be tried:  Miller's claim that her contract was not

renewed because of her sex, and Miller's claim that her contract was not renewed in

retaliation for her complaining about Title IX violations.[11]  The Court will therefore deny

UMD's motion without prejudice.[12]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    UMD's motion for summary judgment on Annette Wiles's claims [ECF

No. 75] is GRANTED.  All of Wiles's federal claims are DISMISSED WITH

PREJUDICE AND ON THE MERITS.  All of Wiles's state claims are

DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION.

---

[11]The Court notes that whether UMD *in fact* violated Title IX—the focus of much of Lopiano's expert report—is largely irrelevant to Miller's retaliation claim.  *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000) ("A finding of unlawful retaliation . . . is not conditioned on the merits of the underlying discrimination complaint. . . . A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law.").  The Court has no intention of trying the question of whether UMD violated Title IX or permitting Lopiano or anyone else to testify regarding that topic.  Any probative value that such evidence would have on the question of whether Miller was terminated for *complaining* about perceived Title IX violations would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and wasting time.  *See* Fed. R. Evid. 403.

[12]The University recently asked that, prior to February 9, 2018, the Court hear and rule upon a *Daubert* motion to exclude Lopiano's anticipated trial testimony.  ECF No. 500.  That request is denied in light of the fact that the Court has dismissed all of plaintiffs' claims save two, and the fact that the Court has already indicated at oral argument and in this order that it does not anticipate that Lopiano will be allowed to offer much testimony regarding the two surviving claims.

2.      UMD's motion for summary judgment on Jen Banford's claims [ECF

No. 82] is GRANTED.  All of Banford's federal claims are DISMISSED

WITH PREJUDICE AND ON THE MERITS.  All of Banford's state claims

are DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION.

3.      UMD's motion for summary judgment on Shannon Miller's claims [ECF

No. 79] is GRANTED IN PART and DENIED IN PART.  All of Miller's

federal claims—save her Title VII discrimination and Title IX retaliation

claims—are DISMISSED WITH PREJUDICE AND ON THE MERITS.  All

of Miller's state claims are DISMISSED WITHOUT PREJUDICE FOR

LACK OF JURISDICTION.

4.      UMD's motion for separate trials [ECF No. 273] is DENIED AS MOOT.

And

5.      UMD's motion to exclude the expert testimony of Donna Lopiano, Ph.D.

[ECF No. 69] is DENIED WITHOUT PREJUDICE.

Dated: February 1, 2018                          s/Patrick J. Schiltz
                                                Patrick J. Schiltz
                                                United States District Judge