UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SHANNON MILLER,                                    Case No. 15-CV-3740 (PJS/LIB)

        Plaintiff,

v.                                                                    ORDER

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MINNESOTA,

        Defendant.

---

Sharon L. Van Dyck, Donald Chance Mark, Jr., and Andrew T. James, FAFINSKI
MARK & JOHNSON, P.A.; Dan Siegel and Jane Brunner, SEIGEL, YEE &
BRUNNER, for plaintiff.

Jeanette M. Bazis and Katherine M. Swenson, GREENE ESPEL PLLP; Douglas R.
Peterson and Timothy J. Pramas, UNIVERSITY OF MINNESOTA, for defendant.

In 1998, plaintiff Shannon Miller was hired as the head coach of the women's

hockey team at defendant University of Minnesota Duluth ("UMD"). After the team

struggled, Miller was told that her contract would not be renewed following the 2014-

2015 school year. Miller sued UMD, asserting claims of sex discrimination under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and retaliation under

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (as well as other

claims, which were dismissed). A jury found that UMD had discriminated and

retaliated against Miller and awarded her $744,832 in back pay and benefits and

$3,000,000 in other past damages.

This matter is before the Court on Miller's motion for reinstatement or, in the alternative, front pay on her Title IX claim. (Miller is not entitled to reinstatement or front pay on her Title VII claim.[1]) For the reasons that follow, the Court grants Miller's motion in part. The Court will not order UMD to reinstate Miller, but will order UMD to pay front pay and future benefits in the amount of $461,278.[2]

### A. Standard of Review

"The choice between the two equitable remedies of reinstatement and front pay clearly belongs to the court." *Newhouse v. McCormick & Co.*, 110 F.3d 635, 643 (8th Cir. 1997). Reinstatement is the preferred remedy. *Olivares v. Brentwood Indus.*, 822 F.3d 426, 429 (8th Cir. 2016) ("The equitable remedy of reinstatement should be the norm when practicable and possible." (citation and quotation marks omitted)). If the court elects to

---

[1]With respect to Miller's Title VII claim, the jury found that, while Miller's sex was a motivating factor in UMD's decision not to offer her a new contract, UMD would have made the same decision regardless of her sex. ECF No. 569. As a result, Miller is not entitled to reinstatement or damages on her Title VII claim. 42 U.S.C. § 2000e–5(g)(2)(B); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94-95 (2003).

Although Miller is thus seeking reinstatement or front pay solely with respect to her Title IX claim, the parties in their briefing have relied on cases arising under Title VII and other employment laws. The Court follows suit.

[2]In entering judgment, the Court must accept the jury's determinations regarding liability, back pay, past benefits, and other past damages. UMD will undoubtedly file post-judgment motions to challenge some of the jury's determinations, and the Court will then decide whether to uphold those determinations.

award front pay in lieu of reinstatement, the amount of front pay is also for the court to determine.  *Newhouse*, 110 F.3d at 643.

Although reinstatement and front pay are for the Court to determine, the Court is bound by the jury's findings on issues that were properly submitted to it and may not reject or contradict those findings in making a determination as to reinstatement or front pay.  *Olivares*, 822 F.3d at 430; *Salitros v. Chrysler Corp.*, 306 F.3d 562, 573 (8th Cir. 2002).

## B.  Reinstatement

As noted, reinstatement is the preferred remedy.  Indeed, front pay "should only be awarded in lieu of reinstatement when extraordinary circumstances render reinstatement 'impractical or impossible.'"  *Mathieu v. Gopher News Co.*, 273 F.3d 769, 778 (8th Cir. 2001) (quoting *Newhouse*, 110 F.3d at 641)).  Among the circumstances that render reinstatement impractical or impossible are the lack of an available position. *Olivares*, 822 F.3d at 429 ("Reinstatement may however not be possible when there are no comparable positions available."); *see also Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 12 (1st Cir. 1997) (front pay is an alternative remedy if reinstatement is not available because the position is occupied); *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (reinstatement is not appropriate when it "would require displacement of a non-culpable employee"); *EEOC v. Century Broad. Corp.*, 957 F.2d 1446, 1463 (7th Cir.

1992) ("reinstatement can reasonably be denied when someone else currently occupies the employee's former position" (citation and quotations omitted)).

After declining to offer Miller a new contract, UMD hired Maura Crowell to replace Miller as the head coach of the women's hockey team, and Crowell remains in that position. Trial Tr. 365-66, 704-06. Neither party contends that there are any comparable positions at UMD to which Miller could be reinstated. For that reason alone, reinstatement is impractical in this case.

