UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SHANNON MILLER,                                  Case No. 15-CV-3740 (PJS/LIB)

                    Plaintiff,

v.                                                          ORDER

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MINNESOTA,

                    Defendant.

Sharon L. Van Dyck, VAN DYCK LAW FIRM, PLLC; Donald Chance Mark, Jr.,
FAFINSKI MARK & JOHNSON; Dan Siegel and Jane Brunner, SIEGEL, YEE,
BRUNNER & MEHTA, for plaintiff.

Jeanette M. Bazis and Katherine M. Swenson, GREENE ESPEL PLLP; Douglas R.
Peterson and Timothy J. Pramas, UNIVERSITY OF MINNESOTA, for defendant.

In 1998, plaintiff Shannon Miller was hired as the head coach of the women's

hockey team at defendant University of Minnesota Duluth ("UMD").  After several

extensions, Miller's contract was set to expire on June 30, 2015.  Throughout the

summer and fall of 2014, UMD rebuffed Miller's attempts to negotiate a new contract

and then, on December 9, 2014, UMD abruptly informed Miller that it would not be

renewing her contract.

Miller, along with former UMD coaches Jen Banford and Annette Wiles, brought

this lawsuit against UMD, asserting claims of sex discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and retaliation under Title IX of the

Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (along with several other claims).  The Court granted UMD's motion for summary judgment on all of Banford's and Wiles's claims and on all of Miller's claims save her Title VII sex-discrimination claim and her Title IX retaliation claim, which were tried before a jury in March 2018.

The jury found that, by refusing to offer Miller a new employment contract, UMD had discriminated and retaliated against her.  The jury awarded Miller $744,832 in back pay and benefits and $3 million in other past damages.  ECF No. 569.  The Court later awarded Miller front pay and benefits in the amount of $461,278 and entered judgment.  ECF Nos. 615, 616.

This matter is before the Court on the parties' post-judgment motions.  UMD moves for judgment as a matter of law, a new trial, or remittitur.  Miller moves for an award of attorney's fees and expenses and to amend the judgment to add pre- and post-judgment interest.  For the reasons that follow, UMD's motion is denied except that the Court will conditionally grant a new trial on the amount of past non-economic damages and offer Miller the option of remitting the award to $750,000.  Miller's motion for pre- and post-judgment interest is granted in part and denied in part, and Miller's motion for attorney's fees and expenses is granted.

*A. Judgment as a Matter of Law*

UMD moves for judgment as a matter of law, arguing that (1) UMD's decision not to renew Miller's contract does not constitute an adverse employment action; and (2) there is insufficient evidence to support the verdict.

Judgment as a matter of law is warranted when a party has been fully heard on an issue and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1).  In considering a motion for judgment as a matter of law, the court must view the facts in the light most favorable to the nonmoving party and grant the nonmoving party the benefit of all reasonable inferences.  *See Canny v. Dr. Pepper/Seven-Up Bottling Grp.*, 439 F.3d 894, 899-900 (8th Cir. 2006).  The court should not grant the motion unless "all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party."  *Howard v. Mo. Bone & Joint Ctr.*, 615 F.3d 991, 995 (8th Cir. 2010) (citation and quotation marks omitted).

With respect to UMD's argument that failing to renew Miller's contract was not an adverse employment action:  The Court has already rejected this argument, which UMD made when moving for summary judgment.  *See* ECF No. 501 at 8-9.  The Court adheres to its view that UMD's decision not to renew Miller's contract was an adverse employment action.

With respect to UMD's argument regarding the sufficiency of the evidence: UMD argues that "overwhelming evidence" showed that athletic director Josh Berlo and UMD chancellor Lendley Black decided not to renew Miller's contract because they were dissatisfied with her recent performance, particularly in light of her high salary. This was indeed UMD's story at trial, and a reasonable jury could have credited it. But a reasonable jury could also have found that UMD's story was pretextual, and that the real motivation for UMD's decision was discrimination and retaliation.

The evidence at trial left no doubt that Miller was a world-class hockey coach and that UMD's decision not to renew her contract shocked many people familiar with the world of Division I women's hockey. Of course, the mere fact that others were surprised by UMD's decision does not mean that UMD acted unlawfully. But it provides context for other evidence in the case—evidence that, taken together, provided a sufficient basis for the jury's findings of discrimination and retaliation.

This evidence included UMD's markedly disparate treatment of Miller and Scott Sandelin, the coach of the men's hockey team. Miller's and Sandelin's careers at UMD largely overlapped, and there is no dispute that, as of the date that UMD decided not to renew Miller's contract, Miller's overall coaching record at UMD was much stronger than Sandelin's. During Miller's career at UMD, the women's team won five national

championships and had an overall record of .708.  P118.[1]  By contrast, as of the date of

Miller's non-renewal, the men's team under Sandelin had won one national

championship and had an overall record of .508.  P118.  Of course, as UMD strenuously

argued at trial, UMD was entitled to place more weight on Miller's *recent* performance

and to demand a lot from her in light of her high salary.  But the jury could reasonably

have concluded that Miller's and Sandelin's *recent* performances were not so dissimilar

as to explain UMD's treatment of Miller, particularly in light of Miller's overall stellar

record.

There was also robust evidence that, after Miller filed this lawsuit, UMD's

explanation for terminating her shifted from primarily budget based to primarily

performance based.  UMD points to evidence that it had raised the issue of Miller's

performance before it decided not to renew her contract.  But UMD ignores the overall

tenor of the parties' earlier discussions, which strongly suggested that UMD would

happily have renewed Miller's contract if not for the budget problems it was

experiencing.  In particular, UMD ignores the tenor of the December 9 discussion at

which Berlo and Black informed Miller that her contract would not be renewed.  During

that meeting, Miller repeatedly pushed for an explanation, and Berlo and Black

repeatedly emphasized budget shortfalls and denied that their decision had anything to

---

[1]The Court cites to trial exhibits as "P__" or "D__" and the trial transcript as
"TT__."

do with Miller's performance.  P64.  At trial, however, UMD reversed course and

insisted that it decided not to renew Miller's contract because her performance had

deteriorated so much in recent years that it would not have renewed her contract even

if she had agreed to a drastic salary reduction.

The jury could also have found that UMD's claim that Miller's non-renewal was

performance-based was inconsistent with UMD's actions.  If UMD was so unhappy

with Miller's recent performance that it was unwilling to keep her at any price, then

why did UMD continue to suggest throughout the summer and fall of 2014 that the

parties would eventually be able to reach an agreement?  Alternatively, if UMD wanted

to give Miller one last chance to improve her performance before making a final

decision, why did it give her only half a season to improve—and then yank the rug out

from under her when the team *was* improving (indeed, when the team was ranked sixth

in the nation)?

Given the shock in the hockey community about Miller's firing, the disparate

treatment of Miller and Sandelin, UMD's shifting rationales, and the mismatch between

UMD's actions before and claims during trial, the jury was entitled to find that UMD's

proffered explanation was pretextual, which in turn gave the jury a sufficient basis to

find discrimination and retaliation.  *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1101

(8th Cir. 1988) ("If Estes can establish that this proffered explanation was unworthy of

credence, then he will have made an indirect showing of discrimination which may persuade the finder of fact."), *overruled in part on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

In addition to evidence of pretext, there was scattered evidence from which the jury could have concluded that Berlo had difficulty working with powerful women and, in particular, thought that Miller needed to be taken down a peg.  For example, the jury heard about an incident in which Berlo objected to an April 2014 email blast to alumni touting the unparalleled success of the women's hockey team because, he said, it was "in poor taste."  TT 313-14, 748-49, 953-54.  In contrast, Berlo did not object to a large billboard celebrating his own selection as an athletic director of the year.  TT 749.  There were also other examples indicating hostility to women's hockey specifically and to powerful women generally.  *See, e.g.*, TT 54 (Berlo gave the cold shoulder to Kathryn Martin, the former chancellor of UMD); TT 868 (the women's hockey team "didn't get a lot of love" on the athletic department Twitter account); TT 940-41 (Berlo called Miller on a game day to talk about the budget, which Miller found highly unusual, and to tell Miller that she'd "better win"); TT 941-42 (Berlo described another coach who raised Title IX issues as "a pain in the ass"); TT 954 (women's hockey did not get a lot of marketing support); TT 970 (after Berlo became athletic director, the "Skate With the Bulldogs" event was scheduled when the women's team could not attend); TT 981

(before the women's series with Cornell, Berlo tweeted that "this will be a very telling weekend," but was silent after UMD swept Cornell); TT 1149 (Berlo decided to give a meal benefit only to the men's team and told Banford, who was also a member of Miller's staff, that she would have to "control" Miller to make sure she focused on what she had and not what the men had).

