## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jen Banford and<br>Annette Wiles, | Case No.: 15-cv-03740<br>(PJS/LIB) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM<br>IN OPPOSITION TO<br>DEFENDANTS' SECOND<br>MOTION FOR<br>SUMMARY JUDGMENT** |
| The Board of Regents of the<br>University of Minnesota, | |
| Defendants. | |

---

### INTRODUCTION

The United States Supreme Court held in *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) that Title VII of the Civil Rights Act of 1964 ("Title VII", 42 U.S.C. § 2000e et seq., prohibits discrimination against homosexuals, overturning *Williamson v. A.G. Edwards & Sons, Inc.* 876 F.2d 69,70 (8th Cir. 1989), the eighth circuit precedent this Court relied on to dismiss Plaintiffs Jen Banford's ("Banford")and Annette Wiles' (Wiles) Title VII claims. [ECF 501 at 4-5]. When *Bostock* was released, Banford and Wiles' appeal from this Court's dismissal of those Title VII discrimination claims premised on their status as homosexual women was pending in the Eighth Circuit Court of Appeals. The Eighth Circuit remanded to this Court for further proceedings based on *Bostock*.

1

Title VII makes it unlawful to discriminate against an individual "because of" the individual's sex. 42 U.S.C. § 2000e. *Bostock* held an employer violates Title VII when that employer fires (or takes any other adverse employment action against) an individual because that individual is homosexual or transgender. *Bostock*, 140 S. Ct. at 1731, 1737, 1753. *Bostock* revived Banford and Wiles' Title VII-sexual-orientation discrimination claims.

The Board of Regents of the University of Minnesota (UMD) seeks dismissal of Banford's claims of 1) wrongful non-renewal of her employment contract, which covered both her job as head softball coach and as part-time director of hockey operations, 2) creation of a hostile work environment in the UMD athletic department, and 3) constructive discharge from her job head-women's softball coach.

UMD also seeks dismissal of Wiles' claims of a 1) a hostile working environment in the UMD athletic department, and 2) constructive discharge from her position as head basketball coach.

UMD's motion depends on the truth of the bald allegation that the evidence it presents is undisputed and conclusively establishes each claim fails. But there is considerable evidence UMD does not present or discuss

2

that supports each plaintiff's claims—and much of that evidence is difficult to honestly rebut.

Many statements made in the factual portion of UMD's memorandum are better described as inference—favoring UMD—derived from testimony UMD surgically removed from the pages the come before and after it. Reading the cited testimony in context reveals the selection of the surgically removed portion to be the spin it is.

UMD's selective interpretation of what it calls undisputed factual evidence is the stuff of trial, where adversaries argue the evidence and inferences that favor their version of events. It is inappropriate for summary judgment.

When the evidence favoring Banford and Wiles is considered with all reasonable material inferences drawn in their favor, what emerges is the inescapable conclusion that summary judgment on their remaining Title VII claims is inappropriate because multiple issues of facts material to resolution of those claims are disputed.

## STATEMENT OF DISPUTED FACTS

Annette Wiles and Jen Banford worked in the UMD athletic department simultaneously for many years. The environment towards gay women in that department during those years was common to both—as it

was to Shannon Miller, the women's head ice hockey coach formerly a plaintiff in this action. Evidence of homophobic attitudes and behavior demonstrated by members of UMD management directed towards the gay women in the department is, therefore, evidence applicable to both Banford and Wiles to the degree they witnessed it.

**UMD SOFTBALL: JEN BANFORD.**

Banford was hired in 2005 as UMD's head softball coach. [ECF 308 at 1, ¶3; ECF 365, SLV Dec. Ex.-E, 43:18-21.] During Banford's nine years at UMD, she guided her teams to 273 wins and 174 losses, four regional tournament berths, one regular season conference title, the second-best season in UMD softball history, and was named the conference's Coach of the Year in 2013. UMD Website, http://umdbulldogs.com/coaches.aspx?path=&rc=281, accessed May 31, 2017.

Beginning in July 2009, she also served as part-time director of operations for women's hockey. [*Id.* 47:22-48:18, 49:4-7.]

**UMD WOMEN'S BASKETBALL: ANNETTE WILES.**

UMD hired Wiles as its head women's basketball coach in May 2008. [ECF 309 at 1, ¶2.] Her contract was renewed in 2011 for an additional four years, to expire June 20, 2015. [ECF 367,, 37:24-39:9; ECF 206 at 2.] Wiles achieved her 400th career victory during the 2014-2015 season. [ECF 309 at 5, ¶32; ECF 371 at 2.] That season at UMD was Wiles' twenty-second as a collegiate women's basketball coach. Over twenty-two years, Wiles had only two losing seasons. [ECF 309 at 5, ¶34; ECF 371 at 2.] During her tenure at UMD, Wiles' players had a 100% graduation rate and regularly boasted the highest GPA of any UMD sports team on campus. [ECF 309 at 2, 5, ¶¶7, 33.]

**THE ATHLETIC DEPARTMENT'S HISTORICAL PROBLEM WITH LESBIAN WOMEN.**

All three plaintiffs found their working environment in the Athletic Department to be sexist and homophobic.

In the summer of 2006, Miller and Banford signed up and paid to participate in an Athletic Department golf outing. [ECF 307 at 2-3, ¶¶10-12; ECF 308 at 1, ¶4.] On arrival, their team assignments were changed and they were told to wait in the parking lot. Then-Athletic Director Nielson, aware of the situation, told them to wait and he would remedy the situation. Nielson never returned, leaving Miller and Banford stranded.

They felt humiliated. [ECF 357 49:2-50:4, 50:20-25; ECF 307 at 3, ¶¶11-12; ECF 308 at 1, ¶4.] Miller reported the incident to the Chancellor. No corrective action was taken. [ECF 307 at 3, ¶13.]

In the spring of 2007, Banford paid to attend a fundraising event, but was excluded. Banford and two assistant coaches were told there was no table for them inside. Nielsen directed them to sit at the bar. Banford stayed and sat at the bar during the dinner. She complained, but received no apology or refund. [ECF 308 at 1, ¶5.]

One of Banford's duties with the women's hockey program was to pick up the program's mail. [ECF 308 at 1, ¶6.] From the spring of 2010 to the spring of 2011, both Banford and Miller received harassing hate mail in their mailboxes on four to five occasions. [*Id.*; ECF 307 at 3, ¶16.] For example, one such incident involved placing a department thank-you card in Miller's mailbox on which was written "the end, dyke." [ECF 307 at 3, ¶16.] Though the mail was placed in Miller's mailbox, Banford was the first to see it, because she is the one who picked up departmental mail.

**MAY 2013: BERLO IS HIRED AND THE CLIMATE WORSENS.**

In the spring of 2013, Berlo became UMD's new Athletic Director. [ECF 379, 21:6-8.] Berlo had no experience supervising a female Division I coach. *[Id.* 102:5-8.]

In the summer of 2013, Berlo began randomly calling Banford into his office to discuss extraneous matters. [ECF 308 at 2, ¶9.] Berlo's face reddened as he talked about nothing, as if he were flirting with her. [*Id.*] Banford observed Berlo circle back to talk to her when she was in the office or mail room, for no apparent reason. [*Id.* ¶10.] Banford felt awkward, and avoided unnecessary interactions with Berlo. [*Id.*]

In October 2013, Wiles invited Berlo to join her at UMD's National-Coming-Out-Day Luncheon. [ECF 367 119:14-22; ECF 309 at 2, ¶13; ECF 381 at 2.] Wiles was the keynote speaker. [*Id.*] Berlo said he would be out of town. [ECF 379 38:1-9; ECF 367 121:1-10; ECF 309 at 2, ¶13.] On the day of the luncheon, Wiles saw Berlo in his office and again invited him to the luncheon. Berlo declined, stating "I'm not available for that event" and "that's not really my thing." [ECF 367 123:14-124:14; ECF 369 284:13-14, 285:9-12; ECF 125 at 2.] Following the event, Wiles told Berlo she wished he could have attended the luncheon. [EFC 367 125:5-126:11.] Berlo responded: "Did you give it a lot of thought before you decided to speak?" [ECF 309 at 2, ¶13; ECF 125 at 2; ECF 367 125:5-126:11.]

