IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Jen Banford and Annette Wiles,<br><br>         Plaintiffs,<br><br>v.<br><br>The Board of Regents of the University of Minnesota,<br><br>         Defendant. | Case No. 15-cv-03740 (PJS/LIB)<br><br>**DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**(REDACTED)** |

## INTRODUCTION

The undisputed evidence shows that UMD sought to retain both Jen Banford and Annette Wiles. They complain of conduct that cannot be attributed to their sexual orientation, and that does not meet the high legal threshold for hostile-environment and constructive-discharge claims. Summary judgment on their Title VII claims should be granted—again.

## ARGUMENT

**I. BANFORD**

  **A. Banford lacks proof of discriminatory motive for her hockey-operations non-renewal.**

Although rife with overblown rhetoric, Banford's opposition fails to identify evidence that would permit a reasonable factfinder to conclude that UMD non-renewed her hockey-operations position because of her sexual orientation.

First, Banford lacks the requisite evidence that similarly situated employees were treated differently. She identifies, as "similarly situated" to her, ███████ ████████████████████████ and ██████████████ ██████████, each of whom had hockey-related duties. But all three of these employees were retained, and all three are members of the same protected classes as Banford. Their retention *disproves* sexual-orientation discrimination.[1]

No other purported evidence saves Banford's discrimination claim.[2] Banford alleges that after Berlo saw her with Miller at a December 2013 holiday party, he met with her less often. While the University does not concede that Berlo was unaware of Banford's sexual orientation before the 2013 holiday party (he was aware[3]), it is immaterial because Berlo's post-party conduct toward Banford belies any hostility. For instance:

---

[1] Banford submitted Miller's testimony that ███████ was "openly gay" but ██████ and ██████ were not. ECF 739 ¶¶6–7. "Openly gay" or not, Berlo understood that ██████ and ██████ were gay (Berlo 11/28/2020 Declaration ("Berlo Decl.") ¶3), and *all* three employees were retained. Notably, Berlo placed ██████ on the search committee for Miller's replacement. ECF 379 at 197.

[2] The 2006 golf outing, 2007 fundraiser, and 2010–11 mail incidents predated Berlo's May 2013 hiring and are irrelevant to Berlo's motivation for Banford's hockey-operations non-renewal.

[3] Berlo Decl. ¶2; ECF 365 at 72.

- In January and February 2014, Berlo helped Banford secure a green card (ECF 733 at 4)[4];

- Throughout 2014, Berlo supported Banford by securing $50,000 for softball-field improvements, and worked with her in executing those improvements (ECF 733 at 3–4);

- Berlo gave Banford an extremely positive performance review in May 2014, and renewed her with a raise (ECF 89 at 16–24);

- Berlo appointed Banford to the inaugural Athletic Department Strategic Planning Committee in May 2014 (ECF 219);

- In 2015, Berlo offered Banford the softball head coach position with a sizeable head-coach pay raise, and invited her to apply for the hockey-operations position under the new coach. ECF 89 at 92–96.

Banford also relies on December 2014 email exchanges between Jay Finnerty and Linda Kinnear, which she dubs the "purge list." Plaintiffs mischaracterize this evidence; the Court will search in vain for a list "created by and for Berlo"[5] of five gay women to be fired. In any event, the emails do not create a material fact issue as to Berlo's motive for Banford's hockey-operations non-renewal for at least five reasons:

---

[4] The reference in the opening memorandum to ECF 98 should be to ECF 89.
[5] ECF 735 at 47.

First, of the five individuals mentioned in the December 4 emails, only ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ were non-renewed; Banford, ▬▬▬ and Wiles were not.

Second, Banford concedes that in Division I athletics, when a head coach is let go, the assistant coaches are also let go so the new head coach can pick her assistants. ECF 735 at 37–38. Banford does not dispute that the termination of Miller's assistant coaches was a customary and natural consequence of Miller's non-renewal.

Third, Berlo hired ▬▬▬ (an openly gay woman) ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, at Miller's request. ECF 379 at 29–30, 85; ECF 739 ¶ 5; Jones 11/30/2020 Decl. Ex. 1. It makes no sense that, mere months later, Berlo would "purge" ▬▬▬ because of her sexual orientation.

Fourth, the overwhelming evidence shows that Berlo always intended to retain Banford as head softball coach *and* that he invited her to reapply for her hockey-operations position with the new head coach. The evidence directly contradicts any intention to "purge" Banford from the athletics department.

