UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JEN BANFORD and ANNETTE WILES,          Case No. 15-CV-3740 (PJS/LIB)

Plaintiffs,

v.                                                          ORDER

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MINNESOTA,

Defendant.

---

Sharon L. Van Dyck, VAN DYCK LAW FIRM, PLLC; Donald Chance Mark, Jr., and Tyler P. Brimmer, FAFINSKI MARK & JOHNSON, P.A.; Daniel Mark Siegel and Jane E. Brunner, SIEGEL & YEE, for plaintiffs.

Jeanette M. Bazis and Katherine M. Swenson, GREENE ESPEL PLLP; Timothy J. Pramas, UNIVERSITY OF MINNESOTA OFFICE OF GENERAL COUNSEL, for defendant.

Plaintiffs Shannon Miller, Jen Banford, and Annette Wiles were employed as coaches by defendant University of Minnesota Duluth ("UMD").  Miller coached the women's hockey team, Banford coached the women's softball team (and simultaneously served on Miller's staff as director of hockey operations), and Wiles coached the women's basketball team.

In December 2014, UMD decided not to renew Miller's contract.  UMD also decided not to renew the contracts of three members of Miller's six-person staff, including Banford's contract as director of hockey operations.  In the wake of Miller's

non-renewal, Banford rejected UMD's offer to renew her contract as softball coach, and

Wiles resigned as coach of the women's basketball team.

Miller, Banford, and Wiles filed this lawsuit against UMD, raising numerous

claims, including harassment and disparate treatment on the basis of sexual orientation

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  The

Court granted UMD's motion for summary judgment as to all of Banford's and Wiles's

claims, including their Title VII sexual-orientation claims, which at the time were not

viable due to binding precedent from the United States Court of Appeals for the Eighth

Circuit.[1]  ECF No. 501 at 4–5;[2] *see, e.g.*, *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d

69, 70 (8th Cir. 1989) (per curiam).

While Banford and Wiles's appeal was pending before the Eighth Circuit, the

Supreme Court decided *Bostock v. Clayton County*, which held that Title VII's prohibition

on employment discrimination "because of . . . sex" encompasses discrimination on the

---

[1]The Court likewise granted summary judgment on Miller's Title VII sexual-orientation claims, but denied summary judgment as to her claims of sex discrimination under Title VII and retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.  Miller prevailed at trial and later settled with UMD.  As a result, Miller no longer has any pending claims.

[2]The Court cites to the page numbers generated by the Court's electronic docketing system except when citing to deposition transcripts.  For the latter, the Court cites to the page numbers of the deposition.

basis of sexual orientation.  140 S. Ct. 1731, 1737 (2020).  The Eighth Circuit accordingly

remanded this case for further proceedings.  ECF No. 725.

This matter is before the Court on UMD's renewed motion for summary

judgment on Banford's and Wiles's Title VII sex and sexual-orientation claims.  For the

reasons that follow, UMD's motion is granted.

## I.  BACKGROUND

As the Court explained in its previous summary-judgment order, *see* ECF

No. 501 at 4, the record is voluminous and most of the facts described in the briefs are

undisputed.  The Court will therefore provide basic background information regarding

each plaintiff and then will mention particular facts as necessary to explain the basis of

its rulings.

### A.  Jen Banford

UMD hired Banford as head coach for the softball team in 2005.  ECF No. 308 ¶ 3.

Banford had a winning record and was named the conference's Coach of the Year in

2013.[3]  In July 2009, Banford took on an additional role as part-time director of

operations for the women's hockey team under head coach Miller.  ECF No. 308 ¶ 3.  In

December 2012, Banford was reappointed as head softball coach through May 31, 2016,

---

[3]Plaintiffs' support for these facts is a link to a webpage that no longer exists, ECF
No. 735 at 4; however, these facts are not disputed.

contingent on annual renewal.  ECF No. 89 at 9.  Her duties were split between softball

coaching (60%) and director of hockey operations (40%).  ECF No. 89 at 9, 11.

Banford's base salary for her softball position was $36,280 with an augmentation

of $15,000 per year for the extra work associated with the hockey position.  ECF No. 89

at 9; ECF No. 737 ¶¶ 3, 5.  Banford also received "camp pay" from both softball and

hockey each year; in 2013–14 she received $11,500 and in 2014–15 she received $8,379.

ECF No. 453 ¶ 9.  For 2014–15, her base salary was $37,223, with an additional $931 in

merit pay.  ECF No. 89 at 15.  Combined with camp pay and the augmentation for the

hockey position, Banford earned a total of $63,723 and $61,533 for the academic years

2013–14 and 2014–15, respectively.  ECF No. 453 ¶ 9.