In addition, given the unusual nature of Miller's former position, reinstatement would be much more disruptive than reinstatement in the more typical case involving, say, a factory worker or a flight attendant. Head coaches normally are entitled to hire their own staff, *see, e.g.*, Trial Tr. 706-07, 1006-07, and UMD follows this practice, Trial Tr. 248-49, 339-40. Reinstating Miller would thus cause not only Crowell to lose her job, but also the members of Crowell's staff, even though all of them are innocent bystanders. In addition, there was ample testimony at trial that player recruitment depends heavily on the identity of the head coach and that uncertainty regarding the coach's tenure can hurt recruiting. Trial Tr. 77, 103-05, 118-21, 172. Crowell is now in her fourth season at UMD, and thus many of the current players were recruited by Crowell and expected that they would be coached by Crowell. Given the substantial disruption that a change in coaches would cause at this point—and given the

substantial hardship that such a change would inflict on Crowell, her staff, and her players—reinstating Miller is highly impractical. *Cf. Kucia v. Se. Ark. Cmty. Action Corp.*, 284 F.3d 944, 949 (8th Cir. 2002) (equitable remedies "should depend on the state of facts existing at the time the remedy is either granted or denied").

For these reasons, the Court will not order UMD to reinstate Miller.

## C. Front Pay

"An equitable award of front pay is generally appropriate when reinstatement must be denied." *United Paperworkers Int'l Union, AFL-CIO v. Champion Int'l Corp.*, 81 F.3d 798, 805 (8th Cir. 1996). The plaintiff must prove a basis for a front-pay award, after which the burden shifts to the defendant to disprove the plaintiff's prima facie case. *Olivares*, 822 F.3d at 430; *Curtis v. Elec. & Space Corp.*, 113 F.3d 1498, 1503 (8th Cir. 1997).

In determining the amount of front pay, courts consider such factors as (1) the plaintiff's age; (2) the length of the plaintiff's employment with the defendant; (3) the likelihood that the plaintiff's employment would have continued absent the unlawful conduct; (4) the length of time it will take the plaintiff to secure comparable employment; (5) the plaintiff's work and life expectancy; (6) whether the plaintiff was an at-will employee; (7) the length of time other employees typically hold the position; and (8) the plaintiff's ability to work. *Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003,

1014-15 (N.D. Iowa 1998), *aff'd*, 214 F.3d 999 (8th Cir. 2000), *and cited in Dollar v.*

*Smithway Motor Xpress, Inc.*, 710 F.3d 798, 810 (8th Cir. 2013).  Because front-pay awards

depend on predictions, they are necessarily somewhat speculative and "metaphysical

certainty" is not required.  *Dollar*, 710 F.3d at 809.

### 1.  Prima Facie Case

Miller, who is currently 55 years old, *see* Cobb Decl. ¶ 6, requests a front-pay

award in the range of $1,799,000 to $2,941,000.  The lower figure represents front pay

minus an optimistic amount of mitigation up to age 67, when Miller would be eligible

for full Social Security benefits; the higher figure represents front pay minus a

pessimistic amount of mitigation up to age 70, when Miller intends to retire.  Included

in the mitigation calculation are deductions for Miller's salary as head coach of the

Calgary Inferno women's professional hockey team, a position that she obtained in

June 2018.[3]  Miller Decl. ¶¶ 3-4.

UMD argues that Miller failed to establish a prima facie case for front pay

because she did not produce documentary evidence of her salary with the Inferno.

---

[3]UMD has submitted a newspaper article reporting that Miller quit her position
with the Inferno in December 2018.  ECF No. 613.  Miller objects to the consideration of
this article.  ECF No. 614.  At this point, Miller's position with the Inferno is relevant
only to the extent that her salary must be deducted from any front pay award.  As the
award sought by Miller assumes that she will be paid her full salary—and as Miller has
not asked the Court to reduce the offset in light of her apparent resignation from the
Inferno—the Court sees no reason to address the matter further.

Miller has since produced her contract, which confirms that her salary is $30,000 for the 2018-2019 season. *See* ECF No. 609 at 5, 7. The Court therefore rejects UMD's argument that Miller has failed to offer a prima facie case for front pay.