UMD countered all of these points with plausible arguments of its own. For example, UMD introduced evidence that the timing of its decision not to renew Miller's contract was the result of Miller herself insisting on a decision before Christmas. But the jury could reasonably have found that this was not the real reason for the timing of UMD's decision, as Miller had been pushing for a decision on her contract for months. Likewise, UMD argues that Sandelin is not a proper comparator because his contract was not up for renewal at the same time as Miller's. But the jury was not required to regard that distinction as significant. UMD had the right to terminate Sandelin without cause on 90 days' notice. TT 538-39. Moreover, Sandelin's contract was renewed in 2011 under Black and again in 2016 under both Black and Berlo despite the similarities in Miller's and Sandelin's recent records. P120, P121. The jury could reasonably have found that these renewals were difficult to square with Black's and Berlo's 2014 decision not to renew Miller's contract—which, significantly, was the first and only time Miller's contract was under consideration by either Black or Berlo.

Finally, UMD argues that most of the Title IX complaints Miller made were too remote in time to raise an inference of retaliation.  The jury could have found, however, that Miller continually complained to both Berlo and Black about disparities in resources between the men's and the women's teams.  TT 478-79, 958-64, 1138-39, 1226-27.  Indeed, evidence that Berlo anticipated—and tried to head off—Miller's objection to his plan to give a meal benefit to the men's team and not to the women's team is by itself strong evidence that Miller habitually complained of such disparities.  TT 1149.

There was also evidence indicating that Berlo found these complaints irritating.  Berlo called another coach who kept raising Title IX issues "a pain in the ass."  TT 941-42.  Moreover, after Berlo decided to offer a new meal benefit to the men's team but not to the women's team, he warned Banford that she would have to "control Shannon on this one and make sure she focuses on what she has and not what the men have."  TT 1149.  Based on this evidence, the jury could have found that Berlo was irritated by Miller's complaints about inequalities between the men's and women's programs and wanted to get rid of her.

UMD points out that it offered evidence calling into question whether Miller raised Title IX complaints as frequently as she claimed, as well as evidence that UMD took action in response to her complaints.  But the jury was not required to credit UMD's evidence about the frequency of Miller's complaints.  And the jury could also

have concluded that Miller remained dissatisfied with disparities in resources and that, as a result, UMD wanted her gone.  Moreover, the fact that UMD took action in response to Miller's complaints does not mean that UMD was not irritated by those complaints or that UMD did not retaliate against Miller for making them.  As noted, there was evidence from which the jury could have inferred that Berlo found Miller's complaints irksome.  Based on the evidence about Miller's and Berlo's interactions, the jury could also have inferred that Berlo was somewhat intimidated by Miller, who has a direct, forceful, and no-nonsense demeanor.  The jury could have inferred that Berlo was cowed into taking some action in response to Miller's complaints but that he resented her and took the first "neutral" opportunity he had—the occasion of her contract expiring in June 2015—to retaliate.

Again and again, UMD offers reasons why the jury could have found in its favor. The Court agrees that a reasonable jury *could* have returned a verdict in favor of UMD. But that is not the question.  The question is whether a reasonable jury could have returned a verdict for *Miller*.  The fact that there was evidence supporting UMD's position does not mean that there was no evidence supporting Miller's.  This was a classic case in which the jury could reasonably have found for either party.  The Court therefore denies UMD's motion for judgment as a matter of law.

*B. New Trial*

1.  Weight of the Evidence

When a party moves for a new trial on the ground that the verdict is against the

weight of the evidence, "the court should only grant a new trial to avoid a miscarriage

of justice." *Howard*, 615 F.3d at 995.  Having reviewed the trial record, the Court is

confident that there was no miscarriage of justice.  Reasonable minds could differ as to

the inferences to be drawn and, as discussed above, the jury had a sufficient basis on

which to find discrimination and retaliation.  The Court therefore denies UMD's motion

for a new trial on the ground that the verdict is against the weight of the evidence.

2.  Evidentiary Errors

UMD also argues that the Court erroneously permitted Miller to introduce

certain categories of evidence that misled the jury and affected the outcome of the trial.

In particular, UMD points to four categories of evidence that it contends were

erroneously admitted:  (1) evidence of Miller's pay as compared to Sandelin's;

(2) evidence of industry-wide discrimination against female coaches; (3) evidence of

complaints by Miller that predated Black's and Berlo's appointments; and (4) evidence

of the athletic department's finances.

For these alleged evidentiary errors to warrant a new trial, UMD must show that

they "prejudicially influenced the outcome of the trial."  *Coterel v. Dorel Juvenile Grp.,*

827 F.3d 804, 807 (8th Cir. 2016) (citation and quotation marks omitted); *see also* Fed. R.

Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding

evidence—or any other error by the court or a party—is ground for granting a new

trial . . . . At every stage of the proceeding, the court must disregard all errors and

defects that do not affect any party's substantial rights."). "The key question is whether

a new trial is necessary to prevent a miscarriage of justice." *Coterel*, 827 F.3d at 807

(cleaned up).

Applying these principles, the Court finds that a new trial is not warranted. To

begin with, none of this evidence was erroneously admitted. Evidence of the athletic

department's finances and the pay differential between Miller and Sandelin was

relevant to UMD's argument that Miller was not worth the salary that UMD paid her, as

well as to UMD's claims—repeatedly made both in public and in private—that it simply

could not afford to extend Miller's contract. In addition, as the Court explained at the

pretrial conference, whether Miller had a triable claim under the Equal Pay Act (she

didn't) is a much different question than whether the pay disparity between Miller and

Sandelin was relevant to her discrimination claim (it was). *See* Fed. R. Evid. 401

(evidence is relevant if it "has any tendency to make a [consequential] fact more or less

probable than it would be without the evidence"); *cf. Estes*, 856 F.2d at 1104 ("Evidence

of prior acts of discrimination is relevant to an employer's motive in discharging a

plaintiff, even where this evidence is not extensive enough to establish discriminatory animus by itself.").

Similarly, evidence of Miller's many complaints of sexism and disparate treatment was relevant to the issue of pretext.  It also supported Miller's claim that she frequently complained to Berlo and Black about disparities in resources between the men's and women's teams, as it tended to show that Miller was unafraid to confront her bosses (whomever they were) about perceived inequities and that she would not take "no" for an answer (from anyone).  And finally, the evidence of industry-wide discrimination about which UMD complains consisted of a single question and answer concerning the impact of Title IX on the number of female coaches.[2]  *See* ECF No. 629 at 20; TT 430-31.  This testimony was part of a general introduction to Title IX that Miller's expert provided to the jury and was relevant for that purpose.  Even if it was

---

[2]As UMD acknowledges, the Court granted its motion in limine to exclude evidence of industry-wide discrimination.  *See* ECF No. 600 at 43.  UMD's contention that this evidence was nevertheless admitted over its objection is misleading.  UMD did not object at all to the lawyer's question concerning the number of female coaches in women's sports, nor did it raise a substantive objection to the witness's answer.  Instead, UMD did not object until the witness went beyond the issue of women's sports and testified that women have not been allowed to coach men's teams—and UMD objected only that the witness had strayed beyond the scope of the (unobjected-to) question.  TT 430-31.  Moreover, given that anyone with even a passing familiarity with sports knows that women have almost never been hired to coach men's teams, it is highly unlikely that the testimony had any impact on the jurors.

erroneously admitted, it was so fleeting a point that it could not possibly have prejudiced the jury.

Likewise, even if some of the other evidence about which UMD complains was erroneously admitted, that error almost surely did not impact the jury's decision. UMD tries to portray a case that went off the rails and turned into a wide-ranging referendum on sexism in society at large. That is simply not what happened. In reality, the evidence in most of the categories about which UMD complains was minimal, none of the evidence was particularly inflammatory,[3] and the trial was appropriately dominated by evidence and argument about the credibility of UMD's proffered explanation for its decision not to renew Miller's contract. The jury was not asked to decide, for example, whether UMD discriminated against Miller with respect to pay; instead, it was specifically asked to decide whether Miller's sex and Miller's Title IX complaints factored into UMD's decision not to offer her a new contract. ECF No. 569. The jury

---

[3]UMD contends that evidence of hate mail that Miller received was highly inflammatory because Miller's testimony about it—she testified that one letter said "the end" and another said "goodbye"—suggested that it contained death threats. TT 925-26. But the Court interpreted the letters to be referring to Miller being fired; it never even occurred to the Court that the letters might be referring to Miller being killed. The Court thinks it highly unlikely that the jurors interpreted the letters to be predicting Miller's murder (as opposed to predicting her firing), particularly in light of other evidence that her detractors liked to taunt her by predicting that she would be fired. P64 at 31-33. Even in the unlikely event that the jury interpreted these letters as death threats, there is little chance of prejudice, as there was no hint of any connection between the letters and Black, Berlo, or any relevant member of the athletic department.

returned a verdict in Miller's favor on these issues, and the jury had a sufficient

evidentiary basis for that verdict.  UMD's motion for a new trial on the basis of alleged

evidentiary error is denied.

### 3.  Closing Argument

UMD also contends that it is entitled to a new trial on the basis of allegedly

inflammatory comments made by Miller's attorney during his closing argument.

Specifically, UMD challenges the following remarks:

> And this [Miller's termination] was not done for good
> reason, but for a discriminatory reason.  And it's time—it's
> interesting that this happens when it happens or that this
> trial happens when it happens.  You think about what's
> going on throughout the whole world.  Right?  And you
> think about women standing up. . . .