After the luncheon, Berlo began to systematically exclude Wiles from meetings she normally attended, often by rescheduling them to a time he knew Wiles was unavailable. [ECF 309 at 2, ¶14.] When Berlo

7

and Wiles met —almost always in the presence of others—Wiles found Berlo to be cold and hostile. *[Id.;* ECF 125 at 2; ECF 383.]

In December 2013, Banford and Miller attended the Athletic Department holiday party together as a couple for the first time. [ECF 308 at 2, ¶13; ECF 357 215:17-218:5.] After the party, Berlo drastically changed the way he spoke to and treated Banford. [ECF 308 at 2, ¶14.] He stopped calling her into to his office except for scheduled softball or hockey meetings. [*Id.*]

**SPRING 2014: THE CLIMATE WORSENS.**

On April 24, 2014 (after rescheduling several times), Berlo met with Wiles to discuss her performance evaluation. [ECF 309 at 2, ¶15; ECF 379 46:15-47:7; ECF 320 at 2; ECF 125 at 4.] Berlo prepared Wiles' written evaluation with input from Assistant Athletic Director and Wiles' Sport Administrator, Abbey Strong. [ECF 367 187:10-20; ECF 226 at 2-6; ECF 387, 105:6-109:25.] The evaluation was positive, rating Wiles as "Exceeds Requirements" or "Superior" in every category. [*Id.*] Berlo wrote, "Annette works well within all facets of UMD Athletics" [ECF 226 at 2], "she represents UMD at the highest level" *[Id.* 3], she is "highly organized," and "handles her budget well and is creative in maximizing its use." [*Id.* at 4.] "Overall, Annette is a strong Head Coach for UMD Athletics." [*Id.* at  6.]

But Berlo's demeanor was harsh and negative during the meeting. [ECF 309 at 3, ¶17; ECF 125 at 4.] He criticized her win/loss record and her relationships with her players. [*Id.*] Wiles had never received this criticism before, because her win/loss record and her relationship with her players were good. [ECF 309 at 3, ¶17; ECF 310 at 2, ¶¶9-10.] Wiles reminded Berlo that her team's GPA was the highest of all teams on campus, and of the team's involvement in community volunteer activities and fundraising achievements. [ECF 309 at 3, ¶17.] Instead of responding, Berlo stood up and prepared to leave. [*Id.*] Wiles said she had a few questions to discuss. [*Id.*] Berlo left, telling Wiles he had an important meeting across campus. [*Id.*] The meeting lasted approximately 15 minutes. [*Id.*]

On May 2, 2014, Berlo requested student athletes to complete surveys regarding their coaches. [ECF 309 at 3, ¶18; ECF 389 at 2; ECF 367, 216:22-217:12.] Strong, who lacked experience drafting surveys, drafted the survey at Berlo's request. [ECF 367, 197:15-22, 201:24-202:7, 205:6-18.]

On Sunday May 18, 2014, Strong called Wiles and directed her to meet with Berlo and Strong the following day. *[Id.* 218:2-17; ECF 309 at 3, ¶19.] Strong informed her that Berlo Had met with senior players on the

9

basketball team and had concerns. [ECF 367, 218:11-22.] Wiles was shocked. The day the call, she had attended the seniors' graduation and graduation party—at the players' invitation—with her wife and daughter. Nothing in the invitation, or at the party, indicated that these graduating seniors had any negative concerns about her or her coaching. [*Id.*, 220:11-20; ECF 309 at 3, ¶20.]

Two days later, Wiles met with Berlo and Strong. [*Id.* 222:1-14.] Berlo told Wiles he did not trust her, *Id.* 222:23-223:1], and that the senior exit interviews and the student athlete surveys were negative [*Id.* 223:20-224:18; ECF 309 at 3, ¶21]. Wiles repeatedly asked to see the surveys, the results, and the scores; Berlo refused. [*Id.*] Strong told Wiles she had been instructed by Berlo not to share the survey questions and responses with the coaches. [ECF 309 at 3, ¶21; ECF 125 at 3].

Wiles left the meeting in tears. [*Id.* ¶22]. She went directly to Vice Chancellor Lisa Erwin's office. [*Id.*]. Wiles shared with Erwin her concerns about the disparate treatment in the Athletics Department, her Title IX concerns, and how she felt Berlo was homophobic and on a "witch hunt" to fire her, or run her out of the department. [ECF 308 at 3, ¶22; ECF 383; ECF 390 at 2.]

Wiles received her reappointment notice the next day. [ECF 367 51:3-14; ECF 212 at 2.] Berlo had used the survey results to give Wiles a low merit increase. [*Id.*, 246:7-22; ECF 217 at 2; ECF 292; ECF 379 204:5-21, 213:22-214:13; ECF 323.] A week earlier, Berlo had sent the coaches a list of criteria for determining merit increases: (1) academic success; (2) competitive achievement; (3) community engagement; and (4) fundraising. [ECF 309 at 3, ¶20; ECF 394 at 2.] Student surveys and exit interviews were not listed. *[Id.]*

After investigating, the University found Wiles' merit pay increase "was inequitable as compared to another coach who does not share her protected identities," and that Berlo's decision violated University policy, "which prohibits discrimination on the basis of gender and sexual orientation." [ECF 367, 247:2-12; ECF 218 at 2; ECF 392].

Berlo created a strategic planning committee in May 2014 to address the future of UMD's Athletics Department. [ECF 307 at 4, ¶28.] Berlo selected eleven participants, including the male head coaches of UMD's most prominent men's programs: hockey, football, and basketball. *[Id.]* Also included were the male head coaches of women's volleyball and soccer, the women coaches of women's track and softball, and four department administrators. [ECF 379, 129:17-131:15; ECF 321.] He

11

excluded Miller and Wiles, head coaches of the only Division I sports at UMD. [*Id.;* ECF 309 at 3-4, ¶24.] Miller complained when she learned she was excluded from a committee tasked with planning the department's future. [ECF 307 at 4, ¶29.] When Banford asked Berlo's assistant, Kristina D'Allaird, about Miller's exclusion, D'Allaird replied, "Shannon is not needed ... [Berlo] just needed a smattering of Men's and Women's coaches ..." [ECF 395, 30:13-31:22; ECF 346 at 2.] D'Allaird testified the committee members were strategically selected. [ECF 395, 30:4-11.] She later told the EEOA investigator Berlo put the group together. She and Berlo dialogued about it, but the decision was Berlo's to exclude Miller and Wiles. [ECF 395, 19:1-22, 20:23-21:11, 23:15-24:2, 25:14-16, ECF 344 at 2].

The environment in the Athletics Department and how her merit review was handled in May 2014 took a high emotional toll on Wiles. [ECF 309 at 3, ¶23.] She had been seeing a psychologist for several years to work through work-related and personal issues. [*Id.;* ECF 397.] By spring, 2014, work-related stress was increasing, and Wiles increasingly discussed work-related stress with her psychologist. [*Id.* ¶23.] In the sessions following Wiles' May 20 meeting with Berlo—on May 21 and on

May 28, 2014—she reported having work-related stress and anxiety. [ECF 309 at 3, ¶23; ECF 397.]