Fifth, Berlo intended for the new women's hockey coach to select and supervise the new hockey-operations director, not just her assistant coaches—and

4

that is what happened.[6] Berlo Decl. ¶¶5–6; Crowell Decl. ¶4. Indeed, the more hiring freedom offered to an incoming head coach, the more attractive the coaching position is to candidates. Berlo Decl. ¶5; Crowell Decl. ¶3. Thus, Berlo's decision about which hockey-related positions to non-renew (assistant coaches and director of operations) was consistent with allowing the incoming coach to hire key staff. Indeed, Banford's position description shows that she was an integral member of Miller's staff: "[m]anag[ing] the equipment budget and the recruiting budget, reporting to Shannon Miller, Head Women's Hockey Coach"; creating and monitoring academic plans for student-athletes; hiring and supervising student assistants; planning and operating fundraising events; handling alumni relations; and acting as liaison to the conference and NCAA. ECF 89 at 49–54; *see also* ECF 94 at 34–36. The Finnerty–Kinnear emails are a red herring.

Banford also tries, unsuccessfully, to create a fact issue about Division I custom and practice, relying solely on her partner Miller's belated, self-serving declaration that the practice of letting a coach's staff go when a head coach is let go "is customarily limited to the elimination of the assistant coaches."

---

[6] Miller also participated in hiring Banford as Hockey Operations Director. ECF 89 at 1–2.

5

ECF 739 ¶10.[7] Miller—who has worked at only one Division I institution (UMD) and was never in a decision-making role regarding head-coach non-renewals—does not and cannot claim that hockey-operations directors are *never* let go along with a Division I head coach. But whatever Miller's belief, it is undisputed that the decisionmakers here understood the prevailing custom to extend to hockey-operations directors, and it was Berlo's plan for the new coach to select her hockey-operations director.

That Berlo hired an openly gay woman to replace Miller further undermines the suggestion that anti-gay bias motivated the elimination of Banford's hockey-operations duties. ECF 85 at ¶22; *see Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989).

### B. Banford's hostile-environment claim should be dismissed.

#### 1. Banford's claim is time-barred.

Title VII claims are time-barred unless a plaintiff files her administrative claim within 300 days after the alleged unlawful practice. 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). For a

---

[7] To avoid summary judgment, Banford must submit more than unsupported self-serving allegations; she must provide sufficient probative evidence to allow her to prevail. *See Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2015); *see also Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017) ("[I]t is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion.").

hostile-environment claim, an employee can recover for acts occurring more than 300 days before her charge is filed only if the acts were part of same hostile work environment and at least one occurred within 300-day period. *Morgan*, 536 U.S. at 115. In this regard, the Court considers, *inter alia*, whether the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same manager. *Id.* at 120–21; *Rowe v. Hussmann Corp.*, 381 F.3d 775, 781 (8th Cir. 2004).

Here, Banford's hostile-environment claims are time-barred because (as set forth below) no actionable conduct occurred within the limitations period, and because the alleged hostile acts predating July 15, 2014 (the 2006 golf outing, the 2007 fundraiser, and the 2010–11 harassing mail[8]) preceded Berlo's arrival by years and are unconnected to any events within the limitations period.

### 2. No actionable misconduct occurred within the limitations period.

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[8] Then-Athletic Director Bob Nielson investigated the harassing mail but could not identify the culprit. ECF 363 at 66–69. The matter was referred to UMD Police and the University's Office of the General Counsel for investigation, and the harassing mail stopped. *Id.*; ECF 357 at 58–60, 64–65, 69, 71–72; ECF 365 at 300–03, 306–07; ECF 90 at 26–30.

environment[.]" *Morgan*, 536 U.S. at 116 (quotation omitted). The bar is high: the conduct must be "extreme in nature and not merely rude or unpleasant," *Nitsche v. CEO of Osage Valley Elec. Corp.*, 446 F.3d 841, 846 (8th Cir. 2006), and "so intimidating, offensive, or hostile that it poisoned the work environment," *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005) (quotation omitted).