In the spring of 2013, Joshua Berlo took over as UMD's athletic director.  ECF

No. 379 at 21.  As detailed more fully in the record, Berlo played a key role in the

decision not to renew Miller's contract as head coach of women's hockey.  On

December 9, 2014, UMD notified Miller that her contract would not be renewed beyond

June 2015.  ECF No. 307 ¶ 33.  Two days later, Banford also received a non-renewal

notice for her joint appointment as "Director of Hockey Operations/Head Softball

Coach."  ECF No. 102 at 4.  The letter was sent with a cover email stating that "[w]e are

in the process of working with Human Resources to reclassify your job as solely Head

Softball Coach."  ECF No. 102 at 3.

On January 27, 2015, UMD offered Banford a new contract as head softball coach at a base salary of $40,062.[4]  ECF No. 89 at 95.  The offer did not provide for any augmentation or merit pay, but UMD noted that, once the new head hockey coach was hired, Banford would be able to seek an assignment with the women's hockey team.  ECF No. 89 at 96.  Banford declined the offer.  ECF No. 308 ¶ 29.

### B.  Annette Wiles

UMD hired Wiles as head coach of the women's basketball team in May 2008.  ECF No. 309 ¶ 2.  Like Banford, Wiles had a winning record.  ECF No. 309 ¶ 34; ECF No. 371 at 2.  Her players also had a 100% graduation rate and often had the highest GPA of any UMD sports team.  ECF No. 309 ¶¶ 7, 33.

Wiles's contract was due to expire on June 20, 2015.  ECF No. 206 at 2.  Contrary to Wiles's expectations and UMD's usual practice, UMD did not seek to negotiate a renewal of Wiles's contract in the year before it expired.  ECF No. 309 ¶¶ 40–41, 43.  When Wiles raised the issue with Abbey Strong (the sports administrator for women's basketball), Strong told her that there were no plans to renew her contract.  ECF No. 309 ¶ 41.  Like Miller and Banford, however, Wiles was entitled to six months' written notice of non-renewal, failing which her contract would automatically be extended.  ECF No. 189 at 42–45; ECF No. 207.  UMD did not give Wiles a non-renewal notice,

---

[4]The offer letter is erroneously dated "January 27, 2014."  ECF No. 359 at 339.

meaning that her contract was automatically extended.  ECF No. 189 at 45; ECF No. 207

at 2.  Wiles nevertheless resigned on June 1, 2015, due to work-related stress and

resulting health issues.  ECF No. 309 ¶ 42.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over a fact is "genuine" only

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in [her] favor."  *Id.* at 255.

### B.  Hostile Environment

Both Banford and Wiles bring hostile-environment claims under Title VII.  To

prevail on such a claim, a plaintiff must show that "(1) she is a member of the class of

people protected by the statute, (2) she was subject to unwelcome harassment, (3) the

harassment resulted from her membership in the protected class, and (4) the

harassment was severe enough to affect the terms, conditions, or privileges of her

employment." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (citation and quotation marks omitted).

To determine whether harassment affected a term, condition, or privilege of employment, courts consider "the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010). The Eighth Circuit "sets a high bar for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020). In its previous summary-judgment order, this Court emphasized just how "high" this "high bar" is in the Eighth Circuit. That discussion bears repeating:

> For example, the Eighth Circuit affirmed the dismissal of a hostile-environment claim in *Rickard v. Swedish Match North America, Inc.*, 773 F.3d 181, 183 (8th Cir. 2014), even though the supervisor grabbed and squeezed the employee's nipple while stating "this is a form of sexual harassment," and even though the supervisor took a towel from the employee, rubbed it on his crotch, and gave it back to the employee. The Eighth Circuit also affirmed the dismissal of a hostile-environment claim in *McMiller v. Metro*, 738 F.3d 185, 186–87 (8th Cir. 2013), even though the supervisor put his arms around the employee's shoulders and kissed the side of her face and then later called the employee into his office, locked the door, and, when the employee tried to escape, "placed his hand on her right wrist, removed her hand from the door, turned her toward him, put his arms on her shoulders and neck, and kissed her on the side of her face and forehead." The *McMiller* court found that the employee did not have a viable hostile-environment claim in light of the high bar set by prior Eighth Circuit decisions, some of which it described as follows:

In *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), the court determined that a plaintiff had not proved a hostile work environment with evidence that a supervisor sexually propositioned her, repeatedly touched her hand, requested that she draw an image of a phallic object to demonstrate her qualification for a position, displayed a poster portraying the plaintiff as "the president and CEO of the Man Hater's Club of America," and asked her to type a copy of a "He–Men Women Hater's Club" manifesto.  *Id.* at 931–35.  In *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858 (8th Cir. 2009), where a supervisor had rubbed an employee's back and shoulders, called her "baby doll," "accus[ed] her of not wanting to be 'one of [his] girls,'" suggested once in a long-distance phone call "that she should be in bed with him," and "insinuat[ed] that she could go farther in the company if she got along with him," this court ruled that the evidence was insufficient to establish a hostile work environment.  *Id.* at 862.  And in *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098 (8th Cir. 2005), the court ruled that a plaintiff who asserted that a harasser asked him to watch pornographic movies and to masturbate together, suggested that the plaintiff would advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh, had not established actionable harassment.  *Id.* at 1100–03.

ECF No. 501 at 13-14 (quoting *McMiller*, 738 F.3d at 188–89).

The Court previously held that Banford and Wiles had failed to show that they were subjected to a hostile environment sufficiently severe or pervasive to violate Title VII.  *See id.* at 23–24, 27–31.  In so holding, however, the Court disregarded certain incidents of mistreatment related to sexual orientation, as the Court was required to do

under then-existing Eighth Circuit precedent.  *Id.* at 23 n.8.  Taking those incidents into consideration, however, does not change the result.

1.  Banford

As evidence of a hostile environment, Banford primarily relies on what plaintiffs call the "purge list," by which they mean internal UMD emails concerning the potential non-renewal of the contracts of Banford and three other members of Miller's staff (one of whom was eventually extended), as well as Wiles (who was also eventually extended).  Miller was not on this list, as her non-renewal was handled separately.  *See* ECF No. 347; ECF No. 405 at 41–51.  Banford points out that Miller and the five others on the "purge list" were all openly gay women and contends that this is evidence of a hostile environment toward gay women.

The problem for Banford is that she was not *aware* of these internal discussions, and thus they could not, by themselves, have created a hostile environment.  While such evidence could theoretically bolster a hostile-environment claim, the plaintiff must still point to evidence of severe harassment or other misconduct of which she was aware.  Banford points to no such evidence.  Other than relying on the "purge list," Banford appears to rely mainly on her claim that officials in the athletic department avoided talking or meeting with her after she received her non-renewal letter, ECF No. 735

-9-

at 43–44, which plainly does not rise to the level of a Title VII hostile-environment violation.

Although Banford does not discuss them in defending her hostile-environment claim, the background section of her brief identifies a number of incidents dating back many years, such as Banford and Miller being left stranded in a parking lot and consequently missing a golf outing in 2006; Banford being excluded from the meeting room at a fundraiser in 2007; and Banford and Miller receiving anonymous homophobic hate mail on several occasions in 2010 and 2011. Banford also describes more recent incidents that occurred during Berlo's tenure (which, as noted, began in the spring of 2013). For example, Banford recounts that, after Berlo learned that Banford and Miller were partners, Berlo went from being overly talkative and flirty to only calling her into his office for scheduled meetings. Banford also cites an incident toward the end of her tenure in which Bob Nygaard, an assistant athletic director, expressed anger about Banford to another employee, saying that he would have punched Banford in the face if he had seen her. Again, it is unclear whether Banford relies on any of these incidents in support of her hostile-environment claim, as she does not mention them in her analysis.

Putting aside the fact that, with respect to most of these incidents, there is little or no evidence connecting them to Banford's sex or sexual orientation, these incidents are insufficiently severe to establish a hostile environment (whether considered

individually or as a whole).  They are spread out over a period of approximately ten

years, and most of them do not come close to the type of conduct that could create an

actionable hostile environment.  Nygaard's "punch" comment, while disturbing, was an

isolated incident that Banford only heard about second hand and after the fact.  ECF

No. 365 at 259.  Moreover, UMD investigated and took remedial action, including

imposing a five-day suspension and required training.  ECF No. 126.  UMD later

reversed the suspension on condition that Nygaard commit no further violations

(although Nygaard still had to attend the training).  ECF No. 420 at 173–77.

Nevertheless, as the Court previously found, this isolated threat made outside of

Banford's presence does not rise to the level of a Title VII violation.  Similarly, after

Miller complained about the hate mail, UMD investigated and, although the culprit was

not identified, the hate mail ceased.  ECF No. 357 at 57–65; ECF No. 365 at 301.