## 2. Failure to Mitigate

UMD next argues that Miller has failed to mitigate her damages. As a preliminary matter, the Court rejects UMD's argument that the Court is free to determine for itself whether Miller's *pre*-verdict mitigation efforts were sufficient. The jury was instructed that if Miller failed to mitigate her damages, then the jury should reduce the amount of her back pay commensurately. ECF No. 577 at 8. Armed with these instructions, the jury awarded Miller the full amount of her back-pay request. *Compare* Trial Tr. 1852 (closing argument asking for $744,832) *with* ECF No. 569 at 3 (awarding $744,832). As juries are presumed to follow their instructions, *United States v. Smith*, 910 F.3d 1047, 1053 (8th Cir. 2018), the jury must necessarily have found that Miller met her duty to mitigate her damages up to the date of the verdict. The Court is not free to disregard this finding. *Olivares*, 822 F.3d at 430; *Salitros*, 306 F.3d at 573.

The cases UMD cites are not to the contrary. In *Moysis v. DTG Datanet*, the Eighth Circuit affirmed the district court's conclusion that, in light of the plaintiff's current employment and back-pay and compensatory awards, awarding front pay would confer a windfall. 278 F.3d 819, 829 (8th Cir. 2002). But the plaintiff did not

contend that the denial of front pay was in any way inconsistent with the jury's findings, and the Eighth Circuit therefore had no occasion to address the issue.

In *Kucia v. Southeast Arkansas Community Action Corp.*, the district court awarded front pay, but failed to explain why reinstatement was impractical or impossible.  284 F.3d 944, 949 (8th Cir. 2002).  The Eighth Circuit remanded the case for the district court to address the issue and noted that, because equitable remedies "depend on the state of facts existing at the time the remedy is either granted or denied," the district court could take additional evidence.  *Kucia* does not stand for the proposition that the district court is free to disregard the jury's implicit findings.

Finally, in *Excel Corp. v. Bosley*, the plaintiff argued that the denial of front pay was inconsistent with the jury's back-pay award.  165 F.3d 635, 640 (8th Cir. 1999).  The Eighth Circuit stated that "while the district court is not free to reject the jury's findings, the determination of front pay should be made after considering all of the circumstances regarding the claimant's employment situation that are relevant to the issue of front pay."  *Id.*  In light of the paucity of evidence regarding the plaintiff's efforts to find additional work and the amount of time that had passed since the verdict, the Eighth Circuit rejected the argument that the denial of front pay was inconsistent with the verdict.  *Id.* at 639-40.  In other words, *Excel Corp.* reaffirmed that district courts are bound by the jury's findings and simply held that, in light of the circumstances

existing at the time of the front-pay determination, it was not an abuse of discretion for the district court to deny front pay. The Court will therefore limit its inquiry to Miller's *post*-verdict mitigation efforts.

"A party harmed by a discriminatory employment decision is subject to an affirmative duty to mitigate his damages by reasonably seeking and accepting other suitable employment." *Mathieu*, 273 F.3d at 783. A plaintiff is required to exercise reasonable diligence, but the duty "is not onerous and does not require success . . . ." *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir. 1998) (citation and quotation marks omitted). Nor is the plaintiff required to "go into another line of work, accept a demotion, or take a demeaning position." *Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014) (citation and quotation marks omitted). "All that is required by law is an honest, good faith effort." *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988). UMD bears the burden of proving that Miller has failed to mitigate. *Townsend*, 774 F.3d at 466.

In April, May, and June of 2018, Miller applied for twelve positions. Miller Decl. Ex. 1. As noted, she accepted an offer to be the head coach for the Calgary Inferno in June 2018. Miller Decl. ¶ 4. Although it was a part-time position and Miller was not contractually precluded from other employment, Miller Decl. ¶ 4, ECF No. 609 at 8, Miller was required to relocate to Calgary and could not perform her duties remotely,

Miller Decl. ¶ 5, effectively precluding her from accepting another suitable coaching position while with the Inferno.  In addition, Miller worked "nonstop—morning, noon, and night," to recruit new players; through these efforts, Miller hoped to receive another contract.  Miller Decl. ¶ 6.

UMD contends that Miller's efforts were insufficient because she did not apply for numerous other positions that opened after the trial concluded.  The Court disagrees.  The job market for Miller is narrow and highly specialized:  head coach of a professional hockey team (men's or women's) or a Division I college hockey team (men's or women's).  But UMD identifies a wide array of jobs outside of this market, including jobs in compliance (for which Miller lacks the appropriate background and skills, Second Miller Decl. ¶ 6(d)), head-coaching positions at Division II and III schools, and assistant-coaching positions.  A position as the head coach of a Division II or III team—or as an assistant coach at any level—would be a demotion.  The law does not require Miller to accept a demotion.  Moreover, as Miller attests, if she accepted a demotion, she would be less likely to receive an offer to coach a professional or Division I team.  Second Miller Decl. ¶¶ 6(a), (d), 8(f).  In addition, many of the jobs that UMD identifies either were not publicly posted or became available only after Miller had already accepted the position with the Inferno.  Second Miller Decl. ¶¶ 8-10.