> Women are saying that's enough, no more, me too,
> time is up to bias and discrimination.  And that's a
> wonderful thing.  And Shannon Miller is a champion of
> herself and of women's rights you might say to a fault
> because she hasn't been able to get a job.  She has become
> radioactive.  People won't touch her.  She could apply for
> 500 jobs at this point until this lawsuit is done anyway.  And,
> you know, we asked her, Well, Coach, you knew this was
> going to happen, didn't you?  You know, you've had people
> say this was a hard thing.  She said, I don't care about that
> issue.  Women need to stand up.  I needed to stand up.
> I was not going to put my head between my legs and let
> them do this to me.  My players look up to me.  I want to be
> a role model for my players even if it hurts me.  And she
> stood up.  She filed this lawsuit because she had confidence
> when people from this community came into court and
> learned the whole story here and how UMD has not been

frank, has not been candid that you would do the right
thing.

TT 1850-51.

"When a new trial motion is based on improper closing arguments, a new trial

should be granted only if the statements are plainly unwarranted and clearly injurious

and cause prejudice to the opposing party and unfairly influence a jury's verdict."

*Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 556 (8th Cir. 2017) (citation and quotation

marks omitted).  In determining whether to grant a new trial based on improper closing

arguments, courts consider (1) whether the remarks were minor aberrations made in

passing; (2) whether the court took curative action; (3) whether the size of the damage

award suggests that the remarks had a prejudicial effect; and (4) the weight of the

evidence.  *Ventura v. Kyle*, 825 F.3d 876, 885 (8th Cir. 2016).

Considering these factors, the Court finds that a new trial is not warranted.  The

challenged remarks were a minor aberration—a brief and vague reference to the "Me

Too" movement used to invoke the general concept of standing up for one's rights.

Miller's counsel immediately tied this concept to the perfectly permissible argument

that, as a consequence of UMD's actions and Miller's decision to bring a lawsuit, Miller

has not been able to find a new coaching position.  UMD contends that the remarks

were part of an overall attempt by Miller to turn this case into a referendum on societal

discrimination, but, as discussed above, that is not what happened.  The question that

-16-

was front and center throughout the trial was the question that should have been front and center:  Why did UMD decide not to renew Miller's contract?

It is true that the jury returned an extraordinarily large award for past non-economic damages.  That award gives the Court some pause—and, indeed, the Court agrees with UMD that the award is so excessive as to warrant remittitur (as the Court explains below).  But in the context of this case—a lawsuit against a state university by an extraordinarily successful coach who was unlawfully terminated after leading the program that she had built from the ground up to multiple national championships—the award is not so large as to indicate that the jury's findings regarding liability were the result of improper passion and prejudice.[4]

UMD compares this case to *Gilster v. Primebank*, a sexual-harassment and retaliation case in which the plaintiff's lawyer spoke at length about her personal experience of being sexually harassed by a law professor, contrasted her own decision to remain silent with her client's courage in coming forward, referred to her other

---

[4]The Court acknowledges that there is some tension between a finding that the verdict was so excessive as to require remittitur and a finding that the verdict was not so excessive as to require a new trial on liability.  Although the standards are similar, there is some daylight between them, as the Eighth Circuit recently made clear in holding that a trial court *both* correctly denied a defendant's motion for a new trial *and* correctly granted remittitur.  *See Wright v. Byron Fin., LLC*, 877 F.3d 369, 374-75 (8th Cir. 2017) (holding that the size of the verdict "was not so monstrous, shocking, or plainly unjust as to require a new trial" and that the district court was correct to order remittitur, which is authorized "only when [the verdict] is so grossly excessive as to be monstrous, shocking, or plainly unjust").

clients' experiences with harassment, and repeatedly vouched for her client's credibility.  747 F.3d 1007, 1010-13 (8th Cir. 2014).  The comments of Miller's attorney were nothing like the detailed and emotionally charged vouching of the plaintiff's attorney in *Gilster*.  A new trial is not warranted.

### C.  Remittitur

The jury awarded $744,832 to Miller for lost past wages and benefits—that is, the amount of wages and fringe benefits that Miller would have earned at UMD from the date her final contract expired (June 30, 2015) to the date of the jury's verdict (March 15, 2018).  ECF No. 569 at 3.  The jury also awarded Miller an additional $3 million for "[o]ther past damages"—defined to include damages for the "emotional distress, mental anguish, loss of reputation, and other non-monetary losses" that Miller sustained during the same 32-month period.  ECF No. 577 at 8.  UMD argues that the jury's awards are excessive as a matter of law.

"The district court can remit a jury verdict only when it is so grossly excessive that there is plain injustice or a monstrous or shocking result."  *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1087 (8th Cir. 2017) (citation and quotation marks omitted).  In considering a motion for remittitur, a court must bear in mind that "a jury is the best-equipped entity to determine the size of a damage award."  *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003).  The court should not

grant remittitur merely because it would have awarded a different amount.  *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013).

### 1.   Past Non-Economic Damages

UMD argues that the jury's $3 million award in past non-economic damages grossly exceeds the maximum amount that has ever been upheld by the Eighth Circuit for the type of garden-variety emotional distress at issue in this case.  According to UMD, the evidence warrants an award of no more than $100,000 in past non-economic damages.

"In general, awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms."  *Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014) (citation and quotation marks omitted).  Nevertheless, having presided over the trial and reviewed the applicable law, the Court agrees that $3 million is a shockingly excessive amount to compensate Miller for 32 months of past non-economic damages.  So far as the Court and the parties can discover, neither the Eighth Circuit nor any district court within the Eighth Circuit has ever upheld an award remotely comparable to the award in this case.  To the contrary, in *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997), an employment case in which the jury awarded $1.75 million for a past *and future* emotional distress (approximately $2.79 million in

today's dollars[5]), the Eighth Circuit affirmed the district court's reduction to $100,000

($160,000 in today's dollars), characterizing the jury's award as "grossly excessive."

*Id.* at 1067.  In this employment case, the jury awarded Miller almost $100,000 *per month*

for her past emotional distress and other non-monetary damages.

Miller points to two cases in which the Eighth Circuit has affirmed multi-million-

dollar awards:  *Ondrisek v. Hoffman*, 698 F.3d 1020, 1027 (8th Cir. 2012) (affirming

compensatory damages of $3 million), and *Rustenhaven v. American Airlines, Inc.*, 320

F.3d 802, 807-09 (8th Cir. 2003) (remitting jury award of $4.24 million to $3.24 million).

But *Ondrisek* and *Rustenhaven* bear no resemblance to this case; indeed, *Ondrisek* and

*Rustenhaven* provide further evidence of the aberrational nature of the jury's award in

this case.

In *Ondrisek*, the plaintiffs had been raised in a cult and, during virtually their

entire childhood, had experienced "repeated ritualistic and savage beatings; forced

unpaid labor; denial of food; denial of formal education; complete isolation from the

outside world; and threats of damnation if they tried to escape."  *Ondrisek*, 698 F.3d

at 1027.  In *Rustenhaven*, the plaintiff was the survivor of an airplane crash whose

---

[5]"[W]hen adopting a damage comparison approach, the court must adjust the comparable awards for inflation . . . ."  *McCabe v. Parker*, 608 F.3d 1068, 1082 (8th Cir. 2010).  To determine inflation-adjusted values, the Court uses the Bureau of Labor Statistics' Consumer Price Index inflation calculator, which can be found at https://www.bls.gov/data/inflation_calculator.htm.

terrifying, life-threatening ordeal resulted in permanent physical problems and

cognitive deficits as well as emotional damage that rendered him unable to work and

adversely affected his relationships with his wife, children, and grandchildren.

*Rustenhaven*, 320 F.3d at 804-05.

Miller, by contrast, does not claim any physical or psychological injury,

permanent or otherwise.  Instead, Miller stipulated that her claim for emotional distress

is of the "garden variety" type and that she would not make any claim or offer any

evidence of medical treatment or anything else that implicates her physical or

psychological health.  ECF No. 506.  Without minimizing the emotional distress that

Miller suffered, the Court sees no comparison between the garden-variety emotional

distress experienced by Miller when her contract was not renewed and the

extraordinary trauma experienced by the plaintiffs in *Ondrisek* and *Rustenhaven.*[6]

In addition to the lack of evidence that Miller suffered any physical or

psychological harm, this case is also distinguishable because the $3 million awarded to

Miller was intended to compensate her, not for a lifetime of emotional and other non-

economic damage, but for the distress that she experienced during a period lasting a

---

[6]Miller also points to two California state-court employment cases in which the plaintiffs won multi-million-dollar verdicts.  *See* ECF No. 671 at 23 n.2.  But the Court has no information about the facts of these cases or how the damages were allocated, and neither case appears to have been subject to appellate review.  The Court therefore declines to give these cases any weight.

little more than 32 months.  *See* ECF No. 577 at 8 (instructing the jury to separately determine the amount of past damages from June 30, 2015 through the date of the verdict); ECF No. 569 (verdict returned March 15, 2018).  The jury found that Miller would not suffer *any* emotional distress or other non-economic damages in the future. Obviously, then, the jury must have found that Miller's non-economic damages would not linger past the date of the verdict, which is hard to square with the jury's finding that Miller's past non-economic damages were so severe as to justify an astronomical award.[7]