On July 8, 2014, Wiles saw Berlo at a conference-level coaches meeting. [ECF 309 at 4, ¶25.] Berlo never spoke to Wiles, but acted as if he was angry with her. [ECF 309 at 4, ¶25; ECF 399 at 2.] On August 25, 2014, Wiles again reported work-related stress to Dr. Rose-Carlson. [*Id.;* ECF 401.]

Before scheduling the 2014-2015 season games, Wiles asked to add two additional exempt games, as the men had also done. [ECF 309 at 4, ¶26; ECF 367, 151:13-152:2.] Berlo said no, because it was not in the budget. [*Id.*]

Berlo changed Wiles' proposed 2014-2015 budget, reducing equipment, recruiting, and scholarship funds. [*Id.* ¶27; ECF 125 at 5; ECF 367, 135:20-23, 136:4-11, 137:12-16, 147:10-148:7, 149:17-150:11; ECF 213 at 2.] Wiles knew Berlo's cuts would make it difficult for her to field a successful team while staying within the reduced budget. [ECF 309 at 4, ¶27.] On September 4, 2014, during a budget meeting with Berlo and Strong, Wiles objected to the unilateral changes, hoping to compromise. [*Id.*] Berlo tersely directed her to sign off on the new budget, stating if she did not do so, "then I guess you've signed your walking papers." [*Id.*]

Threatened with losing her job, Wiles signed. [*Id.*] By doing so, Wiles knew she had agreed that "under no circumstances will I exceed my budget" and "budget management will be a key factor in my annual performance evaluation." [ECF 125 at 5; ECF 367 149:17-150:11; ECF 213 at 2.] Wiles felt she had no choice, even though she also knew those restrictions would hinder her team's ability to be competitive. [ECF 309 at 4, ¶27.]

Also in September, 2014, Wiles was asked to serve again on the UMD Chancellor Unit Change Team for Diversity, and she recommended Finnerty, since she had served on the committee. [*Id.* ¶28; ECF 125 at 6.] Finnerty said he had "better things to do than listen to a bunch of old ladies talk diversity." [*Id.*] Berlo sent Finnerty back to inform Wiles she would continue to represent the department on the committee. [*Id.*]

In the fall 2014, Wiles and her assistant ███████ were charged for mileage and excessive wear to their cars provided by the University; other coaches did not have to pay for either. [ECF 125 at 5; ECF 367, 277:24-279:18, 280:3-18; ECF 222 at 2.] Berlo told Strong, "they can either pay that themselves or pay that out of their team's budget." [ECF 387 139:18-140:21.] Berlo had cut the women's basketball team budget. [ECF 309 at 4-5, ¶30.] On November 17, 2014, Strong approached ███████ and Wiles, stating she was "coming to warn" them that in a meeting

14

scheduled for the next day, Berlo "is going to be in your face" about finding a solution to the car and budget problems. [*Id.* ¶29; ECF 125 at 5; ECF 403.]

As planned, ███████, Strong, Berlo, and Wiles met the next day. [ECF 367, 281:17-282:24.] Berlo initially stated the department would try to work it out. [*Id.*] However, since Wiles' budget had been cut, the only thing left to work out was the car charges. [ECF 309 at 4-5, ¶30.] Wiles pointed out other coaches did not have to incur similar charges out of pocket. [*Id.;* ECF 367 281:17-282:24.] Berlo became visibly angry, telling the two women they could just pay the $400. [*Id.*]. When Wiles protested, Berlo said "you just keep going and it'll be $700." *Id.*]. Unwilling to be subjected to more anger or threats, Wiles and ██████ left the meeting. [*Id.*].

Upon leaving the meeting, █████ and Wiles immediately went to see Mary Cameron at Human Resources. [*Id.* ¶31]. Wiles reported Berlo's abusive behavior, including his angry threats about the car fees. [ECF 125 at 6; ECF 367 282:16-283:8.] Wiles also reported the discriminatory budgets, using student surveys in her performance review, and her low merit pay. [*Id.*] Wiles told Cameron she felt Berlo was biased against her because she is a strong, outspoken lesbian woman, and that she felt discriminated and retaliated against. [ECF 309 at 5, ¶31; ECF 383.]

15

**BERLO PLANS TO PURGE SIX COACHES, ALL OF WHOM ARE OPENLY GAY WOMEN.**

In the late fall and winter of 2014, at Berlo's request, Finnerty sought information from Human Resources about the process needed to non-renew the contracts of five female coaches, including, Jen Banford, and Annette Wiles among them. [ECF 405 40:25-42:17, 47:21-48:8; ECF 347]. Shannon Miller's non-renewal was being handled by Berlo in consultation with the General Counsel's office. [*Id.* at 43:4-8]. The requests for information regarding non-renewal were first made about Wiles and Banford in the late October, early November time frame. [*Id.* at 46:10-13, 49:1-15.] The remaining three coaches identified for non-renewal included both of Miller's assistant coaches, ███████████ and ███████████, and ███████████, the strength and conditioning coach/Equipment Manager assigned part-time to Women's ice hockey. [ECF 347; Banford Decl. at 3-4, ¶¶ 10, 11 and 12.] All five women identified in the non-renewal emails and Miller were openly gay. [ECF 307 at 4, ¶ 32; Miller Decl. at 1-2, ¶¶4, 5 and 6].

Berlo was preparing to purge them from the Athletic Department. [ECF 405 at 38:16-39:9, 40:25-41:12, 43:9-44:9, 46:5-48:25; ECF 347; ECF 369 at 92:1-93:4, 96:15-97:2.] All six coaches were openly gay. [ECF 307 at 4, ¶32; Miller decl. at 1-2, §§ 4, 5, and 6.] Linda Kinnear, Co-

Director of the UMD Human Resources and Equal Opportunity, raised concerns about what she called restructuring the athletic department. [ECF 405 at 55:8-19; ECF 318.] Kinnear wrote to Berlo on December 8, 2014, bringing to his attention the potential for a discrimination complaint, since all the proposed non-renewals in the athletic department restructuring plan were female. [ECF 318; ECF 405 at 55:5-56:23.]

Berlo assured Kinnear "none of the reassignments or non-renewals are gender based," pointing to the non-renewal of a male assistant coach earlier in the year. [ECF 318.] There was no discussion that all five women, plus Miller, were openly gay.

On December 6, 2014, while Berlo was preparing the purge, Wiles earned her 400th career victory. [ECF 309 at 5, ¶32.] It went unnoticed.

**THE PURGE BEGINS.**

The morning of December 9, 2014, Berlo and Chancellor Black non-renewed Miller's contract, citing the overall condition of university finances. [ECF 307 at 4-5, ¶33; ECF 144 at 4, 9:50.] In the same meeting, Black told Miller her assistant coaches ██████████ and ██████████ would also be non-renewed. [ECF 144 at 4, 9:50.] On December 11, 2014, two days later, Berlo informed Miller the non-renewals extended to Banford. [ECF 93 at 2, :29.] Miller called Banford to tell her of the non-

renewal. [ECF 308 at 3, ¶18.] Banford received written notice of her non-renewal by email from Berlo the same day. [ECF 102.] The written notice describes her job as Hockey Operations/Head Softball coach, followed by her employee number, and states this position—a 100% position—will end on June 14, 2015. [*Id.* at 4.] Her contract, however, describes her position as that of Head Coach, a specific job classification no matter the sport. [ECF 89 at 9-11; *See* ECF 89 at 17-24.] The job classification for a head coach is 9791. [*See, e.g.*, ECF 89 at 95.]