There simply is no evidence that Banford experienced discriminatory intimidation, ridicule, or insult on account of her sexual orientation within the limitations period, let alone conduct severe or pervasive enough to meet the Eighth Circuit's high bar. She makes two unsuccessful allegations:

First, Banford alleges that Berlo "refused to talk to her the day she received her non-renewal letter"; that he "set follow-up appointments at a time he knew she was in practice"; and that for six weeks she "was not contacted directly by anyone in senior management with the authority to tell her what was happening"—discounting Finnerty's repeated reassurances (ECF 733 at 9–11), Senior Woman Administrator Karen Stromme's softball-team meeting (*id.* at 8–9), and the fact that Miller asked to inform Banford of the non-renewal (*id.* at 6). This alleged poor communication comes nowhere close to meeting the high bar for hostile-environment claims.

Second, Banford points to Bob Nygaard's alleged 2015 statement that he would have punched her in the face had he seen her the day after the media report. As the Court already concluded, this threat was not made to Banford (she heard it secondhand), UMD imposed discipline,[9] and Nygaard's remark fell "far short of the bad behavior" required to support a hostile-work-environment claim. ECF 501 at 23–24.

### C. Banford's constructive-discharge claim fails.

Banford's complaint does not allege constructive discharge, and her opposition brief neither mentions a constructive-discharge claim nor opposes summary judgment on it. Regardless, Banford cannot show that UMD "deliberately created intolerable working conditions with the intention of forcing her" to reject its contract offer, *see Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (quotation omitted)—a higher standard than the already-lofty standard for a hostile-environment claim, *see Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). Because Banford's allegations are insufficient to establish a hostile environment, and because UMD plainly wanted her to stay, her constructive-

---

[9] The University found no merit to other complaints Banford brought to Finnerty's attention in February and March 2014, and which Finnerty forwarded to EOAA—all of which this Court rejected as a basis for Banford's hostile-work-environment claim. ECF 137; ECF 501 at 23.

discharge claim must fail. *E.g., O'Brien v. Dep't of Agriculture,* 532 F.3d 805, 811 (8th Cir. 2008).

## II.   WILES

### A.   Certain of Wiles' claims are time-barred.

Wiles' pre-August 27, 2014 allegations regarding Berlo's remarks and cold demeanor after the October 2013 luncheon, her 2014 performance feedback, and her exclusion from unnamed meetings and the Strategic Planning Committee all fall outside the limitations period and should be dismissed. There was no actionable conduct within the limitations period and, as set forth below, the allegations also do not rise to the level of severity required to state a claim.

### B.   Wiles did not experience an objectively hostile work environment.

Wiles' subjective feelings are insufficient to defeat summary judgment. For her hostile-environment claim, Wiles must establish conduct that was so "severe or pervasive . . . as to create an *objectively* hostile or abusive work environment." *Crawford v. BNSF Ry. Co.,* 665 F.3d 978, 983 (8th Cir. 2012) (emphasis added). Constructive-discharge claims also employ an objective standard. *E.g., Parrish v. Immanuel Med. Ctr.,* 92 F.3d 727, 732 (8th Cir. 1996). Viewed through an objective lens, the evidence resoundingly calls for summary judgment.

Berlo's alleged statement to Wiles about the October 2013 luncheon—on its face—does not demonstrate "antipathy towards homosexuality." ECF 735 at 45.

Moreover, the alleged animus is difficult to reconcile with Berlo's inviting Wiles to participate in the Downtown Live event in November 2013, the positive performance review Berlo gave her in April 2014, his renewal of Wiles' appointment for 2014–15, their July 2014 one-hour breakfast meeting, and his encouragement in face-to-face meetings, text messages, and emails. *See* ECF 85 ¶¶26, 35, 39–41; ECF 91 at 124, 133–35; ECF 92 at 12; ECF 94 at 11, 13; ECF 167, 169, 171, 173, 175, 212, 226; ECF 367 at 196, 265–68. Indeed, if Berlo harbored animus toward Wiles, he could have used the disturbing feedback from student-athletes received in spring 2014 as an excuse to non-renew her.

The Court should reject Wiles' contention that Berlo's decision, in the wake of the 2014 feedback, to award her a below-baseline merit-pay increase created a hostile environment. Although Wiles disagreed with Berlo's decision to give her a raise of 1.5% rather than 2.5%, that decision most certainly does not constitute "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [Wiles'] employment[.]" *Morgan*, 536 U.S. at 116 (quotation omitted). Moreover, the University deemed Berlo's decision inequitable, and Berlo paid Wiles the difference.[10] ECF 132 at 13 (UM_583); ECF 218.