Under the circumstances, these unrelated incidents, spread out over many years,

are insufficiently severe to establish a hostile environment.  Moreover, as the Court

explained in its previous summary-judgment order, the many disputes between

Banford and UMD over various work-related issues are the type of disputes that are

common in a workplace, and not the type of extreme conduct that is actionable under

Title VII.  ECF No. 501 at 23.  The bottom line is that the bad behavior of which Banford

complains was not nearly as serious as the bad behavior experienced by the

unsuccessful plaintiffs in *Rickard*, *McMiller*, *Anderson*, *LeGrand*, and *Duncan*.  If those plaintiffs did not have a viable hostile-environment claim, neither does Banford.

The Court therefore grants UMD's motion for summary judgment with respect to Banford's hostile-environment claim.

### 2.  Wiles

Wiles dates the beginning of the allegedly hostile environment to October 2013, when Wiles invited Berlo to a luncheon marking National Coming Out Day at which she was to be the keynote speaker.  ECF No. 309 ¶ 13.  Berlo declined, claiming that he would be out of town.  *Id.*  This was untrue (or Berlo's plans changed), as Wiles saw Berlo in his office on the day of the event.  *Id.*  Wiles invited him again, at which point Berlo said "that's not really my thing." *Id.*  Later, Berlo asked Wiles whether she "[gave] it a lot of thought" before deciding to speak at the luncheon.  *Id.*  Wiles also recounts a September 2014 incident in which Jay Finnerty, an assistant athletic director, declined to serve on a UMD diversity committee because, as he put it, he had "better things to do than listen to a bunch of old ladies talk diversity."  ECF No. 309 ¶ 28; ECF No. 125 at 6.

In addition to these comments, Wiles also points to the "purge list" as evidence of a hostile environment and cites a litany of other largely work-related complaints, such as Berlo cutting her budget, Berlo giving her an unjustly low raise (which UMD

later remediated after Wiles complained, *see* ECF No. 218), Berlo excluding her from a strategic planning committee,[5] Berlo scheduling meetings when Wiles was unavailable, and Berlo treating her in a cold and hostile manner.  Wiles also takes issue with the manner in which Berlo and Abbey Strong conducted a survey of all student athletes and communicated the negative comments of Wiles's players to her.

As for the "purge list," again, given that Wiles was not aware of these internal communications, they are of little relevance to her hostile-environment claim.  The other incidents about which Wiles complains—both those described above and those described elsewhere, *see* ECF No. 501 at 27–31—fall far short of the type of severe and pervasive conduct that gives rise to a viable hostile-environment claim.  (There is also little or no evidence connecting most of the incidents to Wiles's sex or sexual orientation.)  The Court therefore grants UMD's motion for summary judgment on this claim.

---

[5]Wiles erroneously states that she and Miller, who was also not invited to join the committee, were head coaches of the only Division I sports at UMD.  ECF No. 735 at 11–12.  Basketball is not a Division I sport at UMD.  ECF No. 739 ¶ 9.

### C. *Discharge*

### 1. Banford

#### a. *Discriminatory Non-Renewal*

The parties agree that Banford's claim for wrongful non-renewal must be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case by offering evidence that (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances permit an inference of discrimination. *Banks v. John Deere & Co.*, 829 F.3d 661, 666 (8th Cir. 2016). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* If the employer meets this burden, then the plaintiff must show that the proffered reason is merely a pretext for discrimination. *Id.*

In its previous summary-judgment order, the Court agreed with Banford that the non-renewal of her *hockey* position constituted an adverse employment action, but found that she did not suffer an adverse employment action with respect to her *softball* position. ECF No. 501 at 19–20. Banford takes issue with the latter determination, but her reasoning is difficult to follow. It is undisputed that UMD offered Banford a softball-only contract for a higher base salary than she had earned for the softball

-14-

portion of her previous contract.[6]  *Compare* ECF No. 89 at 15 (base salary of $37,223 plus

$931 in merit pay for 2014–15), *with id.* at 95 (offer for 2015–16 with base salary of

$40,062).  Moreover, although Banford attempts to dispute it, the record is clear that,

from the beginning, UMD intended to offer her a new softball-only contract, as it told

her several times, and as it eventually did.[7]  ECF No. 102 at 3; ECF No. 103 at 2; ECF

No. 89 at 65–66, 89; ECF No. 365 at 155; ECF No. 405 at 29–30, 60–61, 77; ECF No. 369

at 200–01; ECF No. 357 at 191; ECF 147 at 58, 67; ECF No. 93 at 68.[8]

---

[6]Banford seems to suggest that the augmented pay she had received under previous contracts was untethered to the hockey position.  The record makes clear, however, that the augmentation was for her hockey duties.  ECF No. 89 at 4, 7.  More importantly, while Banford asserts that she received augmented pay over the years for other part-time work, ECF No. 735 at 31, Banford does not contend—and nothing in the record suggests—that the augmented pay was for the *softball* position.