Miller limited her job search to geographic areas where she would be willing to live. Second Miller Decl. ¶ 6(c). She acted within her rights; as a general rule, the duty to mitigate does not require a plaintiff to relocate.[4] Indeed, it is possible that UMD's failure to identify a suitable position that would not require Miller to move is fatal to its argument that Miller failed to mitigate. Miller does not make this argument, however, and the Court need not address it. Suffice it to say that it is not reasonable to demand that Miller be ready and willing to move anywhere in the world where there might be an open position. The law entitles Miller to exercise some discretion regarding the locations to which she is willing to move.

For these reasons, the Court finds that Miller has made reasonable efforts to mitigate following the jury's verdict.

---

[4]*See Canny v. Dr. Pepper/Seven-Up Bottling Grp.*, 439 F.3d 894, 905 (8th Cir. 2006) (defendant failed to meet its burden to show failure to mitigate where, among other things, its offer of reinstatement would have required plaintiff to relocate); *Arlington Hotel Co. v. NLRB*, 876 F.2d 678, 680 (8th Cir. 1989) ("Here, AHC did not show the number of substantially equivalent positions *in the Hot Springs area* for which Avant could have applied. Thus, the record does not support AHC's contention that Avant's efforts to find employment before March 1982 were deficient." (emphasis added)); *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983) (evidence of police-chief positions in other Nebraska towns was not by itself sufficient to meet defendant's burden to show failure to mitigate; "Coleman cannot be required to move from his home 'in order to reduce damages caused by the [defendant's] unlawful acts.'" (quoting *Hegler v. Bd. of Educ.*, 447 F.2d 1078, 1081 (8th Cir. 1971)); *Jackson v. Wheatley Sch. Dist. No. 28*, 464 F.2d 411, 413-14 (8th Cir. 1972) ("[T]he burden is on the Board of Education to prove that [the plaintiff] could have obtained employment as a teacher in or near the community where the family lived.").

### 3.  Amount of Front Pay

Finally, UMD argues that Miller's calculation of front pay is overly speculative and unreasonable, largely because she seeks front pay through retirement (at either age 67 or age 70) and because her expert's calculations assume an unrealistically low level of future earnings.  Specifically, Miller contends that, had she not been terminated, she would have remained the head women's hockey coach at UMD for an additional 12 to 15 years past the date of the verdict, for a total of 15 to 18 years beyond the date of her termination.  Cobb Decl. ¶ 7.  She also assumes that she will earn around $30,000 per year until 2022-2023, when she proposes that she will begin to earn either $60,000 (at the low end) or $140,000 (at the high end), with annual increases of 3 percent after that. Cobb Decl. ¶¶ 13-14.

The Court generally agrees with UMD that Miller's front-pay request is inflated and excessive.  To begin with, although Miller has not yet had much success in matching her previous earnings, it is not reasonable to assume that she will never do so. There was ample evidence at trial that Miller is an outstanding hockey coach—arguably one of the most successful college hockey coaches of all time.  Trial Tr. 284-85, 481.  She is also a well-educated, driven, and energetic individual with strong leadership skills. Before becoming a hockey coach, Miller was a police officer for ten years.  Trial Tr. 892. After being terminated by UMD, she and her partner moved to Palm Springs and

started a pedal-pub business.  Trial Tr. 994, 1281.  Given the breadth of Miller's skills and experiences, the Court agrees that it is unrealistic to assume that she will remain underemployed for the remainder of her working life.

More importantly, it is wildly speculative to assume that Miller would have remained employed as the head women's hockey coach at UMD for 12 to 15 years past the date of the verdict—that is, for a total of almost 35 years.  Miller argues that front pay through retirement is appropriate in a case involving an older plaintiff who is close to retirement and who has had difficulty mitigating her damages.  But by her own admission, Miller is not close to retirement.  As UMD points out, Miller was the head women's hockey coach at UMD for 17 years, and she is seeking a combined total of back and front pay equal to 15 to 18 years.  In other words, Miller herself is asserting that she was only about halfway through her expected tenure at UMD when she was terminated.