Again, the Court does not mean to minimize Miller's experience.  It is easy, in hindsight, to view 32 months as an insignificant amount of time, but almost three years of emotional suffering is not a trivial matter.  Nevertheless, the Court is unaware of any Eighth Circuit case (or, for that matter, any other case) in which such an enormous amount was awarded (1) for non-economic damages (2) suffered over such a limited period of time (3) in a case involving no physical or psychological injury.  Miller was a college hockey coach who did not get a new contract; each of the plaintiffs in *Ondrisek*

---

[7]In his closing argument, Miller's attorney did not ask for a particular amount of past non-economic damages.  He suggested, though, that the jury use as a "guideline" the testimony of Miller's expert that Miller would suffer between $2.6 million and $3.2 million in future economic loss.  ECF No. 595 at 79.  This may have influenced the jury, despite the fact that Miller's attorney was talking about *economic* losses (and the jury was charged with assessing *non-economic* losses), and despite the fact that Miller's attorney was talking about *future* losses (and the jury was charged with assessing *past* losses).

was an enslaved child who endured almost two decades of "savage" physical and

emotional torture.  The fact that the *total* compensatory damages—past *and*

future—awarded to each child in *Ondrisek* (albeit in 2012 dollars) was identical to the

damages awarded to Miller to compensate her for 32 months of garden-variety distress

is striking.  The Court finds that the award of $3 million is shockingly excessive.

The Court therefore concludes that remittitur is required.  The next task, then, is

to determine the amount of the remittitur.  The goal of this exercise is not for the Court

to substitute its judgment for the jury's and choose an amount that it would have found

suitable had it been the factfinder.  Instead, the Court must remit to the maximum

possible amount that the jury could reasonably have awarded.  *Wright v. Byron Fin.,*

*LLC*, 877 F.3d 369, 374 (8th Cir. 2017) ("If a remittitur was justified, the issue becomes

whether it comports with the 'maximum recovery rule,' under which damages may be

remitted only to the maximum amount the jury could have reasonably awarded."); 11

Wright, Miller & Kane, *Federal Practice & Procedure* § 2815, at 221 (3d ed. 2012)

(describing the maximum-recovery rule as "the only theory that has any reasonable

claim of being consistent with the Seventh Amendment").

The Eighth Circuit has cautioned that comparing damage awards from other

cases is of limited utility and in some cases may even be an abuse of discretion.

*Gonzalez v. United States*, 681 F.3d 949, 953 (8th Cir. 2012); *McCabe v. Parker*, 608 F.3d

1068, 1080 (8th Cir. 2010).   Acknowledging that fact, the Court is nevertheless uncertain

how any court could determine an acceptable range of damages without in some way

considering awards upheld in other cases.   The parties do not identify any other method

for making this determination and, so far as the Court has been able to discover, the

Eighth Circuit also has not identified any other method (other than to recite the facts of

the case under review and state that those facts are not comparable to the facts of other

cases).   *See Gonzalez*, 681 F.3d at 952-53.   Even courts that purport to apply some other

method seem to fall back on comparisons to other cases.   *See Hurd v. City of Lincoln*,

No. 4:16CV3029, 2019 WL 1958111, at *5-6 (D. Neb. May 2, 2019).   And in employment

cases in particular, the Eighth Circuit itself has often relied on comparisons to other

cases in determining whether and to what extent remittitur is warranted.   *See, e.g.*,

*Townsend*, 774 F.3d at 466-67; *Bennett*, 721 F.3d at 552-53; *Eich*, 350 F.3d at 763-64; *Morse*

*v. S. Union Co.*, 174 F.3d 917, 925 (8th Cir. 1999); *Kim*, 123 F.3d at 1067.

After reviewing again the evidence introduced at trial and using damage awards

in other cases as reference points (while bearing in mind that such comparisons are in

no way determinative), the Court holds that the maximum amount of past non-

economic damages that the jury could have lawfully awarded in this case is $750,000.

The Court acknowledges that this amount is itself extremely large.   Indeed, this

amount appears to be much larger than any award of non-economic damages (past,

future, or combined) that has ever been affirmed by the Eighth Circuit in an employment case, even adjusting for inflation.  *See Townsend*, 774 F.3d at 467 (reducing award to $300,000 (worth approximately $328,000 today)); *Bennett*, 721 F.3d at 552-53 (affirming $300,000 award (worth approximately $330,000 today)); *Rowe v. Hussmann Corp.*, 381 F.3d 775, 783 (8th Cir. 2004) (affirming $500,000 award (worth over $675,000 today)); *Eich*, 350 F.3d at 762-64 (reinstating $200,000 award (worth approximately $280,000 today)); *Mathieu v. Gopher News Co.*, 273 F.3d 769, 782-83 (8th Cir. 2001) (affirming $165,000 award (worth approximately $240,000 today)); *Ross v. Douglas Cty.*, 234 F.3d 391, 397 (8th Cir. 2000) (affirming $100,000 award (worth over $147,000 today)); *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357-58 (8th Cir. 1997) (reducing award to $50,000 (worth approximately $80,000 today)); *Kim*, 123 F.3d at 1067 (reducing award to $100,000 (worth approximately $160,000 today)); *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060-62 (8th Cir. 1993) (affirming $125,000 for past and $25,000 for future damages (worth, respectively, over $222,000 and $44,000 today)).

In fact, the Court is aware of only one employment case involving an award of non-economic damages that *may* have approached $750,000 in today's dollars.  In *Wilmington v. J.I. Case Co.*—a case in which the plaintiff was terminated on account of his race—the Eighth Circuit affirmed an award of compensatory damages of $400,000, the equivalent of $937,000 in 2019.  793 F.2d 909, 921-22 (8th Cir. 1986).  But that award

included both economic and non-economic damages.[8]  It is impossible to know how much of that award was intended to compensate the plaintiff for economic damages, but, in affirming the award, the Eighth Circuit noted that the plaintiff had "presented evidence of his earnings, fringe benefits, and other data related to a determination of lost pay," as well as "evidence of his inability to secure another job after [the defendant] discharged him."  *Id.* at 922.

That said, it is important to recognize that the large cluster of cases with damage awards in the low six figures is a less-meaningful indicator of the maximum amount of permissible damages than may at first appear.  In many of these cases, the Eighth Circuit was affirming (or reinstating) the jury's award.  *See, e.g.*, *Bennett*, 721 F.3d at 552-53; *Rowe*, 381 F.3d at 783; *Eich*, 350 F.3d at 762-64, *Mathieu*, 273 F.3d at 782-83; *Ross*, 234 F.3d at 397; *Kientzy*, 990 F.2d at 1060-62.  In other words, the Eighth Circuit was indicating only that the award was within the permissible range; the Eighth Circuit was not (or not necessarily) indicating that the award was at the upper limit of that range.  In addition, some cases involved statutory limits on non-pecuniary losses, *e.g.*, *Bennett*, 721 F.3d at 553, which is not the case here.  Finally, *Delph*, in which the Eighth Circuit

---

[8]This fact was overlooked by the Eighth Circuit in subsequent cases, which mistakenly cited *Wilmington*'s combined award as a measure of non-economic damages alone.  *See Madison v. IBP, Inc.*, 257 F.3d 780, 801-02 (8th Cir. 2001) (citing *Wilmington*), *vacated*, 536 U.S. 919 (2002), *remanded to* 330 F.3d 1051 (8th Cir. 2003) (reinstating compensatory-damage award of $266,750 (now worth around $385,000)); *Morse*, 174 F.3d at 925 (citing *Wilmington*).

reduced a $150,000 award to $50,000, did not involve a jury trial. *Delph*, 130 F.3d at 351. The Eighth Circuit was therefore not conducting a remittitur analysis nor (so far as the Court can tell) applying the maximum-recovery rule. *Id.* at 358 (applying a clearly erroneous standard).

As UMD would point out, many of these cases are also distinguishable because they involve aggravating factors not present here, such as extensive harassment, *e.g.*, *Rowe*, 381 F.3d at 777-79; *Eich*, 350 F.3d at 755-56, or illness or other physical manifestations of emotional injury, *e.g.*, *Kim*, 123 F.3d at 1065. But UMD overlooks that in other cases involving nothing more than garden-variety emotional distress, the Eighth Circuit affirmed awards substantially higher than the $100,000 that UMD contends is the permissible maximum in this case. *Mathieu*, 273 F.3d at 782-83 (affirming award worth approximately $240,000 today); *Kientzy*, 990 F.2d at 1060-62 (affirming award worth over $267,000 today).

All of this simply underscores the pitfalls of comparing damage awards and the importance of assessing each case on its facts. And there is an important fact that sets this case apart from the other employment cases that the Court has looked to for comparison purposes: As the former head coach of a Division I hockey team, Miller is nothing like a typical employment plaintiff.

Miller held a position that is held by only a handful of people in the country. Even within this rarefied group, Miller stood out.  Her stellar record won her an international reputation, and multiple witnesses testified that Miller's passion and commitment set her apart, even from other elite coaches.  Like most coaches, Miller was strongly emotionally attached to her team and its success.  But Miller had even more reason than most to regard her program as her baby:  She had built the program from scratch and, over the years, turned the program into the most successful Division I women's hockey program in the nation.  During her years at UMD, Miller received other lucrative offers, but she remained loyal to UMD.