Banford's contract in December 2014 was offered to her by then-acting Athletic Director Karen Stromme. [ECF 89 at 9-11.] Her job classification was as Head Coach, classification code 9791, with her duties split between Head Coach for Women's Softball at 60% time and Director of Women's Hockey Operations at 40% time. The contract was for 3 years, June 1, 2013 – May 31, 2016. [*Id.* at 9.] For the 2013-2014 academic year she received the Head Softball Coach base salary of $36,380. Her salary was augmented by an additional $15,000, which was associated with the Women's ice hockey position. [*Id.*] This contract was renewed for 2014-2015 with a merit raise, bringing her base pay to $38,154. ($53,154 total salary less the $15,000 augmentation). [ECF 453 at 4.] When the $15,000 augmentation and the camp pay—the first year $11,500 and the second

year $8,379—the contract Berlo non-renewed provided Banford not only the base salary generated by her position as head softball coach, but an additional augmentation each year of approximately $25,000. Banford received funds from both softball camp and hockey camp, but the amounts generated from hockey camp were more lucrative. [Banford decl. at 2, ¶ 7.]

After being non-renewed on December 11, 2014, Banford received a new contract proposal by email on January 27, 2015. [ECF 89 at 93, 95.] The proposal was for a position of full-time Head Softball Coach position, again job code 9791, at a base salary of $40,062. [ECF 89 at 95.] The offer provided for no augmentation, though Banford's base softball-related base salary had been augmented every year since 2007 with an assignment to other part-time work within the university. [Banford decl. at 1, ¶¶ 2 and 3.] Without augmentation or camp pay from hockey camp, the offer represented a pay decrease of approximately $20,000 (the $15,000 augmentation and a low estimate e of $5,000 for hockey camp). Banford declined. [ECF 365 at 202:14-16; ECF 308 at 4, ¶29.]

**THE RETAINED HOCKEY STAFF.**

Upon non-renewal of the assistant coaches and Banford, only three members of the 2014-2015 women's ice hockey staff" remained: ███ ████, ███████████, and ██████████████. ████████ was the

Assistant Soccer Coach also assigned as a part-time Sports Information Director to Women's hockey. [Banford decl. at 3, ¶10.] She reported to the head soccer coach, Greg Cane, who under university protocol would have conducted her annual performance evaluation. [*Id.*]. ███████ was assigned to Women's ice hockey during the season and to track in the spring. ██████ reported to Mike Wendinger, who did her annual performance evaluation. [*Id.* at 3, ¶ 11.] ████████████ was a Strength & Conditioning Coach and Equipment Manager assigned to Women's ice hockey. She reported to Mike Wendinger, who did her annual performance evaluation.[1] [*Id.* at 4, ¶ 12.]

All three were women. Of the three, only ███████ was openly gay. [Miller decl. at 2, ¶¶ 6 and 7.] ██████ was on Berlo's non-renewal list, though she was not non-renewed with the others.

**BANFORD REPORTS A HOSTILE WORK ENVIRONMENT**

On February 9, 2015, Banford emailed Finnerty and reported working in a hostile work environment. [ECF 308 at 4, ¶30.] She received no help. [*Id.*]. Her complaint was triggered when Banford learned from ██████ that Nygaard reacted to the ESPN article by stating he would have

---

[1] ██████ was, at the time, suffering from a life-threatening illness. [Miller decl. at 2, ¶ 6.].

20

punched Banford in the face if he had seen her. [ECF 365, 259:8-25; ECF 385 100:23-101:11.] Nygaard directed ██████ "you can tell [Banford] to come meet me in front of my face." [*Id.* 261:4-7.] ██████ also informed Banford that Nygaard had directed her to state that Berlo is Banford's boss. [*Id.* 261:15-19; ECF 418.] Banford interpreted these messages as a threat and was nervous about meeting with Nygaard alone. [*Id.*, 259:20-25, 260:1-6, 261:10-19; ECF 418.] Having heard nothing in response, Banford emailed him again on March 12, 2015. [ECF 309 at 4, ¶31].

On March 31, 2015, having still received no assistance, Banford emailed Finnerty again, complaining the work environment in which she was working was hostile, and making a list of additional concerns. [*Id.* at 4-5, ¶32; ECF 365 207:7-13; ECF 107.]

Finnerty forwarded Banford's complaint to UMD's Office of Equal Opportunity and Affirmative Action (EOAA). [ECF 308 at 5, ¶33.] On September 9, 2015 the EOAA issued its report, and recommended Nygaard be disciplined, up to and including termination. [ECF 420, 131:1-19, 132:20-25, 151:16-152:11, ECF 342.] In September 2015, Chancellor Black imposed a five-day unpaid disciplinary suspension on Nygaard. [*Id.*, 171:3-25.] Berlo rescinded the five-day suspension in spring, 2016. [*Id.*, 173:1-174:23.]

21

**THE PURGE ENGULFS WILES.**

On January 9, 2015, Wiles' team achieved its highest-ever combined GPA, and she had won her 400th career game in December. [ECF 309 at 5, ¶33; ECF 422 at 2.] Despite these successes, Wiles suffered her first panic attack on January 15, 2015. [*Id.* ¶35.] She was treated at the emergency room at St. Luke's Hospital. [ECF 424.]

Because nobody at UMD made any attempt to address the issues Wiles raised with Vice Chancellor Erwin in May 2014 and with Mary Cameron in November 2014, in February 2015, Wiles went to HR and spoke with Kinnear. [ECF 309 at 5, ¶36.] Wiles reported she felt isolated, alienated and retaliated against in the department. [*Id.;* ECF 383; ECF 405 87:6-25, 88:1-12, 89:17-24.] Wiles reported Berlo's outward discrimination and daily hostility towards her, complained about her performance evaluation and low merit increase, and described the hostile work environment in the Athletic Department. [*Id.*] Kinnear took no notes during the meeting. [ECF 405, 90:6-8.] Kinnear did nothing to help, other than to tell Wiles to put her concerns in writing. [*Id.* 88:13-90:2; ECF 309 at 5, ¶36.]

On March 3, 2015, Wiles saw Dr. Rose-Carlson and complained of severe issues at work and of feeling shunned. [ECF 426.] When Wiles saw

22

Dr. Rose-Carlson the next day, she reported ongoing Title IX violations, continued stress, and ongoing abusive behavior toward her by UMD. [ECF 428.] Wiles saw Dr. Rose-Carlson five more times in March, often in tears, complaining of increasing anxiety from the stress, abuse, and discrimination in her workplace. [ECF 430.]

Wiles filed a formal complaint with Human Resources on March 16, 2015. [ECF 125; ECF 309 at 5, ¶35.] Her complaint itemized examples of discrimination and retaliation she had experienced in the Athletic Department, including: (1) Berlo's abusive and discriminatory treatment of her after he refused to attend the Coming-Out-Day luncheon; (2) Berlo's excluding her from the Strategic Planning Committee; (3) the student surveys and exit interviews; (4) her performance evaluation and merit pay issues; (5) Berlo's arbitrary reductions to her program's budget; (6) being required to sign a budget contract agreeing to those reductions; (7) unfair treatment in relation to the cars for her and her assistant coach; (8) lack of diversity and commitment to diversity in the Athletics Department; and (9) the behavior of Strong. [*Id.*]. One or two days later, Wiles had another major panic attack. [ECF 430; ECF 432].

On April 23, 2015, while at Dr. Rose-Carlson' s office, Wiles watched her UMD calendar being changed by someone else from another location.

23

[ECF 309 at 5, ¶38; ECF 367, 167:10-18; ECF 317 at 2.] Certain appointments and entries were being removed or altered. *[Id.]* Dr. Rose-Carlson and her office manager also witnessed the event. [ECF 434; ECF 367, 167:10-18; ECF 317 at 2.] Wiles had another panic attack in the doctor's office. [ECF 309 at 5, ¶38; ECF 434.]