---

[10] Berlo's merit-pay decision also cannot support Wiles' constructive-discharge claim because she quit without giving the University a reasonable opportunity to

11

Moreover, though understandably unpleasant for Wiles, Berlo's feedback was not harassment. Wiles' subjective feeling of being unfairly criticized is also insufficient to support a constructive-discharge claim. *Tork v. St. Luke's Hosp.*, 181 F.3d 918, 919 (8th Cir. 1999). In addition, the feedback was obtained through a process that treated Wiles the same as any other coach. Surveys were given to all student-athletes, no coach received a copy of the results, and UMD reached out to all senior athletes for the exit interviews. *See* ECF 91 at 121–22; ECF 733 at 20–21.

As for the remaining conduct that Wiles cites, the Court correctly concluded that the host of matters she labeled as hostile—such as disputes over her budget,[11] exclusion from meetings and committees, the imposition of wear-and-tear charges for her UMD-leased vehicle, Finnerty's remark about the diversity committee, and being treated coldly by Berlo—do not satisfy the Eighth Circuit's high standard for a hostile work environment. ECF 501 at 28–29. Wiles' subjective distress over the alleged "alteration" of calendar entries—which she does not and cannot connect to anyone at UMD, and for which she cannot rule out automated synchronization—

---

correct the issue—which she complained about in mid-March 2015. *See Craft v. Panera Bread Co.*, No. 14-cv-5061, 2006 WL 1430015, at *3 (D. Minn. Apr. 11, 2016) (Schiltz, J.) ("[A]n employee must give her employer a reasonable opportunity to correct the problem before quitting and making a claim of constructive discharge.") (citing *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014)).

[11] Wiles is incorrect that Berlo unilaterally reduced her budget. The budget for women's basketball *increased* for the 2014–15 academic year. ECF 214 (compare FY14 to FY15); ECF 453 ¶5.

also falls short of establishing a hostile-environment claim. Moreover, there is no evidence that any of this conduct was based on Wiles' sexual orientation.

Finally, the Court should reject Wiles' contention that the so-called "purge list" is evidence of hostility toward Wiles because of her sexual orientation. Even *if* Berlo considered non-renewing Wiles in late 2014, the fact remains that her appointment *was* renewed. Regardless of Wiles' subjective understanding of the renewal process, without a non-renewal notice by the end of 2014, her appointment was automatically renewed. ECF 206–07.

### C. Wiles' constructive-discharge claim fails.

Wiles complains of conduct that is not objectively severe and pervasive enough to establish a hostile environment, dooming her constructive-discharge claim. *See O'Brien*, 532 F.3d at 811. A reasonable person in Wiles' position would not have found her working conditions so intolerable that she had no choice but to resign. *Thompson v. Kanabec Cty.*, 958 F.3d 698, 707 (8th Cir. 2020). Moreover, no reasonable jury could conclude that the University deliberately made Wiles' working conditions intolerable with the intention of forcing her to quit. *Parrish*, 92 F.3d at 732.

No evidence supports Plaintiffs' speculation that Berlo inadvertently missed the December 2014 deadline to non-renew Wiles' appointment and thereafter hoped that she would quit, or that Berlo was aware of "Wiles' increasingly debilitating anxiety" and "avoided" talking about her contract to exacerbate her

13

distress after other "other gay women" (Miller and her hockey staff) were non-renewed. In fact, Berlo's expressions of support for Wiles in December 2014 and throughout the 2014–15 basketball season—including commemorating her 400th career win—contradict an intent to induce her resignation.[12] That Berlo did not provide Wiles a renewal notice before she resigned proves nothing, because Berlo had issued *no* reappointment notices by then. ECF 85 ¶43; ECF 224.

## CONCLUSION

Summary judgment is proper on Banford's and Wiles' Title VII claims.

---

[12] ECF 85 ¶39; ECF 91 at 123–24.

Dated: November 30, 2020    **GREENE ESPEL PLLP**

 s/ Jeanette M. Bazis
Jeanette M. Bazis, Reg. No. 0255646
Katherine M. Swenson. Reg. No. 0389290
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jbazis@greeneespel.com
kswenson@greeneespel.com
(612) 373-0830

- and –

DOUGLAS R. PETERSON
General Counsel
University of Minnesota
By Timothy J. Pramas, Reg. No. 240321
Senior Associate General Counsel
360 McNamara Alumni Center
200 Oak Street S.E.
Minneapolis, MN 55455
pram0001@umn.edu
(612) 624-4100

*Attorneys for Defendant Board of Regents of the University of Minnesota*