[7]Because UMD in fact offered Banford a new softball contract—and because (as discussed below) Banford does not have a constructive-discharge claim arising out of the overall reduction in pay due to the loss of the hockey augmentation—UMD's intentions during this process would not seem to be relevant to the question of whether Banford suffered an adverse employment action.  But because UMD's intentions regarding the softball contract may be somewhat relevant to the sincerity of UMD's proffered reason for terminating Banford's hockey position, it is worth noting that the record is clear that at all times UMD intended to offer Banford a new softball contract.

[8]Banford points to the delay in preparing her new contract and cites January 2015 statements from Linda Kinnear, a human-resources manager, that the paperwork Banford had received terminated both of her positions and that Kinnear had not received any paperwork relating to a new softball contract.  ECF No. 365 at 187–90, 197–98.  Kinnear was not a decisionmaker, however, and she was simply describing the facts as they then existed; indeed, she advised Banford to talk to Berlo about a new contract.  *Id.* at 191.  In addition, Kinnear's statements are consistent with undisputed

(continued...)

-15-

As best as the Court can tell, Banford is making a type of constructive-discharge argument—specifically, an argument that the non-renewal of her *hockey* position resulted in her losing the extra salary that she received for taking on the hockey duties, and the loss of that extra salary forced her to reject the new contract offer for the *softball* position. *See* ECF No. 735 at 29 (contending that the new contract offer with a lower salary did not "neutraliz[e] the effect of the non-renewal"); *id.* at 44 ("A reasonable jury could readily conclude that Berlo could foresee that Banford would turn down the proffered contract because the compensation was inadequate."). Such a claim is not properly before the Court, however, as during the first summary-judgment hearing, Banford explicitly disavowed any claim that she was constructively discharged from the softball position. ECF No. 573 at 10–11.[9] Banford's claim for wrongful non-

---

[8](...continued)
evidence that Kinnear advised the athletic department that, in order to keep Banford as the softball coach while removing her from the hockey-operations role, the department should first non-renew her joint contract and then separately offer her a new, softball-only contract (which is exactly what the department did). ECF No. 405 at 31–37; ECF No. 103 at 2; ECF No. 379 at 159–60; ECF No. 369 at 96–97, 208; ECF No. 147 at 67. Moreover, Banford was aware that Finnerty (the athletic department's liaison with human resources, ECF No. 369 at 43) believed that the department had 60 days to offer her a new contract. ECF No. 365 at 164–65, 192. The fact that Kinnear did not have any relevant paperwork at the time of this conversation is therefore of little significance.

[9]After the Eighth Circuit's remand, the Court permitted Banford to pursue a claim of constructive discharge from her hockey position on the basis of a hostile environment, but at no time did the parties discuss or the Court permit Banford to pursue a claim of constructive discharge from her softball position on the basis of the

(continued...)

renewal of her softball position therefore fails for lack of an adverse employment action.

*See Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1141–42 (8th Cir. 2008) (plaintiff

could not establish adverse employment action because employer reversed her

demotion after three months and awarded her back pay); *Fair v. Norris*, 480 F.3d 865,

870 (8th Cir. 2007) (plaintiff could not establish adverse employment action because

employer later offered her the promotion that it had initially denied).

Banford's claim for wrongful non-renewal of her hockey position fails for

different reasons.  First, Banford has failed to establish a prima facie case, as the

circumstances of her non-renewal do not support an inference of discrimination on the

basis of sex or sexual orientation.  And second, even if Banford had established a prima

facie case, she cannot prove that UMD's asserted reason for not renewing her hockey

position is pretextual.

---

[9](...continued)
loss of the hockey augmentation.  Even if such a claim were properly before the Court,
it would fail for the same reason that her claim regarding the hockey position fails:
Banford has insufficient evidence that UMD was motivated by her sex or sexual
orientation when it non-renewed her hockey position, which was the reason for the
reduction in salary.  *See Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016) (to prevail on a
constructive-discharge claim, "[a] plaintiff must prove first that he was *discriminated
against by his employer* to the point where a reasonable person in his position would have
felt compelled to resign" (emphasis added)).  In other words, if UMD acted lawfully in
not renewing Banford's hockey position, it could not possibly have constructively
discharged her from her softball position when it offered to renew her contract and to
pay her more for her softball duties than it had paid her for her softball duties under the
previous contract.