In addition, Miller was employed as the head coach of a Division I team sport—a notoriously precarious position in which individuals rarely enjoy tenures of 30 years or more.  On top of that, Miller was one of the highest paid Division I women's hockey coaches in the country.  Trial Tr. 70.  UMD understandably had very high expectations for Miller's performance—performance that would depend on numerous variables, only some of which were within Miller's control.

Miller cites several cases in which the plaintiff was awarded front pay through retirement. But as a highly compensated, high-profile figure who worked under individually negotiated contracts, Miller is not comparable to the low-level employees in those cases, all of whom were awarded front pay for a shorter period than Miller is seeking. *See, e.g.*, *Salitros*, 306 F.3d at 570-74 (affirming seven years of front pay through retirement for disabled warehouse worker); *Mathieu*, 273 F.3d at 779 (affirming eight years of front pay for delivery manager who had worked for the company for 34 years); *Newhouse*, 110 F.3d at 639, 642-43 (affirming front pay through normal retirement age for failure to rehire 61- year-old salesman who had previously worked for the company for 23 years); *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 285-86 (8th Cir. 1993) (affirming ten years of front pay for secretary who was constructively discharged); *cf. United Paperworkers Int'l Union*, 81 F.3d at 805 (remanding for new trial on liability and expressing "grave doubt" that an award of 24 years of front pay through retirement for power-plant worker could be upheld).

While the Court declines to award front pay through retirement, the Court does not agree with UMD that the jury's back-pay award is sufficient by itself to compensate Miller for lost wages and benefits. At the time of her termination, Miller was seeking a two-year contract extension, Def. Trial Ex. 54, and she had told UMD that after coaching for two additional years, she wanted to take a year off and then do something else with

her life, Trial Tr. 1092-93. UMD argues that this evidence demonstrates that Miller intended to coach for only two more years. At trial, however, Miller characterized her statements as a negotiating ploy that she adopted in light of UMD's apparent reluctance to offer her a new contract. Trial Tr. 993. Miller testified that she thought that UMD would be more comfortable with a two-year extension and that this would give her a chance to improve the team and put her in a strong position for the next round of negotiations. Trial Tr. 993-94. The jury found that, but for UMD's unlawful retaliation, Miller would have been employed at UMD on the date of the verdict, which would put her past the two-year contract extension she was seeking. In other words, the jury seems to have credited Miller's contention that she intended to stay at UMD longer than two years.

In light of the jury's finding, the Court determines that front pay through June 2020 is a reasonable award. This represents a total of five years of pay past the end of Miller's last contract. Notably, in her request for reinstatement, Miller argues for a five-year contract. ECF No. 602 at 6. And a total of five additional years would have given the parties ample time to evaluate Miller's performance.

Beyond that timeframe, however, the Court cannot reasonably find that Miller would have remained employed by UMD. Although Miller may not have been sincere when she told UMD that she intended to retire from coaching in two years, she did

make that representation to UMD.  That representation would undoubtedly have caused UMD to question Miller's commitment to the job—and that, in turn, would have made it less likely that UMD would have locked itself into a long-term contract with her.  Setting that aside, there are simply too many unknowable variables that would have affected Miller's continued employment.  To remain employed, she would have had to win—and she would have had to win a lot, given her very high salary.  No one can know with any degree of confidence whether Miller would have been able to achieve the kind of success necessary to remain employed at UMD beyond 2020.

With respect to the amount of front pay, the Court finds that Miller's calculation of her losses through June 2020 is reasonable.  UMD contends that Miller's assumed rate of pay increase is too large and that Miller's assumed amount of estimated mitigation is too small.  Were the Court awarding front pay for a longer period, it might be inclined to agree, as any errors would have a large compounding effect.  Under the circumstances, however, and given the uncertainty that is inherent in determining front pay, the Court will adopt Miller's proposed salaries and mitigation reductions for the 2018-2019 and 2019-2020 academic years.  The Court therefore awards front pay in the amount of $414,713 and future benefits in the amount of $46,565, for a total award of $461,278.  *See* Cobb Decl. ¶¶ 15, 17.

ORDER

Based on the foregoing, the jury's verdict, and all of the files, records, and

proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motion for reinstatement or front pay [ECF No. 601] is

        GRANTED IN PART and DENIED IN PART.

2.      Plaintiff shall recover from defendant the total sum of $4,206,110,

        consisting of (1) $461,278 in front pay and future benefits; (2) $ 744,832 in

        back pay and past benefits; and (3) $3,000,000 in other past damages.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 13, 2019                   s/Patrick J. Schiltz_____
                                           Patrick J. Schiltz
                                           United States District Judge