As the Court has already noted, Miller comes across as a forceful person who is able to remain calm under pressure.  This rendered her testimony all the more poignant, as she frequently became distraught and emotional on the stand.  Miller testified that the experience of losing her coaching career has "ruined" her:

> I'm trying to be strong.  I'm trying to recover, move on, but I felt like it has ruined me.  I loved what I did so much, and it was who I was.  It was my life.  I feel ruined. My heart is broken.  I have a broken spirit.  It's a horrible way to live.  I have lost faith in people.  I've lost faith in the values that I was raised by and that I lived by, which is great work ethic, honesty, trust.  They've been shattered for me. I'm trying to recover, and I'm trying to get stronger.  I feel like I'm ruined.

TT 997. Similarly, Banford (who is Miller's partner) confirmed the pain that Miller

experienced:

> She's heartbroken and still to this day is devastated
> by what happened to her. It's really hard to see somebody
> so strong, like her, hurt this bad. I think probably the best
> way to describe it is that there's a very—there is a very big
> piece of her missing. I would describe her as feeling
> defeated. Shannon is such a champion in everything she
> does, and to watch her for the past three years apply for jobs,
> countless jobs, and ever since Josh Berlo fired her, it's as
> though she has, like, the plague. She's become extremely
> emotional, lack of energy. She doesn't sleep well, which
> from a health standpoint isn't good. It's just really, really
> sad to see how hurt she is. . . .
>
> I would say that Shannon has become very guarded
> from this experience. She was loyal to this institution for
> 16 years, and was a champion, and brought a great deal to
> UMD and to the Duluth community. So I would say now
> that she's very guarded, and she feels betrayed. So she has a
> lot of trust issues. And I would say that she's distanced
> herself from people, her friends and family. She's
> sometimes just happiest being alone.

TT 1159-60.

While it is true that Miller limited herself to presenting evidence of garden-

variety emotional distress, the jury could nevertheless have found, based on this

evidence, that the emotional distress that Miller experienced was worse than what is

typically experienced by employees who lose their jobs. Miller's termination was

extremely public; it quickly became known not only in her community, but around the

world.  The termination separated her from a program that she had built from the

ground up and in which she had a huge emotional investment.  And she perceived the

firing as a shocking betrayal of the loyalty that she had shown to UMD for many years.

Miller is also unlike typical employment plaintiffs because she could not expect

to get a similar job without upending her personal life.  Most people who lose their jobs

can expect that there are somewhat comparable employment opportunities reasonably

available near where they live.  That was not the case for Miller.  Once she lost her

coaching job at UMD, it was literally impossible for her to find a comparable position

without moving hundreds or thousands of miles away (and possibly even to a new

country).  The jury could have considered the stress and sorrow associated with the

prospect of having to move away from the community in which she had put down

roots.

Finally, as Miller argues, she suffered reputational damage that a typical plaintiff

would not experience.  Most people who lose their jobs do not read about it in the

newspaper.  But news that UMD had decided to terminate Miller quickly spread

throughout the international hockey community.  Moreover, the jury could have found

that Miller's reputation was crucial not just to her employment prospects, but to her

emotional well-being.  Obviously, as the jury awarded no damages for future non-

economic harm, the jury must have found that the reputational harm ceased when

Miller was vindicated in court.  But the jury was entitled to find that the abrupt, public

loss of Miller's position—despite her unparalleled success and despite her team being

ranked sixth in the nation—seriously damaged Miller's reputation in the years leading

up to the return of the jury's verdict.

In sum, the Court finds that $3 million is shockingly excessive given the limited

damage period and the lack of evidence of any physical or psychological injury.  The

Court further finds that $750,000 is the highest amount that the jury could reasonably

have awarded for past non-economic harm.  The Court therefore offers Miller the choice

to accept a remittitur to $750,000 or to again try the issue of past non-economic

damages.

### 2. Backpay

UMD argues that, in light of undisputed evidence that Miller told Black and

Berlo that she was seeking only a two-year contract extension (through June 2017), the

jury's award of backpay through the date of the verdict (March 15, 2018) is excessive

and impermissibly speculative.  The Court disagrees.  Miller testified that her request

for a two-year extension was a negotiating tactic to give her a chance to improve the

team and put her in a stronger position for the next round of contract negotiations.

Miller also testified about recruiting successes and about staffing and roster changes

that she had made to improve the team going forward.  And finally, at trial, Berlo

himself touted the team's recent successes, TT 366-68, from which the jury could have

inferred that Miller's efforts were bearing fruit.  Given the evidence about Miller's skills

as a coach, the jury had a sufficient basis to predict that, had Miller's contract been

extended to June 2017, the team would have been successful, which would have put her

in a strong position to negotiate another contract extension.  The Court therefore denies

UMD's motion for remittitur with respect to the backpay award.

*D.  Interest*

Miller seeks an award of both pre- and post-judgment interest.  UMD argues that

Title IX does not permit the recovery of prejudgment interest.[9]  Alternatively, UMD

takes issue with Miller's interest calculation.

UMD points out that nothing in Title IX authorizes an award of prejudgment

interest and that there is a paucity of authority to support such an award.  This

argument proves too much, though, as nothing in Title IX expressly authorizes a private

right of action or a damages remedy for a person injured by a violation of Title IX;

instead, Title IX's private right of action is implied.[10]  *See Cannon v. Univ. of Chicago*, 441

---

[9]There is no dispute about Miller's entitlement to post-judgment interest from the date of the initial judgment, and the Court will include such interest in the amended judgment.

[10]As the Supreme Court noted in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 72-73 (1992), a later-enacted statute provides that, in a suit against a state for violations of Title IX (among other statutes), "remedies (including remedies both at law
(continued...)

U.S. 677 (1979) (recognizing an implied right of action under Title IX); *Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (implied right of action under Title IX

includes claims of employment retaliation).  It is therefore not particularly meaningful

that Title IX does not expressly authorize prejudgment interest.

In holding that Title IX's private right of action encompasses a claim for money

damages, the Supreme Court explained that "absent clear direction to the contrary by

Congress, the federal courts have the power to award any appropriate relief in a

cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett*

*Cty. Pub. Schs.*, 503 U.S. 60, 70-71 (1992); *see also Rodgers v. Magnet Cove Pub. Schs.*, 34

F.3d 642, 644 (8th Cir. 1994) ("*Franklin*, therefore, states that Title IX provides a full

spectrum of remedies.").  The Supreme Court has also recognized that "[p]rejudgment

interest, of course, is an element of complete compensation." *Loeffler v. Frank*, 486 U.S.

549, 588 (1988) (citation and quotation marks omitted).

Taken together, these general principles indicate that prejudgment interest

should be available under Title IX—at least to the same extent that it is available under

Title VII.  *See id.* at 557-58 (holding that Title VII authorizes prejudgment interest).

---

[10](...continued)
and in equity) are available for such a violation to the same extent as such remedies are
available for such a violation in the suit against any public or private entity other than a
State."  42 U.S.C. § 2000d–7(a)(2).  But this provision does not define what those
remedies may be.  *Franklin*, 503 U.S. at 73.

UMD cites no authority to the contrary, nor does UMD offer any plausible reason why prejudgment interest should not be available under Title IX.  The Court therefore rejects UMD's argument that prejudgment interest is categorically unavailable.

UMD next argues that the Court should exercise its discretion to deny prejudgment interest.  *Cf. Smith v. World Ins. Co.*, 38 F.3d 1456, 1467 (8th Cir. 1994) ("The decision whether to award prejudgment interest is within the district court's discretion and we will reverse that decision only for abuse of discretion.").  But UMD does not offer much reason to do so other than its conclusory assertion that Miller's damage award is sufficient to compensate her.

With respect to backpay, the Court finds that an award of prejudgment interest is appropriate.  "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, [and] (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation." *E.E.O.C. v. Rath Packing Co.*, 787 F.2d 318, 333 (8th Cir. 1986) (citation and quotation marks omitted).

During the four years that this case has been pending, Miller has remained uncompensated for the pay to which she is entitled.  There are many reasons for the delay, some of which are attributable to UMD.  UMD has made little effort to focus its

case; instead, UMD has time and again thrown everything against the wall, often

making overly aggressive or otherwise unreasonable arguments.  In addition, as Miller

earned a set salary, the amount of the backpay award was reasonably ascertainable.

And while liability was not a given, UMD should have recognized that Miller's claims

were far from frivolous, especially after those claims survived UMD's motion for

summary judgment.  An award of prejudgment interest on Miller's backpay award is

therefore justified.  *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194 (8th Cir. 2000)

("Generally, prejudgment interest should be awarded unless exceptional or unusual

circumstances exist making the award of interest inequitable." (citation and quotation

marks omitted)).