Wiles had another panic attack on May 1, 2015. *[Id.* ¶39.] She was again treated at St. Luke's emergency room. [ECF 436.] Wiles was placed on stress leave from May 5 to May 18. [ECF 309 at 5, ¶39; ECF 438.]

Since Wiles was hired in 2008, if a UMD coach's contract would be renewed, it was renewed the year before its expiration date. [*Id.* ¶40.] Wiles' coaching contract was due to expire on June 20, 2015. [ECF 367 37:24-39:9; ECF 206 at 2.] If she was to get a new contract for 2015-2016, Wiles expected a renewal to occur in the spring of 2014. [ECF 309 at 5, ¶40.] Given the events that spring, Wiles believed her contract would not be renewed for the 2015-2016 season. [*Id.*]

Wiles asked Strong, her Sport Administrator, multiple times in 2014 whether her contract would be renewed. [ECF 367 51:16-52:2; ECF 309 at 6, ¶41.] Strong confirmed her understanding that if her contract was to be renewed, there would have been negotiations the prior year. [*Id.* 52:11-

20; ECF 309 at 6, ¶41.] During each conversation, Strong told Wiles there were no plans to renew her contract. [ECF 309 at 6, ¶41.]

Wiles resigned on June 1, 2015 because her health had so deteriorated from the stress of the environment in the UMD Athletics Department she could not sustain her work for the additional 19 days until her contract expired. [*Id.* ¶42; ECF 367 295:21-296:5.] She had not been offered a new contract when she resigned. [*Id.*] Three days after her resignation, but before her existing contract expired, Wiles saw that her nameplate had been removed from her office door. [*Id.*]

## **ARGUMENT**

### I.   **SUMMARY JUDGMENT STANDARD.**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit" and a dispute is genuine if "the evidence is such that it could lead a reasonable jury to return a verdict for either party." *Jenkins v. Univ. of Minn.,* 131 F. Supp. 3d 860, 870-71 (D. Minn. 2015) *(citing Anderson v. Liberty Lobby, Inc., 477* U.S. 242, 248 (1986)).

A party seeking to defeat summary judgment must "produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 24749). "A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts." *Jenkins*, 131 F. Supp. 3d at 871 (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980).

## II. SUMMARY JUDGMENT IS INAPPROPRIATE ON BANFORD'S REMAINING TITLE VII CLAIMS.

Banford's sexual discrimination claim is a disparate treatment claim. The claim must be analyzed under the analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Using that analytical framework, Banford must first make out a *prima facie* case of discrimination. She must show (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action, and (4) evidence that supports an inference of improper motivation. *McDonnell Douglas*, 411 U.S. at 802.

Upon establishing a prima facie case, the burden of production, but not of persuasion, shifts to UMD to articulate some legitimate, nondiscriminatory reason for adverse employment action. If UMD proffers a legitimate reason for its action, the Court may move directly to the final stage, and consider whether the plaintiff can demonstrate the proffered rationale is pretextual. *Lenzen v. Workers Comp. Reinsurance Ass'n*, 843 F. Supp. 2d 981, 990 (D. Minn. 2011) (*citing U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009)). If the employer presents a legitimate business reason, the plaintiff must then show the articulated reason is pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

"Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 850 (8th Cir. 2005), *abrogated on other grounds*

27

by *Torgerson v. City of Rochester,* 643 F.3d 1031 (8th Cir. 2011); *see Twiggs v. Selig,* 679 F.3d 990, 993 (8th Cir. 2012).

### A.   UMD NON-RENEWED BANFORD'S CONTRACT AT LEAST IN PART BECAUSE SHE IS A GAY WOMAN

To establish a prima facie case for discrimination, Banford must present evidence showing she suffered an adverse employment action and some evidence of discriminatory motive for that action by her employer. Here, Banford must present evidence the adverse employment action was motivated at least in part because she is a gay woman. *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 0106 (8th Cir. 1999). The evidence—much of which is disputed—will make both showings, creating genuine issues of material fact for trial.

### 1.   UMD ENGAGED IN AN ADVERSE EMPLOYMENT ACTION AGAINST BANFORD.

The challenge to Banford's prima facie disparate treatment claim is to \requirements three and four: that she suffered no adverse employment action, and was treated no differently than similarly-situated employees who are not members of the protected class. To qualify as an adverse employment, action the action must produce a "material employment disadvantage." *Id.*, *citing Cross v. Cleaver*, 142 F.3d 1059, 1073 (8th Cir. 1998). Termination, cuts in pay or benefits, or changes that affect an

employee's future career prospects are significant enough to meet this standard, as are circumstances amounting to a constructive discharge. Minor changes in duties or working conditions that cause no materially significant disadvantage to the employee do not meet the standard. *Id.*

UMD argues this Court correctly decided the "adverse employment action" requirement was not met in its February 1, 2018 Order, and that the determination is made no different with consideration of Banford's status as a gay woman.

This Court's decision seems to have been based on three premises: 1) that the existing and the offered contracts were substantially similar regarding the softball portion of Banford's job, neutralizing the effect of the non-renewal; 2) that the non-renewal of Banford's job as director of operations with the women's ice hockey program was justified because it is a "common practice" upon the discharge of a head coach to also discharge that coach's "senior staff," and not pretextual, and 3) that Banford reported directly to Miller, whereas the three retained team employees—also women—did not.

The Court's determination Banford cannot demonstrate an adverse employment action should be reconsidered because it was made with the pre-*Bostock* standard in mind, so evidence of homosexuality was not

29

considered. The conclusion is wrong because the premises on which it is based are flawed, given all the available evidence.

At the time of her non-renewal, Banford was operating under a three-year contract subject to annual renewal. Her job classification was as Head Coach, classification code 9791, with her duties split between Head Coach for Women's Softball at 60% time and Director of Women's Hockey Operations at 40% time. The contract designated a three-year term, June 1, 2013 – May 31, 2016. For the 2013-2014 academic year—the first under the contract, Banford received the Head Softball Coach base salary of $36,380. Her salary was augmented by an additional $15,000, which was associated with the Women's ice hockey position.

Berlo renewed Banford's existing three-year contract for 2014-2015 increasing her base pay to $37,223, with augmentation pay of $15, 000 and a $931 merit increase for a total compensation of $53,154. [ECF 89 at 17-24]. In his memo to her summarizing the renewal terms, Berlo noted her UMD job classification, stating "your duties will be those associated with serving as 9791 Head Coach."

Banford regularly earned additional compensation by participating in both softball camp and hockey camp. Hockey camp contributed a significant bump to her total compensation. Income from the two camps

increased her total compensation by $11,500 the first year of her contract, and the second year $8,379 [[ECF 453 at 4]. While Banford received funds from both softball camp and hockey camp, hockey camp was the more lucrative. [Banford decl. at 2, ¶ 7]. The contract Berlo non-renewed provided Banford not only the base salary generated by her position as head softball coach, but an additional augmentation each year of at least $20,000, the $15,000 augmentation written into the contract and at least another $5,000 from hockey camp.

After being non-renewed on December 11, 2014, Banford received a new contract proposal by email on January 27, 2015. The proposal was for a position of full-time Head Softball Coach position, again job code 9791, at a base salary of $40,062. [ECF 89 at 95]. The offer provided for no augmentation, though Banford's base softball-related base salary had been augmented every year since 2007 with an assignment to other part-time work within the university. With losing funds generated by hockey camp and eliminating the $15,000 augmentation, the replacement contract provided Banford less annual compensation less than she made before the renewal despite the increase in her base pay, which would likely t have increased for the 2015-2016 year given her participation in the merit pool. In its simplest terms, Banford's 2014-15 contract with a base

31

pay of $37,223 , a $15,000 augmentation and merit pool addition of $931 for a total compensation of $53,154 provides more guaranteed income than a base pay of $40,000 with no augmentation. The new contract she was offered represented a $13,000 decrease in overall compensation, and losing a guaranteed opportunity to earn at least $5,000 more.