As to the inference of discrimination:  Miller had a staff of six; all of them were gay women, and Berlo knew that at least five of the six were gay.[10]  ECF No. 365 at 290, 307; ECF No. 739 ¶¶ 4–5; ECF No. 308 ¶ 1; ECF No. 743 ¶ 3.  At the time that UMD non-renewed Miller, UMD also non-renewed Banford (her director of hockey operations) and her two assistant coaches.  UMD retained the other three members of Miller's staff, at least two of whom Berlo knew to be gay.  It is difficult to find an inference of discrimination when UMD retained three gay women on Miller's staff (knowing that at least two were gay) and did not retain three other gay women on her staff.

The most common way that a plaintiff in Banford's position establishes an inference of discrimination is by pointing to one or more "comparators"—that is, one or more similarly situated employees outside of the protected class who were treated better than the plaintiff.  *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).  For example, in denying UMD's motion for summary judgment on Miller's discrimination claim, this Court found that Miller had established an inference of discrimination through evidence that Scott Sandelin, the head coach of the men's

---

[10]There is no dispute that Berlo knew that the three non-retained staffers were gay.  Of the remaining three women, Miller attests that one was openly gay and the other two were not.  ECF No. 739 ¶¶ 6–7.  Berlo, for his part, attests that he knew that two of those three women (including the openly gay woman) were gay; he does not say anything about the third.  ECF No. 743 ¶ 3.  (It seems likely that Berlo's declaration was intended to say that he knew that the two non-openly-gay women were gay, as that is how it is presented in the briefs, *see* ECF No. 741 at 2 n.1, but his declaration does not so state.)

hockey team at UMD, "had his contract renewed despite comparable (or arguably worse) performance" and evidence that "[i]n deciding to renew Sandelin's contract, UMD applied different criteria than it applied in deciding not to renew Miller's contract."  ECF No. 501 at 9.

Banford points to the three members of Miller's staff who were retained as comparators.  Those staffers are not valid comparators, however, as they were not "'similarly situated [to Banford] in all relevant respects.'"  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005)).  The three retained staffers "had different immediate supervisors from [Banford]," *id.*, and, as described below, Banford's duties differed in material respects from the duties of the three retained staffers.  More importantly, to be a valid comparator, a retained staffer would have to be "outside of [Banford's] protected group."  *Id.*  Banford claims discrimination on the basis of sex and sexual orientation, but the three staffers share both of those protected traits (and Berlo knew that at least two were gay).

It appears to the Court that the closest thing to a valid comparator in the record is Bob Rients, the male coach of the men's baseball team.  But whereas UMD treated Miller *worse* than her counterpart (Sandelin), UMD treated Banford *better* than her counterpart (Rients).  Specifically, the base salary that UMD offered to Banford for the

-19-

softball-only position was actually higher than the base salary paid to Rients. ECF No. 91 at 166. Both the fact that UMD tried to retain Banford—and the fact that UMD offered her a higher base salary than her closest comparator—are inconsistent with an inference that UMD was being motivated by Banford's sex or sexual orientation in deciding not to renew her hockey position.

As to pretext: Even if Banford could establish a prima facie case, the Court would nevertheless dismiss her discrimination claim because UMD has articulated a legitimate, non-discriminatory reason for non-renewing Banford's hockey position, and Banford does not have sufficient evidence to allow a jury to find that UMD's explanation is pretextual.

UMD explains that it non-renewed Banford and the two assistant coaches so that Miller's replacement would be able to hire her own senior staff. On its face, there is nothing suspicious about UMD's explanation. As even a casual sports fan knows—and as even a non-sports fan can learn by spending a few minutes on the Internet—it is not uncommon for at least some of the senior members of a head coach's staff to be fired when the head coach is fired, so that the new head coach will have the opportunity to choose his or her own senior staff. Even Miller acknowledged in her deposition (referring to assistant coaches) that "no head coach maybe wants to be dictated who's on their staff . . . ." ECF No. 357 at 22.

-20-

In denying UMD's motion for summary judgment on Miller's discrimination claim, the Court held that a jury could find that UMD's proffered reason for non-renewing Miller—Miller was being paid a lot of money, and yet her team was performing poorly—was pretextual because of the evidence regarding Sandelin and because "[t]he administrators involved in the decision not to renew Miller's contract offered inconsistent explanations for their decision, first claiming that the non-renewal was based solely on financial considerations and only later attempting to justify the non-renewal on the basis of Miller's performance."  ECF No. 501 at 9.  Here, by contrast, Banford was treated *better* than her closest comparator (the coach of the men's baseball team), and UMD's explanation for its decision to non-renew Banford has been consistent throughout.  *See* ECF No. 93 at 2–3; ECF No. 89 at 89, 96; ECF No. 379 at 31–32; ECF No. 137 at 5; ECF No. 147 at 67; ECF No. 369 at 96.  For example, in a December 11, 2014 telephone call that Miller recorded without Berlo's knowledge, Miller asked Berlo why Banford would not be retained as director of operations, and Berlo responded, "Because the supervisor potentially is changing and anytime that's the case . . . you know, it would be up to whomever comes in if they want that arrangement or not."  ECF No. 93 at 3.