With respect to Miller's past non-economic damages, however, the Court finds

that prejudgment interest is not warranted.[11]  The amount of such damages is not

merely uncertain; it is totally unpredictable, as this case well illustrates.  Moreover,

Miller concedes that the earliest any such interest should accrue is the date of the

verdict; the length of the delay between the verdict and the initial entry of judgment

was relatively brief.[12]  Under these circumstances, it is unnecessary to award

---

[11]Although the amount of past non-economic damages has not yet been finally determined, the Court need not delay its resolution of this issue, as the amount at stake is irrelevant to resolving the issue.

[12]If Miller accepts the remittitur, she will be entitled to post-judgment interest on
(continued...)

prejudgment interest, and it would be inequitable to do so on an amount that remains hotly contested and that was not reasonably ascertainable.

Miller cites *Thomas v. Texas Department of Criminal Justice*, 297 F.3d 361 (5th Cir. 2002), for the proposition that prejudgment interest should be awarded for past emotional injuries.  But the Fifth Circuit's standards for awarding prejudgment interest appear to differ from those of the Eighth Circuit.  *Compare id.* at 372 (stating that the jury's award for past emotional injuries "compelled" the district court to award prejudgment interest) *with Smith*, 38 F.3d at 1467 (prejudgment interest is committed to the district court's discretion).  The Court therefore denies prejudgment interest on Miller's award of other past damages.

Finally, as to the calculation of prejudgment interest:  The parties agree on the rate (2.56 percent) and the initial accrual date (July 1, 2015), and the parties agree that prejudgment interest should be computed daily and compounded annually.  UMD contends, however, that interest should be adjusted to account for the fact that Miller would have received biweekly paychecks instead of a onetime lump sum.  The Court disagrees, for several reasons.

---

[12](...continued)
the reduced amount dating from entry of the first judgment.

First, UMD cites no evidence that Miller was paid on a biweekly basis, nor did it submit a calculation based on biweekly payments.[13]  Notably, under ¶ 3.2 of Miller's contract, Miller is entitled to her full contractual compensation in the event that UMD terminates her without cause.  D25.  That is what the jury has found.

Second, UMD cites no Eighth Circuit case mandating that prejudgment interest on backpay be calculated on a paycheck-by-paycheck basis, and the Court has been unable to find any.  *Cf. Frazier*, 200 F.3d at 1194 (the district court did not err in awarding prejudgment interest under Iowa law despite the defendant's argument that "the lost income occurred at various times during Frazier's discharge and thus each pay day would have a different interest associated with it").

In the absence of Eighth Circuit authority, UMD relies on out-of-circuit cases, including *Reed v. Mineta*, 438 F.3d 1063 (10th Cir. 2006), and *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80 (2d Cir. 1994).  In *Chandler*, however, the Second Circuit affirmed the district court's simplified, lump-sum calculation:

> We agree with the defendant that interest should have run from the date of the missed payments, rather than from the date of termination.  However, the district court applied the federal statutory rate of 3.58%, calculated pursuant to 28 U.S.C. § 1961, as opposed to the much higher Vermont statutory rate of 12%.  *See* 9 V.S.A. § 41a(a) (1993).  By using

---

[13]Miller's contract states that her compensation "shall be paid in accordance with the University's regular payroll procedures," D25 ¶ 2.1.2, but does not describe those procedures.

> the much lower rate for the longer period, the district court
> appears to have achieved a fair figure for the interest,
> avoiding the need for numerous calculations establishing a
> separate interest figure for each lost monthly payment.  We
> find this came within the district court's discretion.

*Chandler*, 44 F.3d at 84; *see also Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513

F.3d 949, 961 (9th Cir. 2008) (adopting *Chandler's* "practical approach").

Here, as in *Chandler* (and not as in *Reed*, in which the court applied an interest

rate of nine percent), the parties have agreed on a relatively low rate—likely much

lower than the rate of return Miller could have earned if she had been able to invest the

money.  Again, the point of awarding prejudgment interest is to compensate plaintiffs

for the true cost of the damages they have incurred, including lost investment

opportunities and the impact of inflation.  As this is an exercise in recreating an

alternate reality in which Miller was compensated in a timely fashion, it is necessarily

somewhat imprecise.  Given the relatively low interest rate, the lack of evidence

supporting UMD's proposed calculation,[14] the existence of a colorable contractual basis

for treating Miller's recovery as a lump sum, and the lack of Eighth Circuit authority

---

[14]UMD has offered to submit a calculation based on biweekly payments in the
event that the Court agrees with its argument.  The Court could not adopt UMD's
calculation without first giving Miller an opportunity to contest it, however.  The Court
sees no reason why UMD could not have submitted its calculation with its brief, and
therefore the Court sees no reason to further prolong the resolution of this issue.
Moreover, as noted, UMD submitted no evidence that Miller was paid on a biweekly
basis.

requiring that interest be calculated on a per-paycheck basis, the Court adopts

*Chandler*'s "practical approach" and rejects UMD's argument that interest should be

calculated on a biweekly basis.  The Court therefore awards Miller $71,529.14 in

prejudgment interest on her backpay award.[15]

### E.  Attorney's Fees and Expenses

Finally, Miller moves for an award of attorney's fees and expenses.  UMD

concedes that, under 42 U.S.C. § 1988(b) and § 2000e–5(k), Miller is entitled to

reasonable attorney's fees and expenses, but UMD raises numerous objections to the

claimed amount.

In determining a reasonable fee, the Court starts by calculating the lodestar—that

is, the number of hours reasonably expended multiplied by reasonable hourly rates.

*Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019).

### 1.  Hourly Rate

Miller retained attorneys from two law firms:  Siegel, Yee, Brunner & Mehta

("SYBM"), which is located in Oakland, California, and Fafinski Mark & Johnson

("FMJ"), which is located in a suburb of Minneapolis.[16]  UMD does not take issue with

---

[15]The Court's calculation differs slightly from Miller's.  Despite diligent effort, the Court was unable to craft a calculation that yielded Miller's figure and so it substitutes its own.

[16]For ease of discussion, the Court groups former FMJ attorney Sharon Van Dyck

(continued...)

FMJ's rates, but argues that the Court should reduce SYBM's rates because they are higher than the market rates prevailing in Minnesota.[17]  *See Blum v. Stenson*, 465 U.S. 886, 895 (1984) ("'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community").

Having reviewed the submissions of SYBM's attorneys and paralegals, however, the Court finds that their hourly rates do not exceed the upper limit of what professionals with comparable experience, expertise, and reputation command in this market.  *See Bryant*, 919 F.3d at 529 ("When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." (citation and quotation marks omitted)); *Roeser v. Best Buy Co.*, No. 13-1968 (JRT/HB), 2015 WL 4094052, at *12 (D. Minn. July 7, 2015) (stating, in a case filed in 2013, that while hourly rates of $775 and $880 were higher than prevailing market rates, they would be approved in light of the high quality of the work and other factors); Second Brunner Decl. ¶ 2 & Ex. A at 10, 13 [ECF No. 681] (2018 top hourly rates of $690 for Briggs and Morgan and $710 for Lindquist & Vennum;); *id.* ¶ 4 & Ex. C (2015-16 survey

---

[16](...continued)
with FMJ.

[17]*See* Siegel Aff. ¶ 22 [ECF No. 654] ($750); Brunner Aff. ¶ 26 [ECF No. 650] ($550); Weills Aff. ¶ 16 [ECF No. 652] ($550); Dafa Aff. ¶ 12 [ECF No. 646] ($400); Johnson Aff. ¶ 9 [ECF No. 648] ($250 (paralegal)); Clatterbaugh Aff. ¶ 7 [ECF No. 644] ($200 (paralegal)).

of Minnesota attorney rates indicating that five percent of Minnesota attorneys charged

rates of over $675 at the time); *id.* ¶ 6 & Ex. E (2009 affidavit seeking $550 hourly rate for

a Greene Espel attorney in *United States v. Petters*, No. 08-CV-5348 (ADM/JSM), ECF

No. 365 ¶ 2).[18]

The SYBM attorneys are quite skilled, and the three highest-billing timekeepers

(Dan Siegel, Jane Brunner, and Anne Weills) have many decades' worth of experience

among them.  Siegel (the lead attorney) has nearly 50 years of experience, has worked

on over 130 jury trials and a similar number of court trials and arbitration hearings, and

has extensive specialized experience representing coaches and other employees against

universities and other public employers.  Siegel Aff. ¶¶ 1-16.  Accordingly, the Court

declines to reduce SYBM's hourly rates.

### 2.  The Lodestar Calculation

In her initial submission, Miller sought a lodestar of $2,434,143.94, which

(according to the Court's calculation) represents 6,447 hours of combined attorney and

paralegal time from December 2014 through March 2019.[19]  Mark Decl. ¶ 5 [ECF

_____

[18]Judge Montgomery reduced Greene Espel's requested fees in *Petters* on the
ground that the overall amount was excessive in light of the nature and extent of the
work performed.  *Petters*, No. 08-CV-5348, ECF No. 440 at 10.  Nevertheless, the
affidavit is evidence of prevailing market rates at the time.

[19]The Court cannot quite get the figures in Miller's initial round of submissions to
match the total amount of the initial fee request.  The Court also notes that there are

(continued...)