An $18,000+ reduction in annual compensation for a person at Banford's income level is significant, and qualifies as an adverse employment action. Berlo's promise to Banford she could apply for the director of operations job with the new women's hockey coach did not replace the guaranteed income loss. Banford's non-renewal was an adverse employment action.

### 2. UMD's Non-Renewal of Banford's Contract Was Pretextual.

Banford can demonstrate a material question of fact regarding pretext in two ways. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006). She can demonstrate UMD's explanation for its non-renewal is unworthy of credence because it is without basis in fact, or (2) "by persuading the court that [her homosexuality] is the more likely motivating factor behind her non-renewal. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason,

actually motivated the employer's action." *Id.* More substantial evidence is required to show pretext than the minimal showing required to make a *prima facie* case, however, because evidence of pretext is viewed in light of the employer's justification. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).

UMD's explanation of its non-renewal of Banford's contract was, in its own words, "when a college discharges a head coach, it is common to discharge the coach's senior staff at the same time so the incoming head coach can select her own staff." [ECF 763 at 31]. Far from being undisputed, the evidence UMD cites is taken out of context, and does not support the conclusion drawn.

The problem with UMD's explanation is the phrase "senior staff". Banford does not dispute it is not unusual in Division I schools for the school to eliminate the entire <u>coaching</u> staff when the head coach is eliminated. Taken in context, the evidence cited to support the "senior staff" extension is not supported by the sources cited.

For example, in his deposition, Chancellor Black to his understanding that as a matter of general practice, new head coaches have

an option to bring or hire their own "staff". [ECF 359 at 214:23-215:4].][2]
The statement was made in the last portion of questions about a meeting
between Black and Berlo in late November 2014. The topic was the need
to decide about whether to eliminate the assistant coaches along with
Miller, because they were under contract, and notice had to be given of
non-renewal by a date in Mid-December. [*Id.* at 213:14-215:4]. The
comment about giving a new coach an option to bring or hire their own
staff was made and that context, from which the reasonable inference to
be drawn from his use of the word "staff" was that it was a reference back
to the discussion about assistant coaches.

Shannon Miller discussed the need for a head coach to select his or
her own assistant coaches in her deposition, stating regarding hiring her
first two assistant coaches, "Those are your core people. It's your right arm
and your left arm, your two assistant coaches." [ECF 357 at 22]. In the
December 11, 2013 conference call between Berlo and Miller, Miller knew
███████ and ███████ her assistant coaches, were being non-renewed,
[ECF 93 at 2,  timestamp :29], but was surprised about Banford, telling
Berlo "you're obviously wiping out my entire coaching staff. I did not know

---

[2] When the document referenced is a deposition transcript, the page
number referenced is to the deposition page.

you were going to also eliminate Jen as director of operations." [*Id.*; ECF 93 at 3, timestamp 2:06]. While upset, Miller was not surprised her assistant coaches were being let go. That is the "staff" she is referring to. This inference is supported by Miller's statements in a meeting held with her players, assistant coaches ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮, and her strength coach, ▮▮▮▮▮▮▮▮▮ on December 12, 2014, when she told them about her decision not to resign. Noting it was a difficult position to be in, Miller stated "your thoughts go to your coaching staff and then your thoughts to your players . . . . Like, they're wiping out your entire coaching staff in one blow." [ECF 93 at 20, timestamp 10:59].

In her deposition, in response to the question "didn't' [Berlo] say to you . . . when a head coach is non-renewed . . . her staff is also non-renewed so that the new coach can hire their own," Banford testified she had heard that before, but she forgot where she heard it, or if it was directly from Berlo. [ECF 365 at 150:10-22]. Banford was unaware of the "common practice" UMD refers to, particularly with as applied to a part-time operations director position.

Berlo states in his declaration "it is common practice in Division I college athletics that when a head coach is replaced, the assistant coaches and operations staff also are let go to enable the new coach to select his or

her own staff.   [ECF 85, ¶ 48.] In Division 1 schools—schools with an athletic department comprised of Division 1 teams—this is a known practice. However, while women's ice hockey is a Division I sport at UMD, UMD is a Division II school in all other respects. The only Division I sport at UMD is ice hockey. [Miller decl. at 2, ¶¶ 8 and 9].Even in Division I schools, the practice is generally limited to the coaching staff, who are generally selected by Division I coaches.

In Division I schools, ice hockey is staffed with a full-time director of operations position. Like Division I schools, the men's Division I ice hockey team at UMD was staffed with a full-time director of operations. [*Id.* at 2-3, ¶ 11]. Women's ice hockey never had a full-time director of operations, despite Miller's repeated requests for one. [*Id.* at 3, ¶ 13]. In those Division I programs, including the men's ice hockey program at UMD, the full-time director of operations, job classification number 9343DR, reported to the head coach. [ECF 94 at 35-36]. That was not the case with Banford's position, which was part time.

Banford's job was allocated as 60% for head coach of softball and 40% Director of Operations of Women's ice hockey. Her job classification was 9791—head coach. Besides her head-coach-base salary, Banford received a $15,000 "augmentation", which represented payment for her

part-time position as part-time director of operations for women's ice hockey. With a job classification of 9791, head coach, her direct report was to Jay Finnerty, Assistant Director of Athletics. Her salary was determined by the Athletic Director—Berlo. Every annual performance review conducted since her arrival was conducted by the then-Assistant Athletic Director, with her salary increase determined by the then-Athletic Director. Shannon Miller did neither.

Because Miller was the head coach of women's ice hockey, Banford's hockey-related assignments and responsibilities came from Miller, including working with the hockey budget. Banford reported to Miller about the status of those responsibilities. Miller, however, had not hired Banford, lacked the ability to fire or non-renew her, did not give Banford her annual review, and did not determine her compensation for the part-time director of operations portion of Banford's job. Those responsibilities lay with the assistant Athletic Director and, ultimately, the Athletic Director. Banford's part-time job as director of operations for women's hockey made her part of the women's hockey staff. At UMD, however, it did not fall in the same category as a head coach's assistant coaches.

UMD's statement it is a "common practice" upon the discharge of a head coach to also discharge that coach's "senior staff" is an exaggeration.

37

There is evidence that for Division I athletics, when a head coach is non-renewed the coaching staff—which was selected and hired by that head coach—is also non-renewed. The new coach is afforded the opportunity to surround his or herself with the coaching staff he or she selects. Those assistant coaches report directly to the head coach, and that coach performs their annual performance evaluations.

In Division I schools, there is evidence to support the proposition that upon the discharge of a head coach,  that coach's  to also discharge that coach's coaching staff is also discharged. Where the director of operations is a full-time position, selected and managed by the head coach, the same practice may apply. However, non-renewing a part-time employee with no coaching responsibilities whose direct report supervisor is an assistant athletic director, not the head coach, does not fall into the proposition UMD sponsors here. UMD's explanation for Banford's non-renewal is pretext.

### 3. BANFORD'S CONTRACT WAS NON-RENEWED IN SIGNIFICANT PART BECAUSE SHE IS A GAY WOMAN.

Even if there were evidence the discharge of a head coach is commonly paired with the discharge of that coach's "senior staff," consideration of the evidence provides definitive evidence that the non-renewal of Banford's contract was more likely her homosexuality. While

preparing to dismiss Miller, an openly gay woman, Berlo also prepared to dismiss five other openly gay women. He began the process by having Assistant Athletic Director Finnerty gather the needed contract non-renewal procedures from human resources. The first two people about whom that information was requested were Wiles and Banford—both openly gay women. Wiles was the head women's basketball coach and had no connection to women's hockey. Banford had a part-time administrative position with women's hockey, but was not a coach.