Banford nevertheless contends that UMD's reason is pretextual.  Although Banford does not contest that it is common for *some* staff members of *some* head coaches

to be fired when the coach is fired, she argues that (1) it is not a common practice to discharge a director of operations when the head coach is fired; (2) her hockey position more closely resembled that of the three members of the hockey staff who were retained than the two members of the hockey staff were not retained; and (3) all of the employees targeted for non-renewal in the fall of 2014 were openly gay women.  These circumstances are insufficient to show pretext.

The most obvious fact undercutting Banford's attempt to show pretext is that, regardless if she had more in common with the two assistant coaches who were not renewed or the three staff members who were renewed, all of them were gay women. ECF No. 365 at 289–90, 307.  In other words, UMD renewed some gay women and did not renew other gay women; something other than the fact that the non-renewed staff were gay women must have been driving UMD's decision.  Banford contends that only one of the three staff members who were retained was *openly* gay (like her, and like the assistant coaches).  But as noted, Berlo knew that at least five of Miller's six staff members were gay at the time that he made the decisions about which staff members would not be renewed.[11]  Again, Banford is complaining that she was treated more

_____

[11]At oral argument, plaintiffs contended that Berlo testified at his deposition that he did not know that the retained staff members were gay and that he claimed during an internal UMD investigation (which plaintiffs misidentified as an EEOC investigation) that he did not know that Banford was gay, thus calling his credibility into question. Plaintiffs did not cite anything in support of these contentions and, having reviewed the
(continued...)

harshly than *other gay women*.  Even if Banford is correct that UMD's stated

justification—that it wanted to allow the new head coach to hire her own senior

staff—does not adequately explain the difference in treatment between Banford and the

other staffers, the fact that they are all gay women and that Berlo knew that at least five

of them were gay is inconsistent with an inference of discrimination.

Setting that aside, while Banford's position might have been distinguishable

from the positions of the two assistant coaches who were not retained, Banford's

position was also distinguishable from the positions of the three staff members who

were retained.  Banford and Miller both claim that Banford did not "report" to Miller,

ECF No. 365 at 147–48, ECF No. 739 ¶ 13, even though the formal job description

provides that the director of operations *does* report to the head coach.[12]  ECF No. 94

at 35.  Banford admitted, however, that with respect to her job as director of hockey

operations, Miller directed Banford's activities and assigned her "roles and

responsibilities."  ECF No. 365 at 147–48; *see also* ECF No. 735 at 37 (admitting that

Banford "reported to Miller" about her hockey-related assignments and

---

[11](...continued)
report of the investigation and Berlo's deposition testimony, *see* ECF Nos. 137, 379, the
Court could not locate any evidence to support plaintiff's assertions.

[12]In her briefing, Banford contends that this job description only applies to full-
time operations directors.  ECF No. 735 at 36.  Banford does not point to any language
or other indication in the description that limits its application to full-time employees,
however.

responsibilities).  The descriptions of Banford's position in the record also show that her

work was broader in scope than the work of the three retained staff members.  ECF

No. 89 at 9–11; ECF No. 94 at 35–36.  The three retained staff members—none of whom

reported to Miller[13]—served as an assistant trainer, an assistant trainer/equipment

manager, and a part-time sports information director.  Banford's role clearly differed

from the narrow roles of the three retained hockey staffers whom she cites as

comparators.  ECF No. 92 at 10, 14–15, 35; ECF No. 385 at 30–33.

Banford also offers evidence that discharging the director of operations when the

head coach departs is not a common practice.  She further contends that the practice of

terminating a fired head coach's senior staff is limited to full-time staff at Division I

schools who report directly to the head coach.  Hockey is a Division I sport at UMD,

however, ECF No. 739 ¶ 9, and as discussed above, Miller directed Banford's work as

the director of operations (whether or not Banford technically reported to her).  More

importantly, the dispute over the frequency and scope of terminating the senior staff of

a fired head coach is tangential.  The relevant question is whether Banford can prove

that UMD's stated reason for her partial non-renewal is a pretext for discrimination.

---

[13]At her deposition, Banford testified that two of the three staffers reported to
Miller and another individual.  ECF No. 365 at 287–89.  In the declaration she submitted
in opposition to UMD's renewed motion for summary judgment, however, she attests
that none of the three reported to Miller, ECF No. 737 ¶¶ 10–12, and her briefing relies
on this version of events, ECF No. 735 at 19–20.