-41-

No. 665] (3,793.2 hours for FMJ attorneys and paralegals); Siegel Aff. ¶ 23 (723.4 hours);

Brunner Aff. ¶ 27 (908.25 hours); Weills Aff. ¶ 17 (138.8 hours); Dafa Aff. ¶ 13 (131.4

hours); Johnson Aff. ¶ 9 (742.6 hours); Clatterbaugh Aff. ¶ 8 (9.35 hours).  It also reflects

a five percent discount of $67,925.35 on SYBM's fees, which SYBM applied in an attempt

to offset any duplicative or unnecessary work.  Second Brunner Decl. ¶ 7.  In response

to UMD's objections, SYBM and FMJ further reduced their hours:  SYBM deducted an

additional 107.62 hours, for a total of $46,827, and FMJ deducted a total of $153,868.50.[20]

Second Brunner Decl. ¶ 8 & Ex. F.  The law firms also added $126,042.50 for their time

in April and May (including work on the parties' post-judgment motions), which

represents 380.43 additional hours.  Second Mark Decl. ¶ 3 & Ex. 1 at 11; Second

Brunner Decl. ¶ 9; Second Johnson Decl. ¶ 11 [ECF No. 683]; Second Van Dyck Decl. ¶ 7

---

[19](...continued)
minor discrepancies between the FMJ hours reported in ¶¶ 5 and 8 of Donald Chance
Mark, Jr.'s declaration and the figures reported on the last page of the attached
Exhibit A.  In both cases the discrepancies are minor, however, and evidently the parties
agree that the only mathematical error in the initial request is that it was mistakenly
inflated by $31,718.31.  ECF No. 675 at 4; ECF No. 680 at 8.

[20]FMJ did not separately break out the additional hours that it deducted, but it
provided a table of billing amounts organized by the category of UMD's objection and
identified by the unique number that UMD assigned to each billing entry.  Second Mark
Decl. ¶¶ 5-10, 12 [ECF No. 685].

& Ex. A.  After correcting for the mathematical error mentioned above, Miller seeks a

lodestar of $2,327,772.63.[21]

For its part, UMD contends that the lodestar should be much lower—

approximately $800,000.  Jones Decl. ¶ 12 [ECF No. 676].  (UMD's calculations do not

include Miller's fees for April and May 2019, so presumably UMD's final number

would be slightly higher.)  UMD reaches this number through a combination of

reducing SYBM's hourly rates—which the Court has declined to do—and objecting in

whole or in part to hundreds (perhaps thousands) of time entries.

UMD groups its objections to the claimed number of hours into twelve

categories, including: (1) time that was spent exclusively on Banford's and Wiles's

claims; (2) billing entries in which the plaintiff's identity is not specified (or that

mentioned more than one of the plaintiffs); (3) time spent on matters other than this

case; (4) California counsel's travel time and time spent on *pro hac vice* forms; (5) time

spent on an unsuccessful motion to compel a deposition; (6) time spent on clerical and

administrative tasks; (7) overstaffing; (8) time spent awaiting the jury verdict; (9) time

spent correcting ministerial errors (such as in court filings); (10) excessive time spent on

---

[21]The chart on page 8 of Miller's reply brief mistakenly omits SYBM's fees from
the subtotal for "April/May 2019 Fees."  *See* ECF No. 680 at 8.  The overall total fee
request is correctly calculated, however.

the fee petition; (11) time spent on media and public-relations tasks; and (12) billing entries that are insufficiently specific.

UMD documents these objections in a detailed, 139-page spreadsheet comprising 3,252 individual time entries, with each entry containing notations as to the nature of UMD's objection (if any) and an adjusted dollar amount for that entry.  Jones Decl. Ex. A.  The spreadsheet is of little use to the Court, however, as it simply lists the entries in chronological order, with no calculations—either in total, by category, by timekeeper, by year, or by any combination of the above—as to the number of allegedly excludable hours, the dollar amounts attributable to these allegedly excludable hours, or the dollar amounts attributable to UMD's application of reduced hourly rates to the SYBM attorneys.[22]  Indeed, the spreadsheet does not even display a calculation reflecting the roughly $1.6 million by which UMD contends the lodestar should be reduced.

In short, although the Court understands that UMD wants the lodestar to be reduced by $1.6 million, the Court has no idea how UMD reached that figure.  Given the shortcomings in UMD's presentation, the Court has no practical way to calculate (1) the total number of hours to which UMD objects; (2) the overall dollar figure

---

[22]The Jones declaration includes dollar figures attributable to some (or portions of some) of these categories, and UMD's brief makes assertions about two more.  Jones Decl. ¶¶ 8, 9, 11; ECF No. 675 at 17.  All told, these references account for approximately $320,000 of the roughly $1.6 million that UMD contends should be deducted from Miller's lodestar.  UMD's spreadsheet does not include any calculations showing these amounts, however.

attributable to the allegedly objectionable hours; (3) the number of allegedly

objectionable hours attributable to each category; or (4) the dollar figures attributable to

each category.

As noted, in response to UMD's objections, Miller reduced her fee request by

over $200,000.  These reductions included over $80,000 for overstaffing; over $49,000 for

clerical tasks; over $46,000 for Banford's and Wiles's claims; over $12,000 for separate

matters; and over $9,500 for media.  Moreover, these reductions are in addition to

SYBM's initial 5 percent reduction.  Although the Court lacks the practical ability to

calculate an exact figure, the final lodestar represents somewhere in the range of 6,300

hours.[23]

In the Court's view, this is a reasonable number of hours.  It represents about

three years' worth of fulltime work for one person (assuming a 40-hour week) for a case

that generated nearly 700 individual docket entries and involved extensive and

voluminous discovery, substantial pretrial motion practice, an eight-day trial, a post-

verdict motion regarding front pay, and substantial post-judgment motion practice.

---

[23]As noted, FMJ did not separately break out the hours that it deducted, but
instead provided dollar-figure deductions, which total $153,868.50.  Because FMJ's rates
vary by year, it would be extremely burdensome to produce an exact number of hours
attributable to these deductions, as the Court would have to cross-reference FMJ's 13-
page table of billing amounts with the thousands of entries in UMD's spreadsheet to
determine the date and amount of time that corresponds with each entry.  But even if
the Court assumed that all of the $153,868.50 was incurred at FMJ's highest hourly
rate—which is not the case—FMJ's deduction represents nearly 400 hours of work.

The Court does not agree with UMD's attempt to carve out time spent on certain matters, such as time spent on unsuccessful motion practice or SYBM's travel time. The fact that Miller did not prevail on every motion and every argument does not detract from her victory, nor does it mean that time spent litigating unsuccessful motions was unreasonable. *Cf. Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. . . . Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."). With respect to travel time, a reasonable fee presumptively includes travel time billed at the lawyer's normal hourly rate. *Safelite Grp. v. Rothman*, 759 F. App'x 533, 536 (8th Cir. 2019) (per curiam) (affirming fees for travel time between New York and Minneapolis).[24]

As for the remainder of UMD's objections, Miller's efforts to reduce duplicative, unnecessary, and non-compensable time appear reasonable and, as noted, yield an overall reasonable number of hours. Had UMD supplied the Court with the allegedly excessive number of hours, either in total or attributable to each category (along with the associated dollar figures), the Court might have been persuaded that some

---

[24]*Safelite Group* suggests that out-of-state counsel's travel time is properly recoverable when their fees have been reduced to a local rate. *Safelite Grp.*, 759 F. App'x at 536. In this case, however, the Court has found that SYBM's rates are consistent with local rates.

additional targeted reductions were warranted.  As the overall number of hours appears reasonable, however, the Court declines to make further reductions in the absence of such information.

The Court emphasizes that what UMD seems to want the Court to do—review hundreds of time-sheet entries and determine whether each was appropriate—is beyond the capacity of this or any other court.  Judge are not accountants; they are not auditors.  They do not have the luxury of putting on a green eyeshade and devoting hundreds of hours to reviewing billing entries.  The Supreme Court has made this clear on many occasions:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." *Hensley*, 461 U.S., at 437, 103 S. Ct. 1933.  The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award." *Ibid.*  But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Fox v. Vice*, 563 U.S. 826, 838 (2011).  That is exactly what this Court has attempted to do.

UMD also argues, in the alternative, that the Court should reduce the amount of the lodestar by two-thirds (or some similar amount) to account for Miller's "limited success."  The Court disagrees.  There was nothing "limited" about Miller's success.

-47-

She was completely vindicated on her claim that UMD's decision not to renew her contract constituted illegal discrimination and retaliation.  And she was, in a sense, *too* successful in recovering damages for UMD's unlawful behavior, causing the Court to have to reduce those damages (albeit to an amount that might still be the highest amount of non-economic damages ever awarded in an employment case in the Eighth Circuit).

UMD points out that this case originally involved three plaintiffs and that each plaintiff asserted up to 13 claims (depending on how they are counted).  Miller has made a good-faith effort to exclude time relating solely to Banford's and Wiles's claims, however.  Moreover, UMD goes too far in (apparently) assuming that any billing entry that mentions Banford or Wiles must be excluded in whole or in part.  Evidence regarding both women was relevant to Miller's claims and presented at trial, and much of the work done on behalf of the plaintiffs as a group would have been necessary even if Miller had been the sole plaintiff.