The remaining three on Berlo's list—███████████, ██████████████ and ███████████████—were added a month later. These three had been hired by Miller and could fairly be called her coaching staff. They were also openly gay women.

Within the women's hockey program, only two employees were not on the purge list: ███████████ and █████████████. Their jobs in women's hockey did not involve coaching. ██████r was the part-time sports information director for women's hockey. However, her primary function was as an assistant soccer coach whose direct report was the head soccer coach. ███████ was an athletic trainer assigned to women's hockey and track. Her direct report was assistant athletic director Mike Wendinger. Neither was hired by Miller. Neither reported directly to Miller,

39

though they with communicated with Miller about their women's hockey responsibilities. Miller did not do their annual performance evaluations, or decide their salary or their merit increases. And neither was openly gay.

The purge list is significant. It consists exclusively of openly gay women. Regarding women's ice hockey, the list targets not only Miller's two self-selected assistant coaches, but also Banford and ████, neither of whom is primarily a hockey coach, and for neither of whom Miller was a direct supervisor. That leaves Banford, openly gay and openly Miller's partner, who was on the list several weeks before the two assistant coaches, and, other than being an openly gay woman, had an employment contract more similar to the three program employees who remained than those purged.

A reasonable jury could easily conclude Banford was non-renewed because she is openly gay, and because she was Miller's partner in a gay relationship. She has presented evidence the non-renewal of her contract and removal from her part-time position in women's hockey was motivated by unlawful discrimination because she is a gay woman. Further, she has presented evidence a reasonable jury could believe, that UMD's defense— the elimination of Banford's position as part-time director of operations was a customary practice—is pretext.

40

## B.   BANFORD EXPERIENCED AN ENVIRONMENT HOSTILE TO HOMOSEXUAL WOMEN IN THE UMD ATHLETIC DEPARTMENT.

The best evidence Banford experienced an environment hostile to openly gay women is the purge list, which was generated when Miller, who was also openly gay, was non-renewed. Of those women on the purge list, a list which included Banford, UMD non-renewed of five of the six. The purge list and its execution was the culmination of increasing Berlo's hostility to Banford because she was a gay woman

Discrimination based on sex that creates a hostile or abusive working environment violates Title VII. *Harris,* 510 U.S. at 21. To prevail on a hostile work environment claim, each Plaintiff must establish that (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on membership in a protected group; (4) the harassment affected a term, condition or privilege of her employment; and (5) the employer knew of or should have known of the harassment and failed to take appropriate remedial action. *Carter v. Chrysler Corp.,* 173 F.3d 693, 700 (8th Cir. 1999).

"Even if a plaintiff demonstrates discriminatory harassment, such conduct is not actionable unless it is 'so severe or pervasive' as to 'alter the conditions of the [plaintiff's] employment and create an abusive working environment.' *Meritor Say. Bank v. Vinson,* 477 U.S. 57, 67 *and*

41

*Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982). The objectionable environment must be both objectively and subjectively offensive, one that "a reasonable person would find hostile or abusive," and one the victim did in fact perceive to be so. *Harris,* 510 U.S. at 21-22. The Court has a duty to examine the totality of the circumstances when reviewing a hostile work environment claim. *Burns v. McGregor Elec. Indus., Inc.,* 989 F.2d 959, 965 (8th Cir. 1993). In determining whether an environment is sufficiently hostile or abuse to support a hostile work environment claim, courts look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 78788 (1998). "[I]ncident[s] within the limitations period need not satisfy the definition of sexual harassment under Title VII when viewed in isolation." *Van Steenburgh v. Rival Co.,* 171 F.3d 1155, 1159 (8th Cir. 1999) (citation and internal quotation omitted).

The purge list encapsules the homophobic hostility in the Athletic Department under Berlo. The evidence supports the strong inference that Berlo added began his list with Banford and Wiles, neither of whom was a

hockey coach. Banford was implicated not only because she was an openly gay woman in an program where an opportunity presented itself to purge the department of a group of gay women, not just one. Besides being a gay women, she was Miller's partner—the partner of a well-known openly gay woman, and whom a jury has already determined was non-renewed because of her sex.

UMD responds there was not hostility aimed at Banford, as witnessed by the new contract Berlo offered her over six weeks after she was notified her existing contract would be extended, right before her softball season began. Although UMD claims it always intended to keep Banford as a softball coach, Banford was not treated that way. Berlo refused to talk with her the day she received her non-renewal letter. He set follow-up appointments at a time he knew she was in practice getting her team ready to start the season. For six weeks, Banford was not contacted directly by anyone in senior management with the authority to tell her what was happening. Banford's recollection of the conversation with Kinnear is indirect conflict than what Kinnear testified to. It is entirely believable that Kinnear told Banford no contract for Banford had crossed her desk, and there would be no contract if she did not know about it.

When the six weeks of waiting was broken, Berlo offered Banford a contract for head softball coach, but eliminated not only the director of operations position with women's ice hockey, but also the salary augmentation pay that historically pushed her salary into a level she could live at. A reasonable jury could readily conclude that Berlo could foresee that Banford would turn down the proffered contract because the compensation was inadequate. Banford has presented a prima facie claim of hostile work environment. She has presented evidence that disputes evidence upon which UMD relies to support its factual conclusions presenting genuine questions of material fact for jury resolution. Her discrimination claim and her hostile work environment claim should both proceed to trial, and UMD's summary judgment motion should be denied.

### III.   SUMMARY JUDGMENT IS INAPPROPRIATE ON WILES' REMAINING TITLE VII CLAIMS.

As Court stated in its February 1, 2018 order, Wiles ' main claim is that UMD forced her to resign less then three weeks before her existing contract ended because of a work environment openly hostile to women. [ECF 501 at 27]. The question now requires examination of the question with an examination of the environment regarding hostility to the real issue—that Wiles is an openly gay woman. That examination yields a different result.

44

### A.   WILES HAS MADE A PRIMA FACIE SHOWING IN SUPPORT OF HER HOSTILE WORK ENVIRONMENT CLAIM.

"A constructive discharge occurs when an employer renders the Wiles' claims comes down her contention that the work environment at UMD, fostered by Berlo, was so hostile to gay women she was forced to resign three weeks before her contract ended. Wiles' working environment, which was actively fostered by Berlo, the head of the Athletic Department, was so hostile to Wiles as a gay woman, it was both objectively and subjectively toxic—intolerable—she was constructively discharged as head coach of UMD women's basketball.

Within the context of Wiles' employment history at UMD, life changed with Berlo's arrival, and it changed dramatically after Wiles' invitation to the "Coming Out Day Luncheon" in October 2013. Berlo's stated reason for rejecting the invitation changed from her fist invitation, when he said he would be gone that day, to having an engagement at Amsoil arena he could not miss when, shortly before the meeting began, she saw him in his office. Berlo's statements afterwards—whether she had thought about appearing as a speaker at such an event before accepting the request, objectively demonstrates an antipathy towards homosexuality, linking his hostility to a prohibited class.

Berlo's hostility towards Wiles did not commence until after the luncheon. Once begun, it intensified. The Court remarked in its February 1, 2018 order it is hard to know why a homophobic athletics director plotting to purge lesbians from his department would give Wiles a glowing review. Berlo gave glowing reviews to Wiles and to Banford and to Miller, yet all were on the purge list, and all were purged. Though Miller and Banford worked in different sports—hockey and softball—as opposed to basketball, they all worked in the same department, and they all worked under the same athletic director. Berlo was a person whose written reports and records differ significantly from his personal behavior towards those who work under him.