The record is clear that (1) UMD consistently cited the desire to allow Miller's replacement as head hockey coach to hire her own director of operations as the basis for Banford's non-renewal, even in a secretly recorded private conversation; (2) UMD had an objective basis for wanting the incoming coach to have the opportunity to hire her own director of operations, as the director worked closely with the head coach, the head coach directed the director's work, and the job description for the director's position provided that she reported to the head coach; (3) UMD always intended to, and did, offer Banford a new softball contract; and (4) under that new softball contract, Banford's base salary would exceed the base salary of her closest comparator (the male coach of the baseball team). Under these circumstances, the dispute over the prevalence of the practice of non-renewing a director of operations when a head coach departs is insufficient to show pretext.

Finally, Banford points to the fact that all six women whom UMD was *considering* non-renewing in the fall of 2014 were openly gay.[14] Of these six women, however, five (including Miller) were members of the women's hockey program, which was

_____

[14]Banford points out that Finnerty first asked Kinnear about Banford's and Wiles's contracts, and only later asked about the assistant hockey coaches' contracts. These requests were all fairly close in time, however, ECF No. 405 at 46, and the fact that Finnerty asked about Banford before the assistant coaches is therefore insufficient to show pretext. This is particularly true in light of the fact that Banford's situation was more complex—as UMD wanted to renew the softball part of her contract but not the hockey part—and Finnerty accordingly needed more guidance from human resources.

undergoing a major change because the head coach was being fired.  Given that the women's hockey staff consisted entirely of gay women (most of whom were openly gay), the fact that UMD considered non-renewing multiple openly gay women does little to show pretext.

The sixth person was Wiles, who, as noted in the Court's earlier summary-judgment order, had been harshly criticized by her players during a spring 2014 student survey and spring 2014 student exit interviews.  ECF No. 96; ECF No. 92 at 5, 47; ECF No. 387 at 116–18, 134–36.  And yet—despite having ample justification for non-renewing Wiles, an openly gay woman—UMD ultimately chose to *retain* her.  UMD also chose to retain Banford as the softball coach (despite the fact that she was openly gay) and one of the other openly gay hockey staffers under consideration.

For all of these reasons, a reasonable jury could not find that Banford lost her hockey position because she was a gay woman.  The Court therefore grants UMD's motion for summary judgment on Banford's claim for discriminatory non-renewal.

### b. *Constructive Discharge*

Banford says that she is also pursuing a constructive-discharge claim, ECF No. 735 at 2, but her brief does not explicitly address such a claim.  In any event, any claim that Banford was constructively discharged from her hockey position as the result of a hostile environment is without merit.  To prevail on a such a claim, a plaintiff

"must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). This is a more demanding standard than the standard applied to hostile-environment claims. *See id.*; *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 954 (8th Cir. 2011). As Banford has failed to offer sufficient proof of a hostile environment, she necessarily has failed to offer sufficient proof of constructive discharge. *Wilkie*, 638 F.3d at 954.

### 2. Wiles

To support her constructive-discharge claim, Wiles relies on much the same conduct as she cites in support of her hostile-environment claim. As that conduct is insufficient to establish a hostile-environment claim, it is necessarily insufficient to establish a constructive-discharge claim. *Id.*; *see also Horn v. Univ. of Minn.*, 362 F.3d 1042, 1047 (8th Cir. 2004) (feeling unfairly criticized is insufficient to establish constructive discharge).

In addition to the conduct underlying her hostile-environment claim, Wiles also points to UMD's failure to offer her a new contract, contending that this failure caused her anxiety, and that her anxiety caused her to quit. The Court does not doubt that UMD's decision not to offer Wiles a contract caused her a great deal of anxiety, especially in light of the harsh criticism that she had received from her players. But such a situation cannot be characterized as "so intolerable that a reasonable person

would have felt compelled to resign." *Suders*, 542 U.S. at 147.  This is particularly true given that Wiles was entitled to six months' written notice of non-renewal, which she had not received.  ECF No. 189 at 42–45.  As a result, Wiles's contract had been extended, and she was not in danger of imminently losing her job.  ECF No. 207 at 2; *cf. Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 769–70 (8th Cir. 2014) (even if the Eighth Circuit were to adopt the theory that causing an employee to believe she will be fired is a constructive discharge, that theory requires the employee to "show that if she had not resigned, then she would have been immediately fired").  The Court therefore grants UMD's motion for summary judgment as to this claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.   UMD's motion for summary judgment [ECF No. 731] is GRANTED.

2.   The remaining claims of plaintiffs Jen Banford and Annette Wiles are

DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 22, 2021                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge

-28-