True, the Court granted summary judgment to UMD on a number of Miller's claims.  But all of those claims involved factual and legal contentions that substantially overlapped with the factual and legal contentions made in connection with Miller's successful claims.  Indeed, the dismissed claims mostly asserted additional reasons why Miller's termination constituted unlawful discrimination and retaliation.  It is unlikely

that the scope of discovery would have been much different had Miller's original complaint contained only her two successful claims. For example, although Miller's Equal Pay Act claim was dismissed, evidence regarding her pay in comparison to Sandelin's was used to prove pretext. Similarly, Miller's dismissed claims for age and nationality discrimination required her to develop the evidence of pretext on which she relied at trial. Miller used all of this evidence to great effect, turning a case that struck the Court as marginal into a massive verdict based on findings of sex discrimination and Title IX retaliation. That Miller did not also prove, for example, that UMD declined to renew her contract because of age- or nationality-based animus does not detract from her victory. *See Hensley*, 461 U.S. at 435.

Finally, UMD argues—based on its assumption that Miller should recover no more than $100,000 in past non-economic damages—that the attorney's fees should be reduced because no rational client would pay vastly more in fees than she can recover in damages. The factual premise of UMD's argument is obviously flawed. But even setting that aside, UMD's argument is legally unsound.

The values at stake in a civil-rights case often cannot be measured—or at least fully measured—with dollars. Thus, as a general rule, courts do not require proportionality between the amount of damages awarded to a civil-rights plaintiff and the amount of fees awarded to the plaintiff's attorneys. *Simpson v. Merchs. & Planters*

*Bank*, 441 F.3d 572, 580-81 (8th Cir. 2006).  UMD compares this case to *Gumbhir v.*

*Curators of the University of Missouri*, 157 F.3d 1141 (8th Cir. 1998), in which the Eighth

Circuit drastically reduced the requested fees.  But the Eighth Circuit itself has labeled

*Gumbhir* an "extreme" case, and *Gumbhir* is readily distinguishable from this case.

*Simpson*, 441 F.3d at 581 (distinguishing *Gumbhir* as an "extreme instance").

In *Gumbhir*, it was clear from the outset that the maximum possible recovery was

a fraction of the requested fee award.  *Gumbhir*, 157 F.3d at 1146.  In addition, the

plaintiff "achieved very limited success in the litigation because only three of nine

claims survived summary judgment, retaliation was not his major claim, he received

only a fraction of the compensatory damages sought and no punitive damages, and he

was denied the wide-ranging equitable relief requested."  *Id.*  Acknowledging that

"pro rata fee reductions based upon the relationship between damages requested and

damages awarded are often inappropriate," the court nevertheless held that, in view of

the plaintiff's limited success, a reduction was necessary.  *Id.* at 1147.

In this case, Miller's core claim—from day one—has been that UMD's decision

not to renew her contract was illegal because it was discriminatory and retaliatory.

That is precisely what Miller proved, and the damages that she recovered likely

exceeded her wildest expectations.  This case is nothing like *Gumbhir*, and no fee

reduction is warranted.

3.  Enhancement

Miller asks that the Court enhance the lodestar in recognition of the excellent

results that her counsel achieved.  *See Hensley*, 461 U.S. at 435 ("in some cases of

exceptional success an enhanced award may be justified").  Miller points to a number of

factors, including that her attorneys took this case on contingency, that they had to turn

down other work, and that they fronted significant costs with no guarantee of

repayment.  Miller also points to counsel's experience and skill and to the outstanding

results.

The Court does not minimize either the risks taken or the results achieved by

Miller's attorneys, but the Court finds that an enhancement is not warranted.  "[T]here

is a strong presumption that the lodestar figure is reasonable, but that presumption may

be overcome in those rare circumstances in which the lodestar does not adequately take

into account a factor that may properly be considered in determining a reasonable fee."

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).  Here, most of the factors that

counsel cite are already accounted for in the lodestar.  *Id.* at 553 ("an enhancement may

not be awarded based on a factor that is subsumed in the lodestar calculation").

It is true that an enhancement may be warranted "if the attorney's performance

includes an extraordinary outlay of expenses and the litigation is exceptionally

protracted."  *Id.* at 555.  But the amount of expenses fronted by Miller's attorneys was

far from "extraordinary."  Moreover, although the resolution of this case has been

protracted—in part because of matters beyond the parties' control (such as the need to

replace the judge originally assigned to the case) and in part because of matters within

the parties' control (such as the parties' propensity to fight about everything)—the

delay has certainly not been "exceptional."  Nothing about this case overcomes the

strong presumption that the lodestar is reasonable, particularly in light of counsel's

high hourly rates—rates that are at the very top of the range that the Court would

approve.  The Court will therefore award the lodestar of $2,327,772.63 in attorney's fees.

### 4.  Expenses

Finally, Miller seeks expenses in the amount of $99,445.55.  Expenses that are not

taxable "costs" within the meaning of Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920 may

nevertheless be awarded if they are normally billed to clients.  *Pinkham v. Camex, Inc.*, 84

F.3d 292, 294-95 (8th Cir. 1996) (per curiam); *see also Williams v. ConAgra Poultry Co.*, 113

F. App'x 725, 728 (8th Cir. 2004) ("We note that travel expenses for attorneys and many

other out-of-pocket expenses that Mr. Williams's motion refers to as 'costs' are more

properly characterized as part of an attorney's fees award, which may include expenses

that a law firm normally would bill to its client.").

Predictably, UMD raises many objections to Miller's request.  First, UMD objects

on the same grounds on which it objected to some of the billable hours—namely, that

the expenses reflect overstaffing, unnecessary retention of California counsel, and expenses related to an unsuccessful motion to compel.  The Court rejects these arguments for the same reasons that it rejected them in the context of determining the reasonable number of billable hours.[25]  *See Safelite Grp.*, 759 F. App'x at 536 (affirming award of expenses for travel between New York and Minneapolis).

Next, UMD objects to certain expenses as inadequately documented.  In particular, UMD objects to the $32,185 expert fee for Donna Lopiano and $2,432.58 in "other travel expenses."  Brunner Aff. ¶ 28 (Lopiano expenses); *id.* ¶ 30 & Ex. B (travel expenses).  Miller has now submitted Lopiano's invoices, however, and those invoices reflect fees of $26,850 for preparation of the initial expert report and $5,335 for review of UMD's expert report and a supplemental report, for a total of $32,185.  Second Brunner Decl. ¶ 10 & Ex. H.  These amounts are in line with what similar experts charge for similar tasks in similar cases.  Miller has likewise documented the amounts comprising "other travel expenses."  Second Johnson Decl. ¶ 2 & Ex. A.  The Court therefore overrules UMD's objections.

Finally, UMD objects to the inclusion of computer-research expenses.  Such expenses are recoverable as part of the attorney's fees if counsel in the local community

---

[25]UMD also objected to the inclusion of expenses associated with obtaining Wiles's medical records.  Miller has now excluded those expenses from her fee request. Second Mark Decl. ¶ 11.

normally charge them to clients. *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 432 (8th Cir.

2017).  Recently, in *Harris v. Chipotle Mexican Grill, Inc.*, Judge Susan Richard Nelson

awarded computer-research expenses in a case under the Fair Labor Standards Act,

rejecting the defendant's argument that such expenses are part of normal office

overhead.  No. 13-CV-1719 (SRN/SER), 2018 WL 617972, at *15 (D. Minn. Jan. 29, 2018).

The Court agrees with Judge Nelson, and thus will permit Miller's attorneys to recover

computer-research expenses.  Accordingly, the Court awards Miller expenses in the

amount of $99,445.55.

ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.  Defendant's motion for judgment as a matter of law, a new trial, or

remittitur [ECF No. 628] is GRANTED IN PART and DENIED IN PART.

a.  The motion is GRANTED to the extent that the Court conditionally

grants a new trial on the issue of past non-economic damages.

b.  No later than 12:00 noon on Friday, September 20, 2019, plaintiff

must file a letter stating whether she will remit $2,250,000 of the

jury's $3,000,000 award of past non-economic damages.  If plaintiff

chooses to remit, the Court will enter judgment.  If plaintiff chooses

not to remit, the Court will schedule a new trial on the issue of past

non-economic damages.

    c.    The motion is DENIED in all other respects.

2.    Plaintiff's motion to amend the judgment [ECF No. 624] is GRANTED IN

PART.

    a.    Plaintiff shall recover $71,529.14 in prejudgment interest on the

backpay award.

    b.    Pursuant to 28 U.S.C. § 1961, plaintiff is entitled to recover post-

judgment interest accruing from the date of the original judgment

at the rate of 2.56 percent computed daily and compounded

annually until the date of payment.

3.    Plaintiff's motion for attorney's fees and non-taxable costs [ECF No. 618]

is GRANTED IN PART.  Plaintiff shall recover $2,327,772.63 in attorney's

fees and $99,445.55 in expenses.


Dated:  September 6, 2019         s/Patrick J. Schiltz
                             Patrick J. Schiltz
                             United States District Judge