With Wiles, the Court acknowledged the relationship between Wiles and Berlo soured after the April 2014 performance review. Berlo had instituted an annual player survey, and Wiles' seniors were critical of her coaching. In reporting the negative feedback to Wiles, he told her player feedback was negative, but gave her no specifics. The feedback was deliberately vague, and when Berlo walked out of the rescheduled meeting 15 minutes after it began, is behavior could easily be interpreted by any head coach as hostile behavior, and a set up for failure. That impression was worsened because he deliberately left the impression all of her players'

feedback was negative. Yet Wiles had had years of successful work with her players, some of whom were then coaches themselves and thought highly of her. Having established his obvious distaste for gay women six months before. Berlo then used the negative feedback as justification for giving Wiles an unjustly low merit raise. Wiles filed an EEOA report, the low raise was found to be inequitable, and corrected. However, no reprimand or other consequence was given to Berlo.

As with Banford, the athletic department's hostility to gay women is best demonstrated by the purge list, which was a list created by and for Berlo. Wiles, like Banford, was at the head of the list, being one of the first to be placed there. An there is no connection between Wiles and the upheaval taking place in women's hockey other than being in the same athletic department and being an openly gay woman. Homophobic attitudes, when allowed to bloom, pervade a work environment. In the UMD athletic department, Wiles faced an environment hostile to her very being as an openly gay woman. She faced it every day she went to work, just as Miller and Banford.

### B. WILES HAS MADE A PRIMA FACIE SHOWING IN SUPPORT OF HER CONSTRUCTIVE DISCHARGE CLAIM.

"A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit."

*Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1159 (8th Cir. 1999) (citation and internal quotations omitted). To be actionable under Title VII, the work conditions must be intolerable in a discriminatory way. *Gartman v. Gencorp, Inc.,* 120 F.3d 127, 131 (8th Cir. 1997) *(quoting Chambers v. Am. Trans Air, Inc.,* 17 F.3d 998, 1005 (7th Cir. 1994)). To prove a case of constructive discharge, a plaintiff must show: (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit. *Anda v. Wickes Furniture Co.,* 517 F.3d 526, 534 (8th Cir. 2008) (quotations, alterations, and internal citations omitted). An employee can satisfy the intent requirement by showing her resignation was a reasonably foreseeable consequence of her employer's discriminatory actions. *Breeding,* 164 F.3d at 1159. "If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 575 (8th Cir. 1997) (citation and internal quotations omitted).

Whether an employee's working conditions were intolerable is judged by a reasonable-person standard. The inquiry of whether a constructive discharge has occurred is objective: "Did working conditions become so intolerable that a reasonable person in the employee's position would have

felt compelled to resign?" *Pa. State Police,* 542 U.S. at 141. Whether an employee's working conditions would be intolerable to a reasonable person in the employee's position is a question of fact, usually to be decided by the jury. *See, e.g., Strickland v. UPS, 555* F.3d 1224 (3d Cir. 2009).

The evidence submitted by Plaintiffs depicts an environment where openly gay women were treated coldly, with hostility, or ignored by Berlo and others. The reality of the hostility was white washed. Always under the surface, it provoked an anxiety-riddled, unpredictable working environment. Positive written interactions were frequently followed by hostile, even angry behavior from senior officials. The Athletic Director put together a purge list made up entirely of gay women. That Wiles was left standing after Miller and Banford fell was a function of Berlo's bad timing. His purpose in having Finnerty ask human resources for instructions about how to non-renew his purge list of gay women was to review the existing contracts and give notice of non-renewal before the contractual six-month deadline passed. If he missed the deadline, the contract renewed automatically.

Berlo missed the deadline for one of the first openly gay women on his list. Wiles was not given notice of non-renewal in time to prevent an automatic renewal under the contract's same terms. After missing the

deadline, Berlo let her hang in suspense, knowing her anxiety would increase. Wiles' anxiety level—which is well documented in the record—finally reached a level that was unbearable. Berlo fully knew Wiles' increasingly debilitating anxiety, and acted in ways that exacerbated the tension. When it became a significant hazard to her health, Wiles resigned. What Berlo failed to do with a formal non-renewal he accomplished by increasing the tension in which an openly gay woman worked.

In 2018, this Court expressed concern that the discriminatory, hostile conduct in the UMD athletic department was not bad enough to satisfy the Eighth Circuit's standard. The discriminatory conduct actionable in a constructive discharge claim is conduct "[a] reasonable person in her position would . . . have found . . . so intolerable that she was compelled to resign." *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1143-45 8th Cir. 2007).

Even if Wiles cannot show UMD through Berlo intended for her to quit because of his homophobic behavior, she can still prevail if Berlo could have reasonably foreseen that she would quit if he kept up the pressure long enough. *Id.* at 1144. Berlo cannot say he did not foresee Wiles' resignation. He had targeted her as a non-renewal candidate, and knew of her anxiety, yet avoided talking with her about her contract for

50

months while other gay women were non-renewed. A reasonable jury could conclude Berlo could reasonably foresee Wiles' resignation. Wiles has established a prima face case of constructive discharge, motivated at least in part by a working environment so hostile to her as an outspoken gay woman she was forced to resign.

Wiles has presented a prima facie claim of hostile work environment and of constructive discharge. She has presented evidence that disputes evidence upon which UMD relies to support its factual conclusions, presenting genuine questions of material fact for jury resolution. Her hostile work environment claim and her constructive discharge claim should both proceed to trial, and UMD's summary judgment motion regarding those claims should be denied.

## **CONCLUSION**

The *Bostock* decision and its decision to officially recognize that discrimination against a woman whose partner is a woman is discrimination against that woman because of her sex. That recognition enables Banford and Wiles to move forward with their Title VII claims in their true form—as claims of discrimination, hostile work environment, and constructive discharge because they are openly gay women. They have presented sufficient evidence to move on trial. Defendant's Motion for

Summary Judgment on those claims should be denied, and the parties should be ordered to prepare for trial.

Respectfully submitted,

Dated:  November 16 2020    **VAN DYCK LAW FIRM, PLLC**

By:  s/ Sharon L. Van Dyck
Sharon L. Van Dyck (#0183799)
310 4th Avenue South, Suite 5010
Minneapolis, MN  55415
(952) 746-1095
sharon@vandycklaw.com

and

**FAFINSKI MARK & JOHNSON, P.A.**
Donald Chance Mark, Jr.(#0067659)
Tyler P. Brimmer (#0392700)
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, MN 55344
Telephone:  952.995.9500
donald.mark@fmjlaw.com
tyler.brimmer@fmjlaw.com

and

**SIEGEL, YEE, BRUNNER & MEHER**
Dan Siegel (admitted *pro hoc vice*
Jane Bunner (admitted *pro hoc vice*)
475 14th Street, Suite 500
Oakland, CA 94612
(510) 839-1200
dansiegel@siegelyee.com
jane brunner@siegelyee.com

## CERTIFICATE OF COMPLIANCE

I, Sharon L. Van Dyck, certify that the memorandum titled *Plaintiffs'*
*Memorandum in Opposition to Defendants' Second Motion for Summary*
*Judgment* complies with the type-size limitations of Local Rule 7.1(h),
and with the word limitations of Local Rule 7.1(f). I certify that, in
preparation of this document, I used Microsoft Word 365 applying a 13-
point, proportional font. This word-processing program was applied to
include all text, including headings, footnotes and quotations in the word
count. Finally, I certify the above-referenced Memorandum contains
_____ words.


Dated:  November 16, 2020        *s/ Sharon L. Van Dyck*